## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| PC CONNECTION, INC d/b/a CONNECTION<br><br>Plaintiff<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **Civil Action No. _____**<br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Plaintiff PC Connection, Inc. d/b/a Connection ("Connection" or the "Company"), brings this Complaint against International Business Machines Corporation ("IBM" or "Defendant").

## <u>INTRODUCTION</u>

1.      This action arises from a failed project undertaken by IBM to implement a new enterprise resource planning ("ERP") system for Connection.  The ERP system serves as the nerve center for Connection's operations by allowing for the integration of business functions by the Company and its three subsidiaries.  IBM induced Connection to hire IBM in 2017 to design, develop, and implement a new ERP system, by making deliberate misrepresentations concerning IBM's prior assessment of the project cost and duration, the suitability of the new system to meet Connection's needs, and IBM's capability and willingness to complete the project to the specifications warranted by IBM.  Once it obtained Connection's business and trust, IBM breached its obligations under the parties' contract to design, develop, test, and implement the new ERP system.  In May 2020, after the implementation had taken twice as long as, and cost millions of dollars more than, IBM had represented, IBM directed Connection to proceed with a

premature and disastrous "go-live," or cut-over, to the new ERP system.  Upon go-live, and in the months that followed, core components of the ERP system failed, as IBM knew or should have known would occur.  IBM then failed to repair the defects and complete its work, and left Connection with an ERP system incapable of meeting many of the Company's business requirements.

2.      Connection is a national provider of a wide range of information technology solutions.  For over 20 years, Connection has utilized a customized ERP system to conduct its business, which entails the sale of more than 425,000 IT products through the company's three primary subsidiaries.

3.      Starting in or about 2013, IBM – which had a preexisting, ongoing relationship with Connection as a consultant and vendor of IT hardware and software – began advising Connection with respect to the Company's options for upgrading to a new ERP system.  Connection's then-existing platform, installed in 1998, was a platform developed by J.D. Edwards ("JDE") known as "JDE World."

4.      Connection's business model and success is built on a 40-year history of providing exceptional customer service.  Accordingly, Connection emphasized to IBM that the new ERP system had to maintain the mission-critical functionality of JDE World, and that the implementation to a new system had to be completed without disrupting Connection's operations and its ability to service customers.

5.       IBM recommended that Connection upgrade to a newer JDE platform called "EnterpriseOne" ("E1"), which IBM alleged would be "faster and less costly to implement" than other systems.

6.      Using a playbook that has resulted in IBM being named in a slew of lawsuits over

alleged misrepresentations made in connection with failed ERP implementations, IBM sold itself

to Connection by holding itself out as a leading expert in managing similar, global projects

concerning the implementation of new JDE systems.  IBM claimed to have extensive experience

both in helping companies like Connection to assess their business needs and select an ERP

system to meet those needs, and in successfully implementing JDE upgrades.

7.     Connection relied on IBM's factual representations, and in August 2016, the

Company contracted with IBM to conduct a discovery assessment ("Discovery Assessment"),

during which IBM would evaluate the Company's business in order to develop a project plan

that addressed, among other things, the design, cost, and time required for IBM to implement E1.

During the Discovery Assessment, IBM was granted full access to Connection's business units in

order to determine how Connection used JDE World, and identify the functionality that would be

required of E1.

8.     IBM billed Connection over $600,000 to conduct the Discovery Assessment.

Following the Assessment, IBM represented to Connection that IBM had thoroughly analyzed,

and understood, the Company's requirements for its ERP system, and had determined that a

"vanilla" upgrade that leveraged "out of the box" E1 software was suitable for Connection.  IBM

further represented that it had determined, through its investigation, that the E1 platform would

not require extensive customizations to provide the functionality offered by JDE World, and that

IBM therefore had determined it could complete the implementation project within 17 months at

a cost of $9.2 million.

9.     IBM knew or should have known that these representations were false.  Through

the Discovery Assessment, and its work with Connection before then, IBM knew that the

complexities of Connection's business required extensive configuration and high customization

3

of the ERP system, such that the standard E1 software would not meet Connection's business requirements without extensive customization. During the Discovery Assessment, Connection employees had repeatedly and explicitly informed IBM that they relied on heavily customized features of JDE World in order to conduct business with the Company's partners.

10.    IBM also knew the E1 system could not be implemented in 17 months for $9.2 million. However, to induce Connection to engage IBM to go forward with the implementation, IBM did not disclose to Connection that it had misstated the anticipated cost and duration of the project.

11.    On August 7, 2017, IBM presented Connection with a statement of work (the "2017 SOW") for the JDE upgrade project (the "Project"). In the 2017 SOW, IBM recounted its prior misrepresentations concerning its assessment of Connection's needs, the suitability of "vanilla" E1 to meet those needs without extensive customization, and IBM's readiness and willingness to implement the upgrade in 17 months at a cost of $9.2 million.

12.    In executing the 2017 SOW, Connection relied on IBM's written and oral representations concerning its assessment of Connection's needs, its expertise in recommending a suitable upgrade solution for similarly situated companies, its expertise and experience in managing similar projects, and its determination that E1 was the "best fit" for Connection.

13.    After work began under the 2017 SOW, IBM failed to competently design, develop, and test the implementation of E1, or to fulfill its contractual obligations to manage the Project.

14.    Whereas IBM had represented that its "greatest strengths" included its consultants' depth of experience in JDE upgrades, a substantial number of the IBM consultants assigned to the Project were revealed to have little or no experience with E1.

15.     As IBM knew from the Discovery Assessment (but did not disclose to Connection), E1 had to be extensively customized to meet Connection's business needs.  As a result, the Project was not completed in the 17 month timeframe represented by IBM.  However, IBM's leadership team, specifically Sandeep Singh and William Cahill, insisted that the Project was on track, and they gave Connection no reason to believe that the Project would not be completed successfully.

16.     In May 2020 IBM represented to Connection that the system was ready for go-live, when IBM knew or should have known that the E1 implementation was not close to completion.  IBM's lead consultants, Bill Cahill and Marc Bjarnson, repeatedly told Connection's CEO and other executives that the Company's greatest weakness was its fear of risk, that it had to "rip off the band-aide" and go-live, and that any remaining issues with the E1 system could easily be resolved post go-live through simple "workarounds."

17.     Hours after the go-live process began on May 15, 2020, critical components of the E1 system within IBM's responsibility did not function properly or at all.  Whereas IBM had represented to Connection that a "roll-back plan" – meaning a plan to revert to JDE World – would be available if problems arose during the transition, IBM did not deliver such a plan. Therefore, as system defects emerged, Connection could not revert to World.

18.     In the weeks and months after go-live, defects and deficiencies with the E1 platform continued to emerge, resulting in business and operational disruptions throughout the company.  Despite its prior representations that post go-live problems could be resolved through simple "workarounds," IBM failed to correct the deficiencies in the E1 system.  Connection was forced to spend millions of dollars to remediate system defects and complete the E1 implementation.

19.     As a result of IBM's fraud, breach of contract, and other misconduct, Connection was left with an ERP system that was defectively designed, deficiently installed, improperly tested, and incapable of operating many of Connection's core business processes.

## PARTIES

20.     Connection is a corporation organized under the laws of the state of Maryland, with a principal place of business at 730 Milford Road, Merrimack, New Hampshire, 03054.

21.     IBM is, upon information and belief, a New York corporation with its principal place of business of 1 New Orchard Road, Armonk, New York, 10504-1722.  IBM is engaged in the business of, among other things, providing computer hardware and software consulting and implementation services.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332(a) because Connection alleges damages in excess of $75,000 and the parties are citizens of different states.  For purposes of diversity jurisdiction, Connection is a citizen of New Hampshire and Maryland, and IBM is a citizen of New York.

23.     IBM is subject to *in personam* jurisdiction in New Hampshire, as a substantial part of the events, representations, and/or omissions giving rise to the claims occurred within New Hampshire.

24.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

A.     **Connection's Business**

25.     Connection is a publicly traded company that supplies specialized IT products and

services.  Connection partners with over 1,600 suppliers to offer more than 425,000 products. The Company leverages its state-of-the art logistic capabilities to ship product to customers the same day the order is received.

26.     Connection has three operating subsidiaries, each serving distinct customers: (a) the PC Connection Sales subsidiary, which serves small- to medium-sized businesses; (b) the MoreDirect subsidiary, which serves large enterprise customers; and (c) the GovConnection subsidiary, which serves federal, state, and local government and educational institutions.

27.     Sales by each subsidiary are generated through outbound telemarketing and field sales contacts by sales representatives, through Connection websites, and through direct responses from customers responding to advertising media.

28.     Connection relies on its ERP system to coordinate and manage the critical business processes and functions of the Company and its subsidiaries, to include customer purchasing; billing; order fulfillment; financial accounting; inventory tracking; warehouse management; compensation; and payment/credit card processing.

**B.      2016 IBM Contract to Conduct Discovery Assessment**

29.     Connection's first ERP platform, installed in 1998, was a JDE system known as "JDE World."  JDE subsequently was acquired by Oracle, which continued to support legacy JDE systems while also releasing new software systems, including E1.

30.     In or about 2013, IBM began advising Connection with respect to options for upgrading to a new ERP software system.  At that time, IBM had, for several years, served as a consultant to Connection, and a relationship of trust and confidence existed between Connection and IBM.

31.     IBM represented to Connection that IBM was expert in managing the implementation of JDE systems and had extensive experience and skill in helping companies like Connection to assess their business needs and select ERP systems to meet those needs.

32.     Connection informed IBM that the Company's JDE World system had been heavily customized to adapt to Connection's business model, and that the Company needed a flexible solution that retained the functionality provided by the World system.  IBM expressly acknowledged that Connection was relying on IBM to determine the ERP system that would be the "best fit" for Connection's business.

33.     IBM recommended that Connection upgrade to a newer Oracle/JDE platform called "EnterpriseOne ("E1"). IBM explained the basis for this recommendation in a PowerPoint presentation to Connection in or about July 2013.  IBM acknowledged Connection was "looking for IBM" to determine the ERP system that would be the "best fit" for the Company.  IBM alleged that E1 met all of Connection's "core functional and technical requirements"; shared "many common traits" with and had the same "look and feel" as JDE World, such that the Company's "current knowledge will translate to" E1; and would be "faster and less costly to implement" than other systems.

34.     In the PowerPoint presentation, IBM also promoted itself as "the right partner" to lead the implementation, alleging it had a "World Class JDE Practice"; was "a Tier 1 provide[r] with demonstrated results in transformation programs"; provided "Thought Leadership in Global Design"; was the "Analyst Pick"; and provided "Strong Project Management and Governance."

35.      In August 2016, IBM presented Connection with a contract (the "2016 Contract") for IBM to conduct the Discovery Assessment, the purpose of which was for IBM to meet with Connection employees throughout the Company's departments and business units in order to

assess their use of JDE World, to determine whether E1 would be a suitable platform for Connection, and to determine the projected time and cost to implement E1.

36.     Under the 2016 Contract, IBM was responsible for identifying, among other matters, the scope of the implementation project, the estimated project cost, and a project timeline from design through implementation.  IBM was required, among other things, to conduct workshops with the Company's various departments in order to understand how Connection used JDE World and identify the needed features and functionality of the new system.

37.     IBM was granted full access to Connection's existing JDE World system, and other resources, so that it could perform its obligations under the 2016 Contract.  Connection employees met with IBM for hundreds of hours to address the details of the Company's core business processes.

38.     During the Discovery Assessment, Connection repeatedly informed IBM that the implementation must: (a) be accomplished without disrupting existing operations; (b) preserve the functionality of the JDE World system; and (c) be completed at a reasonable cost.  IBM repeatedly represented to Connection that IBM understood and could achieve these objectives.

39.     Ultimately, IBM billed Connection over $600,000 to perform the Discovery Assessment.  At the conclusion of the Assessment, in 2017, IBM represented to Connection that: IBM had thoroughly assessed Connection's business model and needs; IBM had determined that standard, "out of the box" E1 software, with only minimal modifications, would be suitable for Connection; IBM was committed to, and was fully qualified to perform, the implementation; and IBM had determined it could complete the Project in 17 months at a cost of $9.2 million.

40.     IBM knew or should have known these representations were false.  More

specifically, IBM knew or should have known, given the complexity of Connection's business, that the standard or "vanilla" E1 software would have to undergo extensive customizations in order to provide the necessary functionality to operate Connection's business, and that it would be impossible to complete the Project in 17 months, for $9.2 million.

41.     IBM made these misrepresentations concerning the Project scope and cost in bad faith, for the purpose of inducing Connection to engage IBM to perform the implementation.

42.     At the time it made these representations, IBM knew Connection was relying on IBM's purported skill and expertise with respect to the implementation of a new ERP system.

**C.     IBM's 2017 SOW For the E1 Implementation**

43.     On August 7, 2017, IBM presented Connection with the 2017 SOW for IBM to design, develop, and implement the transformation from JDE World to E1.

44.     The SOW provided that the work on the Project would be performed at Connection's facilities in Merrimack, New Hampshire.

**1.     IBM's Representations in the 2017 SOW**

45.     In the 2017 SOW, IBM reiterated many of the representations that it had made to induce Connection to engage IBM.  For example, IBM represented it had determined – based on its prior experience and information gained under the 2016 Contract – that it could "leverage the standard, 'out of the box' functionality" offered by "base" or "vanilla" E1 software.  This, according to IBM, would reduce the number of customizations and enhancements, such that "***barring any changes or unforeseen issues***," IBM would complete the project in 17 months, at a cost of $9.2 million.  IBM also represented that only 15 technical modifications to "out of the box" E1 would be required to provide the functionality of JDE World.

46.     While claiming a "vanilla" upgrade approach would work, IBM explicitly

acknowledged in the 2017 SOW, that IBM understood Connection's principal objectives and requirements for the Project.  For example, IBM acknowledged that Connection required the Project be performed in such a manner to: (a) "[m]inimize potential disruption" to Connection's existing operations and customer relationships, by protecting the Company's ability to "receive orders and ship product," "manage the supplier relationships," "manage rebates," and "invoice customers and collect cash," and (b) "[a]chieve a scalable [ERP] platform for growth" that "[p]reserves key functionality" of the existing system, and "[e]xpands the use of the JDE system across all Connection businesses."

47.    When IBM presented Connection with the 2017 SOW, IBM knew or should have known it could not meet these requirements.

**2.    IBM's Scope of Work**

48.    Under the 2017 SOW, IBM had overarching responsibility for the project design, management, and implementation.  For example, in an introductory, "Overview" section of the SOW, IBM acknowledged its scope of work included overall responsibility for:

- Providing "necessary and appropriate resources for project management and project execution";

- Designing "work flows, reports, interfaces, customizations, and forms";

- Leading "the testing of the upgraded system"; and

- Developing a "Production cut-over plan."

49.    Likewise, later in the 2017 SOW, IBM further enumerated core project components that were within its scope, including:

- Configuring the system to enable the transaction processes supported by E1;

- The development and testing of system enhancements and extensions;

11

- Supporting the integration of third-party applications into E1;

- Developing a cutover/rollout strategy;

- Identifying gaps between the functionality of JDE World and E1;

- Developing the project design plan;

- Building the architecture for reports, interfaces, conversions, and enhancements;

- Developing an application test plan, integration test plan, and system performance test plan;

- Leading data migration cutover;

- Conducting technical and functional unit testing;

- Monitoring open issues and "bug log," and "drive resolution of all critical issues/bugs;"

- Preparing Cutover Plan documents;

- Preparing entry criteria for system testing and Go Live Readiness Document for final production cutover;

- Preparing go-live criteria; and

- Performing a minimum of two cutover trial runs.

50.     Appendix A to the 2017 SOW enumerates certain deliverables that were required of IBM.  These listed deliverables – which include delivery of weekly status reports, a project plan, a project management and governance framework, a design phase checkpoint, a weekly issue and defect resolution log, a RICE (reports, interfaces, conversions, and enhancements) technical scorecard, a data conversion strategy and approach, a system integration test plan – reflect IBM's overarching responsibility for all critical aspects of the project.  The deliverables were meant to ensure that IBM properly managed the project and informed Connection of

problems and issues that could affect the project schedule, cost, and implementation.

51.     Ultimately, IBM failed to properly manage the Project, and upon information and belief abdicated its responsibility to maintain many of these more critical reports, included weekly status reports and a weekly issue and defect resolution log.

### 3.     IBM's Express Warranties

52.     In the 2017 SOW, IBM made express warranties concerning its knowledge and understanding of Connection's needs, IBM's ability to perform its obligations under the contract, and the quality of IBM's deliverables and work product.

53.     First, IBM warranted that it:

(a)     "had sufficient opportunity to analyze Connection's needs and requirements" in order to "determine the personnel and material resources" that IBM needed to provide to perform under the SOW with respect to the Services and Deliverables";

(b)     was capable of "providing the Services and Deliverables" and "performing all of its obligations under this SOW";

(c)     understood the "nature, location, and scope of services to be performed"; and

(d)     "received answers to any questions that it has presented to Connection regarding Connection's needs and requirements."

54.     Second, IBM warranted that its services, deliverables and work product "shall" be prepared and provided:

(a)     "in a timely, professional, workperson-like manner"

(b)     "by competent and skilled personnel who, when first assigned by IBM to

13

perform Services [under the SOW] shall be appropriately qualified and

experienced for the performance of Services to which assigned"; and

(c)     "in accordance with this SOW … and in accordance with the professional

practices and standards adhered to by large internationally recognized

providers of IT consulting services."

55.     Third, IBM warranted that its deliverables and work product, and the results of

services provided by IBM, "shall":

(a)     "be free of material or frequent errors or defects";

(b)     "conform to the applicable specifications and other requirements under

this SOW"; and

(c)     "perform in accordance with the applicable documentation."

56.     The 2017 SOW requires IBM to indemnify Connection "from and against any and

all actual or threatened losses, liabilities, damages, and claims, and all related costs and expenses

(including reasonable attorney's fees) arising from" any "breach by IBM of this Agreement."

**D.     IBM's Work Under the 2017 SOW**

57.     Work on the Project began in October 2017.  Soon after, in early 2018, IBM

removed Doug Willis as the Senior Project Manager and lead on the Project.  Willis's

background and experience in JDE upgrades were key factors in Connection's decision to

engage IBM on the Project.  After Willis departed, IBM did not replace him with a project lead

with comparable experience.  Upon information and belief, employees that IBM assigned to the

Project over the next three years had little to no experience with E1.

58.     Whereas IBM had repeatedly represented to Connection – both before entering

into the 2017 SOW, and in the 2017 SOW itself – that a "vanilla" E1 upgrade with few

customizations would suit Connection's specific needs, the platform instead required extensive customizations, as IBM knew or should have known before entering into the contract.

59.     For example, in the 2017 SOW, IBM represented that only 15 technical modifications to "out of the box" E1 would be required to provide the base-level functionality of JDE World.  Ultimately, over 90 customizations had to be implemented, and the system still did not provide the functionality that IBM knew Connection required.

60.     At the completion date identified in the 2017 SOW (January 2019), the Project was not finished.  IBM extended the completion date through project change requests ("PCRs") that added millions of dollars to the contract cost.  But IBM did not disclose that it was unable or unwilling to complete the Project as represented.

61.      Instead, IBM continued to represent to Connection that the Project was on course and would be successful.  IBM did so to induce Connection to pay IBM's fees, to conceal IBM's prior misrepresentations concerning E1, and to conceal IBM's failure to comply with its obligations under the 2017 SOW.

**F.     IBM Pushed Connection Into a Failed Go Live**

62.     Under the 2017 SOW, IBM had primary responsibility for the testing and planning necessary to ensure the go-live was accomplished successfully.  Among other things, IBM was responsible for preparing a "Go Live Readiness Assessment Document" that would measure the readiness of the various components of the E1 system to go-live.  IBM also was responsible for preparing a "Cutover Plan," and for performing at least two cut-over trial runs.

63.     Approximately a year before the go-live ultimately occurred (in May 2020), members of the IBM Project Team, including Bill Cahill, represented to Connection's CEO, Tim McGrath, and others at the Company, that the E1 platform was "fundamentally ready," and they

15

advised that the Company should proceed to go-live.  Connection, through Mr. McGrath and others, asked the IBM Project Team for testing data to confirm that the system was ready to go-live.  In response, IBM assembled a "Business Excellence Team" to confirm whether the E1 system was ready to go-live.

64.    Thereafter, IBM, through Cahill, Marc Bjarnson, and others, continued to represent to Connection that the E1 system was ready and that the Company should proceed to go-live.  Cahill alleged that Connection was "too conservative" in its approach to the conversion, that the Company suffered from "change management issues," and that to the extent the E1 system had issues remaining to be resolved, those issues would be resolved post go-live through "simple workarounds."

65.    When Connection requested confirmation that all critical company processes were ready for the upgrade, IBM pointed to its Go-Live Readiness Assessment that purported to demonstrate that Connection was "97% prepared," and that there was "minimal" risk in proceeding.

66.    In fact, IBM knew, or should have known, that the E1 system was not ready on the go-live date, but concealed that fact from Connection and warranted that the system was ready to go live.  Connection relied on IBM's representations that E1 was ready, and agreed to proceed to go-live.

67.    Ultimately, the conversion from JDE World to E1 began on May 15, 2020.  Within hours after the conversion began, it was revealed that components of the E1 system were defective or not ready.  As a result, on May 16, 2020, Connection directed IBM to abort the conversion and revert to JDE World until problems with the E1 platform could be resolved.  Even though members of IBM's Project Team, including Bill Cahill and Marc Bjarnson, had

assured Connection that a roll-back plan was in place, this was not true.  Therefore, as system defects emerged, Connection could not revert to World

**G.     IBM's Failure to Repair Defects and Deliver a Working System**

68.     Following the cut-over, IBM initially assured Connection that the Company was experiencing only typical "glitches" – i.e., normal interruptions that would quickly be resolved.  This was not true.  In the days, weeks, and months after go-live, severe defects and deficiencies with the E1 system continued to emerge.  Components of the system failed to function properly of did not function at all, resulting in business and operational disruptions throughout the Company.

69.     The post-go-live system failures included but were not limited to the following:

- Unable to accept EDI orders from customers
- Unable to invoice customers accurately through email, print, or EDI
- Unable to order product from distribution partners
- Unable to receive invoices from distribution partners
- Unable to update catalog information (e.g. pricing, availability, and product descriptions)
- Orders manually entered in E1 were being held up by superfluous hold processes implemented in the system
- Unable to process credit card transactions
- Unable to calculate freight accurately
- Unable to invoice for cloud software licenses
- Unable to efficiently configure custom orders
- Unable to accurately invoice for technical services
- Unable to accurately track physical inventory
- Unable to perform financial reconciliation of inventory without manual inventory counts
- Unable to accurately perform accounts receivable reconciliation

- Unable to maintain accurate inventory of intake of bill & hold materials, resulting in loss of customer owned inventory
- Inaccurate AR data integration
- Unable to register Apple products for AppleCare
- Inefficiency issues within the sales intake process
- Freight costs were not calculated properly
- Serial numbers were not captured
- Tracking information were not captured
- Integration from E1 to Traxx (Connection Enterprise Services Group) did not function requiring manual intervention for all service billings.
- Intercompany transactions were not functioning
- Unsettled credit card orders were showing in the sales ledger history
- Shipment notifications did not have basic information such as quantity, extended price, and tracking information applied
- Freight charges were not accurately shown on invoices
- Tax charged to customers who are tax exempt
- Invoices for CSP orders were not able to be generated automatically
- Services invoices were not emailed properly even though the customer's profile was setup properly
- Invoice delays for contracted services
- Orders were shipped even though credit card settlement transactions was declined

70.    When it was obvious the E1 problems could not be dismissed as mere "glitches," IBM promised Connection that it would devote whatever resources were necessary to fix the system and complete the implementation.  Specifically, IBM said it would dispatch a so-called "Red Team" comprised of IBM's most skilled technicians.  The "Red Team" never appeared. Instead, IBM assigned the same individuals who had worked on the project, ineffectively, before go-live.  IBM shifted most of the burden of undertaking the repairs onto Connection; work that IBM did undertake was assigned to off-shore consultants.

71.     In the year after go-live, IBM billed Connection approximately $3 million in additional fees, but still did not correct the system defects and complete the project.

72.     Because IBM would not, or could not, resolve the E1 problems, Connection was forced to divert internal resources to the matter.  Since go-live, Connection personnel have spent a total of 80,758 hours specifically on correcting E1 deficiencies.  The Company also was forced to engage other outside experts to replace IBM, including Keste, an expert in JDE applications.

73.     The system failures necessitated months of investigation, which ultimately revealed defects and deficiencies in much of IBM's work.  The post go-live investigation also exposed the lack of validity of the results of IBM's Go Live Readiness Assessment.  Rather than weigh individual task items in terms of importance, the Assessment weighted each item the same.  As a result, IBM's alleged "97% readiness determination" was meaningless, as it obscured the fact that items critical to the system's functioning had not been adequately developed and were not ready for go-live.

74.     IBM also was responsible for performing a minimum of two "cut-over" trial runs to ensure that there would be no issues with the upgrade.  IBM either did not perform the trial runs correctly, or did not disclose to Connection that the trial run results showed that the system was not ready for go-live.

## H.     System Design Defects and Deficiencies

75.     For months after go-live, additional defects and deficiencies with components of the E1 platform continued to emerge.  These were not simply minor "punch list" items, but involved core processes that were specifically identified in the 2017 SOW as critical to Connection's business.

76.     As discussed, the SOW outlines the scope of "business operations" included in

the contract, and provides that "IBM will configure the application to enable the processes defined during the Prepare and Design Phases leveraging the inherent 'leading practice' capabilities of each module in its 'vanilla' form."  IBM spent millions of dollars in the Prepare and Design Phases examining Connection's business requirements, and still failed to properly configure and implement a workable system.  As noted, key problem areas with the E1 platform included the following:

       1.     **EDI - Inbound / Outbound**

77.     The Electronic Data Interchange ("EDI") is how Connection: (1) receives electronic "catalogs" from distribution partners; (2) sends catalogs to customers; (3) sends purchases to distribution partners; (4) receives invoices from distribution partners; and (5) sends and receives purchase orders and invoices with integrated customers.

78.     Per the SOW, IBM was expressly responsible for configuring, testing, and implementing the functionality available to support the EDI transaction sets.

79.     All the EDI functions were immediately disrupted at go-live, causing severe impacts such as delayed outbound shipments, inaccurate or missing catalog data, and late invoicing and delayed payments.  For the first several months post go-live, Connection was required to have a dedicated EDI team remediating basic process flow and mapping issues caused by IBM's neglect to take the integrations done within JDE World into consideration when completing the integration to JDE E1 as suggested by Connection's EDI team.

80.     Most of Connection's largest customers use EDI, and the issues led to a significant loss of revenue.

       2.     **Invoicing**

81.     IBM spent months in the Prepare and Design Phases reviewing Connection's

invoicing requirements and represented to Connection that the invoicing would be seamless after "go-live."  Further, the SOW expressly provides that IBM will "[m]inimize potential disruption to the existing operating companies, and their ability to manage the impact to customers, including the ability to … invoice customers and collect cash."

82.     However, at go-live Connection's ability to invoice its clients was immediately and severely disrupted.  The problems were so numerous that Connection was forced to assign a dedicated project manager to simply to *track* the issues, much less fix them.

83.     Those issues, without limitation, include the omission of freight charges, incorrect tax, and incorrect sales detail lines and terms.  These deficiencies caused incorrect bills to be issued, resultant late (or no) payments, and severe customer satisfaction impacts.

**3.     Configure to Order**

84.     Configure to order ("CTO") capability allows Connection to send, for example, a customer a preconfigured laptop with an operating system, antivirus software, and VPN software already installed. Connection will sell/lease the hardware, and license the software for the customer.  This bundle is put into a "set" within E1, and the set has instructions for how the CTO bundle is to be built out, a function performed by the Company's TIDC center in Wilmington, Ohio.

85.     CTO capability is expressly within the project scope.  IBM, however, failed to configure E1 to work with the "sets" properly.  Because sets were not functioning, CTOs did not get processed and many shipments were sent to customers "unconfigured."  This directly resulted is loss of orders and, ultimately, long-time customers.  Certain issues with CTO's remain to this day, and still require manual intervention to be processed correctly.

21

4.      **Physical Inventory & Lot Management**

86.     Following go-live, Connection's distribution center could no longer reconcile their physical inventory. The impact of this was severe.  Hundreds of companies receive a Connection catalog each day.  Without the ability to accurately verify inventory levels, orders were both being rejected due to perceived backorder challenges, and accepted for goods that Connection did not have in its warehouse.

87.     Further, many significant customers purchase large amounts of inventory and store it at Connection.  Post go-live, Connection could no longer accurately report out inventory levels to these important customers, causing extreme client frustration, some of which took their business elsewhere.  These issues were entirely due to IBM's deficient configuration, including the abject failure to include core processes.

88.     IBM further represented that the E1 system, and the adoption of "serial picking," would reduce manpower and thus costs.  The opposite proved true, and Connection had to expend many more resources to track and send shipments.

89.     IBM misled Connection from the outset.  IBM knew or should have known that its recommendation of a "vanilla" upgrade approach was unsuitable to replace the highly customized World system.  IBM knew or should have known that its $9.2 million cost estimate and projected 17-month completion date were unrealistic and unachievable.  At various times during its performance on the Project, IBM knew, or should have known, about critical risks that threatened to jeopardize and undermine the Project.  IBM had a duty to disclose such risks to Connection, yet failed to do so.

90.     IBM refused to take responsibility for correcting deficiencies in the E1 platform.  IBM alleged, falsely, that it had fulfilled its contractual obligations, even though serious

problems remained with critical components of the system, including features specifically identified in the 2017 SOW as within IBM's scope of work.

91.     As a result of IBM's fraud, breach of contract, and other misconduct, Connection was left with an ERP system that was defectively designed, deficiently installed, improperly tested, and incapable of operating Connection's core business processes.

## COUNT I
## BREACH OF CONTRACT

92.     Connection repeats, re-alleges and incorporates each of the above allegations as if fully set forth herein.

93.     Connection and IBM entered into and are parties to the 2017 SOW.

94.     Connection fulfilled its obligations under the terms of the 2017 SOW.

95.     Under the 2017 SOW, IBM had a contractual obligation to design, develop, test, and implement the E1 system in accordance with the specifications in the 2017 SOW.

96.     IBM breached its contractual obligations under the 2017 SOW by, among other items, failing to:

      (a)     Complete its scope of work;

      (b)     Exercise due professional care in the performance of its services;

      (c)     Adequately plan and supervise the performance of its work on the Project;

      (d)     Assign appropriately skilled, qualified and experienced persons to work on the Project;

      (e)     Adequately identify, disclose, manage and mitigate risks that it knew or should have known were occurring on the Project;

      (f)     Deliver services and deliverables in a timely and professional manner; and

      (g)     Produce work product and deliverables free of errors and defects.

23

97.     In addition, IBM breached its express warranties under the 2017 SOW that services, deliverables and work product "shall" be prepared and provided:

(a)     "in a timely, professional, workperson-like manner"

(b)     "by competent and skilled personnel who, when first assigned by IBM to perform Services [under the SOW] shall be appropriately qualified and experienced for the performance of Services to which assigned"; and

(c)     "in accordance with this SOW … and in accordance with the professional practices and standards adhered to by large internationally recognized providers of IT consulting services."

98.     IBM also breached its separate express warranties and covenants under the SOW that IBM's deliverables and work product, and the results of services provided by IBM, "shall":

(a)     "be free of material or frequent errors or defects";

(b)     "conform to the applicable specifications and other requirements under this SOW"; and

(c)     "perform in accordance with the applicable documentation."

99.     Connection reasonably relied on IBM's warranties as expressly stated in the 2017 SOW.

100.    IBM's breaches were material and not incidental in nature.

101.    As a result of IBM's breaches, Connection has been damaged, and continues to be damaged.

## COUNT II
## CONTRACTUAL INDEMNIFICATION

102.    Connection repeats, re-alleges and incorporates each of the above allegations as if fully set forth herein.

103.     The 2017 SOW requires IBM to indemnify Connection "from and against any and all actual or threatened losses, liabilities, damages, and claims, and all related costs and expenses (including reasonable attorney's fees) arising from" any "breach by IBM of this Agreement."

104.     As described in detail above, IBM breached the 2017 SOW.

105.     Connection has incurred millions of dollars in damages and costs associated with IBM's breach, for which IBM is liable.

106.     Consequently, pursuant to the 2017 SOW, IBM is obligated to indemnify Connection for damage caused by IBM in the course of its failure to fulfill its obligations under the 2017 SOW.

### COUNT III
### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

107.     Connection repeats, re-alleges and incorporates each of the above allegations as if fully set forth herein.

108.     Every contract, including the 2017 SOW, imposes an implied duty of good faith and fair dealing in its performance.  The covenant embraces a pledge that neither party shall do anything that destroys or injures the right of another party to receive the benefits of the contract or frustrates the basic purpose of the contract.

109.     IBM failed to perform the 2017 SOW in good faith by, among the other failures set forth above, advocating that Connection go-live with the system in May 2020, despite its knowledge that the system was not ready to go-live.

110.     The actions of IBM violated the implied duty of good faith and fair dealing in the 2017 SOW by, among other things, depriving Connection of the benefits of its bargain under the 2017 SOW.

111.     As a result of IBM's breaches, Connection has been damaged, and continues to be

damaged.

## **COUNT IV**
## **NEGLIGENCE/PROFESSIONAL NEGLIGENCE**

112.    Connection repeats, re-alleges and incorporates each of the above allegations as if fully set forth herein.

113.    IBM had a duty to perform its professional services with the appropriate level of care.  That level of care includes adherence to the professional obligations, practices, rules, and standards that apply to software implementation professionals such as IBM.

114.    IBM breached this duty in the following respects:

- Failing to exercise due professional care in the performance of its services;

- Failing to determine and disclose to Connection that "vanilla" E1 was not suited to meet Connection's business needs;

- Failing to assign appropriately skilled, qualified and experienced persons to work on the Project;

- Failing to deliver services and deliverables in a timely and professional manner;

- Failing to apply professional standards in design, development, testing and project management during the Project;

- Failing to produce work product and deliverables free of errors and defects;

- Failing to determine and disclose to Connection  that the system was not ready to go-live as represented by IBM, and instead persuading Connection to go-live, even though IBM knew, or should have known, that the system was not ready to go-live, and that going live would damage Connection's business.

115.    IBM's negligent conduct was a proximate and foreseeable cause of the damages sustained by Connection.

116.    As a result of IBM's negligence, Connection has been damaged and continues to be damaged in an amount to be proven at trial.

## COUNT V
## FRAUDULENT INDUCEMENT

117.    Connection repeats, re-alleges, and incorporates each of the above allegations as if fully set forth herein.

118.    IBM fraudulently induced Connection to enter into the 2017 SOW by making misrepresentations of material fact to Connection, and by failing to disclose material facts to Connection when IBM had a duty to do so, regarding the Project.  For example:

(a)    IBM misrepresented, and withheld material information concerning, its assessment of  Connection's business and requirements regarding the functionality of the ERP system;

(b)    IBM misrepresented the results of the Discovery Assessment;

(c)    IBM misrepresented that it had the knowledge, skill, experience, capabilities, and personnel to successfully undertake the upgrade;

(d)    IBM misrepresented, and withheld material information concerning, the suitability of "vanilla" E1 to meet Connection's identified needs;

(e)    IBM misrepresented, and withheld material information concerning, the extent to which the E1 system would require extensive custom configurations that would increase the Project cost and duration;

(f)    IBM misrepresented, and withheld material information concerning, the time and cost required to implement the upgrade; and

(g)    IBM misrepresented its ability and willingness to complete the implementation.

27

119.    IBM misrepresented, and concealed, these and other facts in order to induce Connection to enter into the 2017 SOW.

120.    IBM made such misrepresentations knowing that they were false, and it failed to disclose material facts to Connection knowing that the Company was unaware of the facts and did not have an equal opportunity to discover such facts.

121.    IBM intended Connection to rely on IBM's misrepresentations and nondisclosures.

122.    Connection justifiably relied on IBM's misrepresentations and nondisclosures in entering into the 2017 SOW and continuing to pay fees to IBM.

123.    As a result of IBM's knowing misrepresentations and nondisclosures, Connection has been damaged, and continues to be damaged.

124.    In addition, because IBM's actions were committed knowingly, willfully and in conscious disregard of the rights of Connection, Connection is entitled to recover punitive damages in an amount to be determined at trial.

## COUNT VI
## FRAUDULENT MISREPRESENTATION

125.    Connection repeats, re-alleges, and incorporates each of the above allegations as if fully set forth herein.

126.    After the 2017 SOW was executed, IBM made knowing misrepresentations of material fact to Connection, and failed to disclose material facts to Connection when IBM had a duty to do so, concerning the Project.  For example:

(a)    IBM knowingly misrepresented, and knowingly withheld material information concerning, the time and cost required to complete the implementation;

(b)    IBM knowingly misrepresented, and knowingly withheld material

information concerning, IBM's ability to complete the implementation as represented to Connection and warranted in the 2017 SOW;

(c)     IBM knowingly misrepresented, and knowingly withheld material information concerning, IBM's mismanagement of the Project;

(d)     IBM knowingly misrepresented, and knowingly withheld material information concerning, IBM's failure to properly plan, design, and test the implementation;

(e)     IBM knowingly misrepresented, and knowingly withheld material information concerning, customizations that would be required to the E1 system;

(f)     IBM knowingly misrepresented, and knowingly withheld material information concerning, the E1 system's preparedness to go-live;

(g)     IBM knowingly misrepresented, and knowingly withheld material information concerning, the harm and disruption to Connection's operations that would occur if the conversion was implemented before the system was ready; and

(h)     Post go-live, IBM knowingly misrepresented, and knowingly withheld material information concerning, the extent of the defects and deficiencies with the E1 system, and IBM's ability to correct the same.

127.    IBM knowingly misrepresented, and knowingly withheld, these and other facts in order to conceal its prior misrepresentations, to induce Connection to pay fees which far exceeded the $9.2 million amount stated in the 2017 SOW, to induce Connection to proceed with the go-live, and to continue to pay IBM's fees after go-live.

128.    IBM made such misrepresentations knowing that they were false, and it failed to disclose material facts to Connection knowing that the Company was unaware of the facts and did not have an equal opportunity to discover such facts.

129.    IBM intended Connection to rely on IBM's misrepresentations and

nondisclosures.

130.    Connection justifiably relied on IBM's misrepresentations and nondisclosures in

proceeding with IBM, in paying IBM's fees, in accepting IBM's recommendation to go-live in

May 2020, and in relying on and agreeing to pay IBM to correct deficiencies post go-live.

131.    Such knowing misrepresentation and nondisclosures occurred outside of any

contractual relationship between IBM and Connection.

132.    As a result of IBM's knowing misrepresentations and nondisclosures, Connection

has been damaged, and continues to be damaged.

133.    Because IBM's actions were committed knowingly, willfully, and in conscious

disregard of the rights of Connection, the Company is entitled to recover punitive damages in an

amount to be determined at trial.

## COUNT VII
## NEGLIGENT MISREPRESENTATION

134.    Connection repeats, re-alleges, and incorporates each of the above allegations as

if fully set forth herein.

135.    In the course of marketing itself to Connection, and to convince the Company to

enter into the 2017 SOW, IBM made false representations to Connection regarding IBM's

experience and expertise, IBM's assessment of Connection's business, and the suitability of

"vanilla" E1 to meet Connection's functional needs and business requirements.  IBM also failed

to disclose material facts concerning these issues.

136.    IBM's made misrepresentations, and failed to disclose material facts concerning,

the Project.  For example:

(a)    IBM misrepresented, and withheld material information concerning, the

time and cost required to complete the implementation;

(b)     IBM misrepresented, and withheld material information concerning, IBM's ability to complete the implementation as represented to Connection and warranted in the 2017 SOW;

(c)     IBM misrepresented, and withheld material information concerning, IBM's mismanagement of the Project;

(d)     IBM misrepresented, and withheld material information concerning, IBM's failure to properly plan, design, and test the implementation;

(e)     IBM misrepresented, and withheld material information concerning, customizations that would be required to the E1 system;

(f)     IBM misrepresented, and withheld material information concerning, the E1 system's preparedness to go-live;

(g)     IBM misrepresented, and withheld material information concerning, the harm and disruption to Connection's operations that would occur if the conversion was implemented before the system was ready; and

(h)     Post go-live, IBM knowingly misrepresented, and knowingly withheld material information concerning, the extent of the deficiencies with the E1 system, and IBM's ability to correct the same.

137.     IBM failed to exercise reasonable care or competence in communicating this information to Connection, and in failing to disclose material information to Connection.

138.     IBM knew that Connection would rely on these false representations.

139.     IBM's representations occurred outside any contractual relationship between IBM and Connection.

31

140.     Connection relied on IBM's false representations, and the Company's reliance was reasonable and justifiable given IBM's claimed knowledge, skill, and expertise in JDE upgrades, and given the fact that Connection paid IBM over $600,000 for the express purpose of assessing the Company's needs.

141.     As a result of IBM's negligent misrepresentations, and its negligent failure to disclose material information, Connection has been damaged.

## COUNT VIII
## BREACH OF NH CONSUMER PROTECTION ACT (RSA 358-A)

142.     Connection repeats, re-alleges and incorporates each of the above allegations above as if fully set forth herein.

143.     IBM is a commercial entity engaged in a commercial venture, and through the 2017 SOW was engaged in the conduct of trade or commerce in the State of New Hampshire within the meaning of RSA 358-A:1, II.

144.     RSA 358:A prohibits fraudulent or misleading trade practices within the state, to include, without limitation, representing that services and goods have characteristics, uses or benefits that they do not have.

145.     IBM's conduct, as fully articulated in preceding paragraphs of this Complaint, and as further described below, constitutes unfair and deceptive trade practices within the meaning of RSA 358-A:2 and 358-A:10, I:

146.     IBM's made fraudulent and misleading misrepresentations regarding its goods and services, and failed to disclose material facts concerning, the Project.  For example:

(a)     IBM misrepresented, and withheld material information concerning, the time and cost required to complete the implementation;

(b)     IBM misrepresented, and withheld material information concerning,

IBM's ability to complete the implementation as represented to
Connection and warranted in the 2017 SOW;

(c)     IBM misrepresented, and withheld material information concerning,
IBM's mismanagement of the Project;

(d)     IBM misrepresented, and withheld material information concerning,
IBM's failure to properly plan, design, and test the implementation;

(e)     IBM misrepresented, and withheld material information concerning,
customizations that would be required to the E1 system;

(f)     IBM misrepresented, and withheld material information concerning, the
E1 system's preparedness to go-live;

(g)     IBM misrepresented, and withheld material information concerning, the
harm and disruption to Connection's operations that would occur if the
conversion was implemented before the system was ready; and

(h)     Post go-live, IBM knowingly misrepresented, and knowingly withheld
material information concerning, the extent of the deficiencies with the E1
system, and IBM's ability to correct the same.

162.    As a direct and proximate result of IBM's violations of RSA 358-A, Connection
has been damaged in an amount to be proven at trial.  Connection is also is entitled to applicable
interest, costs and reasonable attorneys' fees.

163.    Upon information and belief, IBM's actions were willful or knowing violations of
the RSA 358-A.  Connection is therefore entitled to at least two, and up to three times its
damages.

**CONNECTION DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

33

WHEREFORE, Connection demands judgment against IBM for:

      A.      Enter judgment in favor of Connection on each of its claims, as set forth herein,

      B.      Award Connection damages in an amount to be determined at trial;

      C.      Direct damages in an amount to be determined at trial;

      D.      Indirect damages in an amount to be determined at trial;

      E.      Pre-judgment interest;

      F.      Post-judgment interest;

      G.      Attorneys' fees and costs incurred by Connection in prosecuting this action;

      H.      Award Connection treble damages, costs, and attorneys' fees as a result of IBM's violations of RSA 358-A; and

      I.      Such other and further relief that the Court deems just and proper.


Respectfully submitted,

PC CONNECTION, d/b/a CONNECTION

By its attorneys,

Dated: September 30, 2022

        /s/ *Christopher H.M. Carter*
        Christopher H.M. Carter, Esq. (#12452)
        Daniel M. Deschenes, Esq. (#14889)
        Hinckley Allen
        650 Elm Street, Suite 500
        Manchester, NH  03101
        Tel: 603-225-4334
        ccarter@hinckleyallen.com
        ddeschenes@hinckleyallen.com

#61668694