UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

PC CONNECTION, INC. d/b/a
CONNECTION,

              Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

              Defendant.

Civil Action No. 1:22-cv-00397-JL

## PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION TO DISMISS

Dated:  January 18, 2023

Respectfully submitted,

PC CONNECTION, INC. d/b/a CONNECTION

By its attorneys,

/s/  *Christopher H.M. Carter*
Christopher H.M. Carter (#12452)
Daniel M. Deschenes (#14889)
Hinckley, Allen & Snyder LLP
650 Elm Street, Suite 500
Manchester, NH 03101
Telephone: (603) 225-4334
ccarter@hinckleyallen.com
ddeschenes@hinckleyallen.com

<u>**TABLE OF CONTENTS**</u>

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ....................................................................................................... 1

BACKGROUND .......................................................................................................... 2

A.    Connection's ERP System ................................................................................ 2

B.    IBM Induces Connection to Enter into the 2017 SOW ................................... 2

C.    IBM's Continued False Representations .......................................................... 5

D.    Failed Go-Live .................................................................................................. 5

ARGUMENT ............................................................................................................... 7

I.    LEGAL STANDARD ............................................................................................ 7

II.    CONNECTION HAS SUFFICIENTLY PLED A BREACH OF CONTRACT ............... 8

    A.    The Complaint Meets the Federal Standard For Pleading Breach of Contract ........... 8

    B.    The Complaint Also Meets the Standard Under New York Law ............................... 9

    C.    The Complaint Properly Alleges Breach of the 2017 SOW's Express Warranties ... 10

    D.    Connection's Contract Claim Is Not Time Barred ..................................... 14

III.    CONNECTION STATES A VALID CLAIM FOR CONTRACTUAL
INDEMNIFICATION ........................................................................................ 16

IV.    THE COMPLAINT STATES A CAUSE OF ACTION FOR BREACH OF THE
IMPLIED COVENANT ..................................................................................... 17

V.    THE COMPLAINT ALLEGES A CLAIM FOR BREACH OF PROFESSIONAL
NEGLIGENCE ................................................................................................. 19

VI.    CONNECTION HAS SUFFICIENTLY PLED ITS FRAUD CLAIMS ......................... 20

    A.    Connection's Fraud Claims Are Distinguishable From Its Contract Claims ............ 20

    B.    The Complaint Alleges Fraud With Sufficient Particularity ..................................... 24

    C.    The Complaint Sufficiently Alleges Scienter ........................................................... 27

    D.    Connection Has Alleged Actionable Misrepresentations .......................................... 30

    E.    Connection's Fraudulent Inducement Claim Is Timely ............................................. 33

    F.    The Fraudulent Inducement Claim Is Not Barred By the Merger Clause ................ 34

VII.    CONNECTION HAS SUFFICIENTLY ALLEGED AN NHCPA VIOLATION ........... 35

VIII.    ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE ........................................ 35

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*17 Vista Fee Associates v. Teachers Ins. & Annuity Ass'n of Am.*,
    693 N.Y.S. 2d 554, 559 (N.Y. App. Div. 1999) ...................................................................... 19

*Adhesive Tech., Inc. v. Isaberg Rapid AB*,
    2011 WL 2134381, at *19 (D.N.H. May 26, 2011)................................................................. 30

*ADL, LLC v. Tirakian*,
    2010 WL 3925131, at *12 (E.D.N.Y. Aug. 26, 2010), *R&R adopted by* 2010 WL 3926135
    (E.D.N.Y Sept. 29, 2010).................................................................................................. 30, 31

*Adorno v. Crowley Towing & Transp. Co.*,
    443 F.3d 122, 126 (1st Cir. 2006)........................................................................................... 35

*Airport Mart Inc. v. Dunkin' Donuts Franchising LLC*,
    2019 WL 4413052, at *10 (S.D.N.Y. Sept. 16, 2019)............................................................ 23

*Amyndas Pharm., S.A. v. Zealand Pharma A/S*,
    48 F.4th 18, 37 (1st Cir. 2022)............................................................................................... 35

*Anunziatta v. Orkin Exterminating Co., Inc.*,
    180 F. Supp. 2d 353, 358-59 (N.D.N.Y. 2001)....................................................................... 19

*Apple Records, Inc. v. Capitol Records, Inc.*,
    529 N.Y.S. 2d 279, 282 (N.Y. App. Div. 1988) ..................................................................... 20

*Ashcroft v. Iqbal*,
    556 U.S. 662, 678 (2009)........................................................................................................... 7

*Avalanche IP, LLC v. FAM, LLC*,
    2021 WL 149258, at *8 (D. Mass. Jan. 15, 2021) ....................................................... 27, 28, 29

*Avantor Performance Materials, Inc. v. IBM*,
    No. 3:12cv6961 (D.N.J. Nov. 8, 2012)...................................................................................... 3

*Balsamo v. University Sys. of N.H.*,
    2011 WL 4566111, at *1, *3 (D.N.H. Sept. 30, 2011) .......................................................... 7, 8

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544, 570 (2007)........................................................................................................... 7

*Bessemer System Federal Credit Union v. Fiserv Solutions, LLC*,
   472 F. Supp. 3d 142, 155-56 (W.D. Penn. 2020) ........................................................ 9

*Beyond Bespoke Tailors, Inc. v. Barchiesi*,
   2022 WL 428193, at *10 (S.D.N.Y. Feb. 11, 2022) ............................................... 23

*Bild v. Konig*,
   2011 WL 666259, at *3 (E.D.N.Y. Feb. 14, 2011), *on reconsideration in part* 2011 WL
   1563576 (E.D.N.Y. Apr. 25, 2011) ........................................................................ 14

*Bizelia v. Clinton Towers Housing Co., Inc.*,
   2022 WL 1747763, at *4 (S.D.N.Y. May 31, 2022) ................................................. 14

*BJB Ltd. v. iStar Jewelry LLC*,
   533 F. Supp. 3d 83, 103 (E.D.N.Y. 2021) ............................................................... 23

*Blackhawk Dev., LLC v. Krusinski Constr. Co.*,
   2021 WL 1225917, at *5 (S.D.N.Y. Mar. 31, 2021) ............................................... 13

*Bridgestone Am., Inc. v. IBM*,
   No. 3:13cv1196 (M.D. Tenn. Oct. 29, 2013) ............................................................. 3

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
   98 F.3d 13, 20 (2d Cir. 1996) ............................................................... 20, 21, 22, 23

*Bullmore v. Banc of Am. Sec. LLC*,
   485 F. Supp. 2d 464, 470 (S.D.N.Y. 2007) ............................................................. 20

*Burlington Packaging, Inc. v. Extra Packaging, Inc.*,
   2020 WL 5043817, at *2 (E.D.N.Y. Aug. 25, 2020) ............................................... 15

*Butler v. Balolia*,
   736 F.3d 609, 616 (1st Cir. 2013) ............................................................................. 7

*Calamel v. Ridge View Realty Corp.*,
   496 N.Y.S. 2d 154, 155 (N.Y. App. Div. 1985) ...................................................... 15

*CBS Inc. v. Ziff-Davis Pub. Co.*,
   75 N.Y.2d 496, 503 (App. Ct. 1990) ...................................................................... 11

*Christian v. Anderson*,
   2006 WL 3698907, at *1 (D.N.H. Dec. 13, 2006) ................................................... 35

*Cohen v. Koenig*,
   25 F.3d 1168 (2d Cir. 1994) ................................................................................... 32

*Colonial Life Ins. Co. of Am. v. Electronic Data Sys. Corp.*,
   817 F. Supp. 235, 239 (D.N.H. 1993) ................................................. 11

*CooperVision, Inc. v. Intek Integration Tech., Inc.*,
   7 Misc.3d 592, 604 (N.Y. Sup. Ct. 2005) ............................................ 34

*Costa Precision Mfg. Corp. v. Farris*,
   2007 WL 1558577, at *5 (D.N.H. May 29, 2007) ................................. 35

*Cutrone v. Mortgage Electronic Registration Sys., Inc.*,
   2015 WL 13931932 (E.D.N.Y. June 26, 2015) ..................................... 13

*Davis v. Gutierrez*,
   2018 WL 1514869, at *10 n.48 (D.N.H. Mar. 27, 2018) ................. 28, 29

*Dickert v. North Coast Family Health, Inc.*,
   2015 WL 3988676, at *1 (D.N.H. June 10, 2015) ................................... 7

*Donald Dean & Sons, Inc. v. Xonitek Sys. Corp.*,
   656 F. Supp. 2d 314, 324 n.21 (N.D.N.Y. 2009) ................................... 20

*Doyle v. Hasbro, Inc.*,
   103 F.3d 186, 195 (1st Cir. 1996) ........................................................ 10

*Dynamic-Hakim, LLC v. Maloney*,
   93 N.Y.S. 3d 289, 291 (N.Y. App. Div. 2019) ..................................... 33

*EED Holdings V. Palmer Johnson Acquisition Corp.*,
   387 F. Supp. 2d 265, 279 (S.D.N.Y. 2004) .......................................... 24

*Freepoint Commodities LLC v. Ridgebury Kilo LLC*,
   2022 WL 461991, at *7-8 (S.D.N.Y. Sept. 30, 2022) ........................... 18

*Gallup v. Sommerset Homes, LLC,*,
   920 N.Y.S.2d 504, 507 (N.Y. App. Div. 2011) ..................................... 13

*Glover v. Bob's Discount Furniture, LLC*,
   2022 WL 3353454, at *6 (S.D.N.Y. Aug. 12, 2022) ............................. 13

*Goodman Mfg. Co. L.P. v. Raytheon Co.*,
   1999 WL 681382, at *13 (S.D.N.Y. Aug. 31, 1999) ...................... 8, 9, 14

*Hamilton Exhibition, LLC v. Imagine Exhibitions, Inc.*,
   2019 WL 2590639, at *3 (S.D.N.Y. June 11, 2019) .............................. 33

*Hempchain Farms, LLC v. Sack*,
   516 F. Supp. 3d 197, 208 (N.D.N.Y. 2021) ........................................................... 32

*Hoffman v. Optima Sys., Inc.*,
   683 F. Supp. 865, 868 (D. Mass. 1988) ................................................................. 27

*Homes Dev. Corp. v. Edmund & Wheeler, Inc.*,
   2022 WL 4586480, at *8, *9 (D.N.H. Sept. 29, 2022) ......................................... 26, 27, 28, 29

*Hooper Assoc., Ltd. v. AGS Computers, Inc.*,
   74 N.Y.S. 2d 487, 492 (1989) ................................................................................. 16

*Howard v. Cycare Sys., Inc.*,
   128 F.R.D. 159, 164 (D. Mass. 1989) .................................................................... 26

*Icebox-Scoops v. Finanz St. Honore, B.V.*,
   676 F. Supp. 2d 100, 111-12 (E.D.N.Y. 2009) ...................................................... 34

*In re CINAR Corp. Sec. Litig.*,
   186 F. Supp. 2d at 279, 303, 314 ........................................................................... 22, 35

*In re New England Compounding Pharmacy, Inc. Products Liability Litig.*,
   2015 WL 13715288, at *4 (D. Mass. July 28, 2015) ............................................. 8

*In re Refco Sec. Litig.*,
   890 F. Supp. 2d 332, 341 (S.D.N.Y. 2012) ........................................................... 16

*IS Chrystie Mgt. LLC v. ADP, LLC*,
   168 N.Y.S.3d 449-451 (N.Y. App. Div. 2022) ...................................................... 23, 24

*J & R Electronics Inc. v. Business & Decision N.A.*,
   2013 WL 5203134, at *7 (S.D.N.Y. Sept. 16, 2013) ............................................. 21

*L'Esperance v. Manhattan Mortg. Corp.*,
   2012 WL 3839376, at *3 (D.N.H. Sept. 5, 2012) .................................................. 24

*Langlais v. Brenner-Currier*,
   561 F. Supp. 3d 103, 113, 114 (D.N.H. Oct. 2, 2020) .......................................... 26, 27, 30

*Landtek Grp., Inc. v. N. Am. Specialty Flooring, Inc.*,
   2017 WL 11264722, at *16 (E.D.N.Y. Aug. 12, 2016) ......................................... 13

*LaRue v. Mortgage Electronic Registration Sys., Inc.*,
   2012 WL 3886876, at *4 (W.D. Mich. Sept. 6, 2012) ........................................... 9

*Liecar Liqs. V. CRS Bus. Computers*,
 613 N.Y.S. 2d 298, 299 (N.Y. App. Div. 1994) ....................................................... 15

*Lubrizol Corp. v. IBM*,
 No. 1:21cv870 (N.D. Ohio Apr. 27, 2021) ................................................................ 3

*Lufkin Indus., Inc. v. IBM*,
 No. CV-02073-13-02 (Tex. Super. Ct. Feb. 5, 2013) ................................................. 3

*Mallards Dairy, LLC v. E&M Engrs. & Surveyors, P.C.*,
 897 N.Y.S. 2d 552, 552 (N.Y. App. Div. 2010) ....................................................... 12

*Mann v. Levy*,
 776 F. Supp. 808, 813 (S.D.N.Y. 1991) .................................................................. 30

*McKinley v. United States*,
 2015 WL 5842626, at *9 (M.D. Ga. Oct. 6, 2015) .................................................... 9

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
 500 F.3d 171, 184-85 (2d Cir. 2007) ................................................................ 12, 22

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
 418 F.3d 168, 178-79 (2d Cir. 2005) ...................................................................... 17

*Milau Associates v. North Ave. Dev. Corp.*,
 42 N.Y.2d 482, 484, 487 (1977) ............................................................................ 12

*Minn. Laborers Health & Welfare Fund v. Granite Re, Inc.*,
 844 N.W.2d 509, 518-19 (Minn. 2014) .................................................................. 34

*Moore v. Mortgage Elec. Registration Sys., Inc.*,
 848 F. Supp. 2d 107, 131 (D.N.H. Jan. 27, 2012) ................................................... 26

*N.H. Elec. Coop., Inc. v. Elster Sols., LLC*,
 2017 WL 2861667, at *3 (D.N.H. Jul. 5, 2017) ................................................. 26, 27

*Nielsen Media Research, Inc. v. Microsystems Software, Inc.*,
 2002 WL 31175223, at *9 (S.D.N.Y. Sept. 30, 2002) .............................................. 11

*N.Y. Islanders Hockey Club, LLP v. Comerica Bank—Texas*,
 71 F. Supp. 2d 108, 118 (E.D.N.Y. Oct. 9, 1999) ................................................... 32

*OneBeacon America Ins. Co. v. Comsec Ventures Int'l, Inc.*,
 2010 WL 114819, at *5 (N.D.N.Y. Jan. 7, 2010) .................................................... 11

*Orlander v. Staples, Inc.*,
  2014 WL 2933152, at *8 (S.D.N.Y. June 30, 2014), 802 F.3d 289, 302 (2d Cir. 2015).......... 13

*Ortiz v. Sig Sauer, Inc.*,
  448 F. Supp. 3d 89, 106 (D.N.H. 2020)....................................................................... 18

*Owen v. Appelbaum*,
  613 N.Y.S. 2d 504, 504 (N.Y. App. Div. 1994) ........................................................ 12

*Panos v. Universal Forest Prods., Inc.*,
  2020 WL 416445, at *4 (S.D.N.Y. Jan. 27, 2020)..................................................... 33

*Pfizer, Inc. v. Stryker Corp.*,
  348 F. Supp. 2d 131, 146 (S.D.N.Y. 2004)................................................................ 17

*Promuto v. Waste Management, Inc.*,
  44 F. Supp. 2d 628, 650 (S.D.N.Y. 1999).................................................................. 16

*Regus Management Grp. LLC v. IBM*,
  No. 3:07cv1799 (N.D. Tex. Oct. 25, 2007) ................................................................. 3

*Renaissance Hous. Dev. Fund Corp. v. Phoenix Constr., Inc.*,
  25 N.Y.S.3d 866, 866 (N.Y. App. Div. 2016) .......................................................... 13

*Richard A. Rosenblatt & Co., Inc. v. Davidge Data Sys., Corp.*,
  743 N.Y.S. 2d 471-473 (N.Y. App. Div. 2002)................................................... 15, 20

*Roberts v. Johnson & Johnson and Ethicon, Inc.*,
  2021 WL 395575, at *2 (D.N.H. Feb. 4, 2021) ....................................................... 24

*Robins v. Finestone*,
  308 N.Y. 543, 545-46 (N.Y. App. 1955) ................................................................. 12

*Rodi v. S. New England Sch. of L.*,
  389 F.3d 5, 14-16 (1st Cir. 2004) ....................................................................... 30, 31

*Roizen v. Marder's Nurseries, Inc.*,
  615 N.Y.S.2d 235, 236 (1994)................................................................................. 13

*Roman v. Spirit Airlines, Inc.*,
  2019 WL 9093467, at *3 (S.D. Fla. Oct. 20, 2019)................................................... 8

*Ruberti v. Ethicon, Inc.*,
  2021 WL 5570109, at *3 (M.D. Ala. Nov. 29, 2021)................................................ 18

*Sagittarius Broadcasting Corp. v. Evergreen Media Corp.*,
   243 A.D.2d 325, 326 (N.Y. App. Div. 1997) ........................................... 17

*Saul v. Cahan*,
   2014 WL 5801839, at *7 (N.Y. Sup. Ct. 2014) ....................................... 22

*Save on Surplus Pension Plan v. United Saver's Bancorp, Inc.*,
   1990 WL 264538, at *1 (D.N.H. Nov. 28, 1990) ....................................... 8

*Sobel v. Major Energy Servs, LLC*,
   2020 WL 5362357, at *8 (S.D.N.Y. Sept. 8, 2020)................................... 18

*Solomon Cap., LLC v. Lion Biotechnologies, Inc.*,
   98 N.Y.S.3d 26, 28 (N.Y. App. Div. 2019) ............................................ 33

*Starakis v. Baker*,
   993 N.Y.S. 2d 177, 179 (N.Y. App. Div. 2014) ....................................... 15

*State of New York, Workers' Comp. Bd. V. Cody Mgmt, Inc.*,
   2015 WL 2383325, at *8 (N.Y. Sup. Ct. Mar. 6, 2015) ......................... 10

*Subramanian v. Lupin Inc.*,
   2020 WL 7029273, at *12 (S.D.N.Y. Aug. 21, 2020), *R&R adopted by* 2020 WL 6075523
   (S.D.N.Y. Oct. 15, 2020) ..................................................................... 22

*Surge Res., Inc. v. The Barrow Grp.*,
   2003 WL 1193012, at *2 (D.N.H. Mar. 12, 2003) ................................... 26

*Sussman Sales Co., Inc. v. VWR Int'l, LLC*,
   2021 WL 1165077, at *19 (S.D.N.Y. Mar. 26, 2021) ............................ 17

*Taylor Precision Prods., Inc. v. Larimer Grp., Inc.*,
   2018 WL 4278286, at *19 (S.D.N.Y. Mar. 26, 2018) ............................ 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 325-326 (2007) ....................................................... 27, 28

*Torok v. Moore's Flatwork & Foundations, LLC*,
   966 N.Y.S.2d 572, 575 (N.Y. App. Div. 2013) ....................................... 12

*VTech Holdings Ltd. v. Lucent Tech., Inc.*,
   172 F. Supp. 2d 435, 440 (S.D.N.Y. 2001)............................................. 23

*Waldman v. Escobar*,
   2009 WL 861068, at *3 (S.D.N.Y. Mar. 27, 2009) ................................ 16

*Walker v. Thompson*,
   404 F. Supp. 3d 819, 825 (S.D.N.Y. 2019)................................................................ 11

*Wabash Castings, Inc. v. Fuji Machine Am. Corp.*,
   2016 WL 4765717, at *2 (N.D. Ill. Sept. 13, 2016) ............................................... 18

*Weatherly v. Universal Music Pub. Grp.*,
   125 Cal. App. 4th 913, 919 (Cal. App. Ct. 2004) .................................................... 34

*White v. Davidson*,
   55 N.Y.S.3d 223, 224 (N.Y. App. Div. 2017) .................................................... 32, 33

*Wild Bunch, SA v. Vendian Entertainment, LLC*,
   256 F. Supp. 3d 497, 503, 507 n.5 (S.D.N.Y. 2017)........................................... 20, 21

*Woods v. Maytag Co.*,
   807 F. Supp. 2d 112, 123 (E.D.N.Y. Aug. 31, 2011) ............................................. 31

*Yanes v. Ocwen Loan Servicing, LLC*,
   2015 WL 631962, *2 (N.D.N.Y. July 8, 2016) ................................................... 8, 10

## Rules

Fed. R. Civ. P. 8 ............................................................................................................. 9
Fed. R. Civ. P. 8(a) ............................................................................................... 8, 9, 27
Fed. R. Civ. P. 8(a)(2)............................................................................................ 1, 8, 24
Fed. R. Civ. P. 8(d)(3).................................................................................................... 18
Fed. R. Civ. P. 9(b) ................................................................... 7, 8, 24, 26, 30, 35

## Other Sources

5A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1298 (4th ed. 2022)..... 26
28 N.Y. Prac., Contract Law § 5:11............................................................................ 34

## INTRODUCTION

PC Connection, Inc.'s ("Connection") 34-page Complaint sets forth in specific factual detail how Defendant International Business Machines ("IBM"), Connection's long-time technical consultant, induced the Company to engage IBM to design and manage the implementation of a new enterprise resource planning ("ERP") system, through a series of misrepresentations concerning, among other things, the results of IBM's year-long assessment of the system functionality required by Connection, IBM's conclusions as to the suitability of "vanilla," "out-of-the-box" E1 software to meet Connection's needs without extensive modifications, and IBM's conclusions as to the cost and time required to complete the implementation.  After work began under the parties' contract (the 2017 SOW), IBM breached its contractual obligations to competently design, develop, and test the implementation of E1, and to manage the project.  As the project cost and time requirements far surpassed IBM's prior representations, due largely to the need to extensively customize E1, IBM induced Connection to continue to pay IBM's fees by falsely representing that the project was on track.  Then, in May 2020, IBM induced Connection to begin the actual implementation of E1, by representing that the E1 system had been fully tested and was ready for go-live, that a contingency "roll back" plan was in place if problems arose during the implementation, and that all remaining issues with the E1 system could be resolved post go-live through simple "workarounds."  These representations were false.  The E1 system was not close to completion, and immediately after the go-live process began, critical components of the E1 system within IBM's responsibility failed.  A roll-back plan was not in place, and Connection experienced company-wide business disruptions that crippled its ability to service customers.

IBM's Motion, by which IBM seeks dismissal of each of Connection's eight claims, should be denied.  Connection has met the standard under Rule 8(a)(2) of the Federal Rules of

Civil Procedure for pleading its contract claims.  Connection also has pled with sufficient particularity its fraud and misrepresentation claims, which as a matter of law are not duplicative with Connection's contract claims.

## BACKGROUND

### A.    Connection's ERP System

Connection is a publicly traded company that supplies specialized IT products and services.  Complaint ("Compl.") ¶ 25.  Connection leverages its state-of-the art logistic capabilities to ship product to customers the same day orders are received.  *Id.*  To operate its business, Connection relies on its ERP system to coordinate and manage the critical business processes and functions of Connection and its subsidiaries.  *Id.* at ¶ 28.  Connection's first ERP platform, installed in 1998, was a JDE system known as "JDE World."  *Id.* at ¶ 29.

### B.    IBM Induces Connection to Enter into the 2017 SOW

In or about 2013, IBM began advising Connection with respect to options for upgrading to a new ERP system.  *Id.* at ¶ 30.  IBM, which had a long-standing relationship with Connection as a technical consultant that dated to 2011, represented to Connection that IBM was an expert in managing the implementation of JDE systems and had extensive experience and skill in helping companies to select ERP systems to meet their needs.  *Id.* at ¶ 31.

Connection informed IBM that the Company's JDE World system had been heavily customized to adapt to Connection's business model.  *Id.* at ¶ 32.  Connection also emphasized to IBM that the new ERP system had to maintain the mission-critical functionality of JDE World, and that the implementation had to be completed without disrupting Connection's operations and its ability to service customers.  *Id.* at ¶ 4.

To obtain Connection's business, IBM employed a playbook that resulted in IBM being

named in a series of lawsuits over alleged misrepresentations made in connection with failed

ERP implementations.  *Id.* at ¶ 6.[1]  Claiming it fully understood Connection's needs and

concerns, IBM recommended that the Company implement a new Oracle/JDE platform called

"EnterpriseOne" ("E1"), and it sold itself as the perfect company to manage the implementation

for Connection.  For example, in a July 2013 PowerPoint presentation, IBM acknowledged that

Connection was relying on IBM to determine the ERP system that would be the "best fit" for

Connection's business, and it alleged that E1 met all of Connection's "core functional and

technical requirements"  and would be "faster and less costly to implement" than other systems.

*Id.* at ¶ 33.  IBM promoted itself as "the right partner" to lead the implementation, alleging it had

a "World Class JDE Practice," was "a Tier 1 provide[r] with demonstrated results in

transformation programs."  *Id.* at ¶ 34.

     Between August 2016 and August 2017, IBM conducted a discovery assessment

("Discovery Assessment"), the express purpose of which was for IBM to further evaluate

Connection's business and develop a project plan that addressed, among other things, the design,

cost, and time required for IBM to implement the new system.  *Id.* at ¶ 35.  IBM billed

Connection over $600,000 to conduct the Discovery Assessment.  *Id.* at ¶ 39.  It was granted full

access to Connection's business divisions in order to understand how the Company used JDE

World, and identify the functionality that would be required of E1.  *Id.* at ¶ 37.  During the

Discovery Assessment, Connection repeatedly informed IBM that the implementation must: (a)

be accomplished without disrupting existing operations; (b) preserve the functionality of the JDE

---

[1]  The Court may take judicial notice of these cases.  *See Avantor Performance Materials, Inc. v. IBM*, No. 3:12cv6961 (D.N.J. Nov. 8, 2012); *Lufkin Indus., Inc. v. IBM*, No. CV-02073-13-02 (Tex. Super. Ct. Feb. 5, 2013); *Regus Management Grp. LLC v. IBM*, No. 3:07cv1799 (N.D. Tex. Oct. 25, 2007)); *Bridgestone Am., Inc. v. IBM*, No. 3:13cv1196 (M.D. Tenn. Oct. 29, 2013); *Lubrizol Corp. v. IBM*, No. 1:21cv870 (N.D. Ohio Apr. 27, 2021).

World system; and (c) be completed at a reasonable cost. *Id.* at ¶ 38. In response, IBM represented to Connection that IBM understood and could achieve these objectives. *Id.*

On August 7, 2017, IBM presented Connection with a statement of work (the "2017 SOW") for the implementation project (the "Project"). *Id.* at ¶ 43. To induce Connection to enter into the contract, IBM made a series of misrepresentations concerning the suitability of the E1 system. For example, IBM misrepresented to Connection that IBM had determined that a "vanilla" upgrade that leveraged "out of the box" E1 software was suitable for Connection, that the E1 platform would not require extensive customizations to provide the functionality offered by JDE World, and that IBM could complete the implementation project within 17 months at a cost of $9.2 million. *Id.* at ¶ 39. In the preamble to 2017 SOW, IBM repeated its misrepresentations concerning its assessment of Connection's needs, the suitability of "vanilla" E1 to meet those needs without extensive customization, and IBM's determination that it could implement the upgrade in 17 months at a cost of $9.2 million. *Id.* at ¶ 45. At the time it made these representations, IBM either knew or should have known that these representations were false. *Id.* at ¶ 40.

The 2017 SOW set forth a detailed scope of work, and IBM made express warranties concerning its knowledge and understanding of Connection's needs, IBM's ability to perform its obligations under the contract, and the quality of IBM's deliverables and work product. *Id.* at ¶¶ 48-55. In executing the 2017 SOW, Connection relied on IBM's written and oral representations concerning its assessment of Connection's needs, its expertise in recommending a suitable upgrade solution for similarly situated companies, its expertise and experience in managing similar projects, and its determination that E1 was the "best fit" for Connection. *Id.* at ¶ 12.

**C.**     **IBM's Continued False Representations**

After work began under the 2017 SOW in October 2017, IBM failed to competently design, develop, and test the implementation of E1, or to fulfill its contractual obligations to manage the Project.  As IBM knew from the Discovery Assessment (but concealed from Connection), E1 had to be extensively customized to meet Connection's business needs.  *Id.* at ¶ 58.  For example, in the 2017 SOW, IBM represented that only 15 technical modifications to the "out of the box" E1 would be required to provide the base-level functionality of JDE World.  *Id.* at ¶ 59.  Ultimately, over 90 customizations had to be implemented, and the system still did not provide the functionality that IBM knew Connection required.  *Id.*

At the completion date identified in the 2017 SOW (January 2019), the Project was not finished.  *Id.* at ¶ 60.  IBM extended the completion date through project change requests that added millions of dollars to the contract cost.  *Id.*  However, IBM's leadership team, specifically Sandeep Singh and William Cahill, *insisted* that the Project was on-track, and gave Connection no reason to believe that the Project would not be completed successfully.  *Id.* at ¶ 15.  IBM did so to induce Connection to pay IBM's fees, to conceal IBM's prior misrepresentations concerning E1, and to conceal IBM's failure to comply with its obligations under the 2017 SOW.  *Id.* at ¶ 61.

**D.**     **Failed Go-Live**

Approximately a year before the go-live ultimately occurred (in May 2020), members of the IBM Project Team, including Bill Cahill, represented to Connection's CEO, Tim McGrath, and others at the Company, that the E1 platform was "fundamentally ready," and they advised that the Company should proceed to go-live.  *Id.* at ¶ 63.  Connection, through Mr. McGrath and others, asked the IBM Project Team for testing data to confirm that the system was ready to go-

live. *Id.* IBM, through Cahill, Marc Bjarnson, and others, continued to represent to Connection that the E1 system was ready and that the Company should proceed to go-live. *Id.* at ¶ 64. When Connection requested confirmation that all critical company processes were ready for the upgrade, IBM pointed to its Go-Live Readiness Assessment that purported to demonstrate that Connection was "97% prepared," and that there was "minimal" risk in proceeding. *Id.* at ¶ 65. See Exhibit A, May 12, 2020 Readiness Assessment at 29. Cahill also dismissed Connection's concerns about risks posed to the Company's business, alleging that Connection was "too conservative," and that it suffered from "change management issues." Compl. at ¶ 64. However, Bjarnson and Cahill nonetheless represented to Connection that a "roll-back plan" – a plan to revert to JDE World – would be available if problems arose during the transition. *Id.* at ¶ 67. Relying on IBM's representations, Connection accepted the recommendation to go-live, and the conversion from JDE World to E1 began on May 15, 2020. *Id.* at ¶¶ 66-67.

Within hours after the conversion began on May 15, 2020, it became clear that the E1 system was far from ready. Because of pervasive system defects and design problems, the E1 platform was unable to perform core business processes, such as processing orders and customer invoices. *Id.* at ¶¶ 67-68. As a result, on May 16, 2020, Connection directed IBM to abort the conversion and revert to JDE World until problems with the E1 platform could be resolved. *Id.* However, even though members of IBM's Project Team, including Cahill and Bjarnson, had assured Connection that a roll-back plan was in place, this representation was false. *Id.* Therefore, as serious system defects emerged, Connection could not revert to JDE World. *Id.*

Following the cut-over, IBM initially assured Connection that the Company was experiencing only typical "glitches" – i.e., normal interruptions that would quickly be resolved. *Id.* at ¶ 68. This was also false. *Id.* In the days, weeks, and months after go-live, severe defects

and deficiencies with the E1 system continued to emerge.  *Id.*  Components of the system failed to function properly or did not function at all, resulting in massive business and operational disruptions throughout the Company.  *See id.* at ¶ 69 (listing the same).  In the year after go-live, IBM knowingly misrepresented, and knowingly withheld material information concerning, the extent of the defects and deficiencies with the E1 system, and IBM's ability to correct the same.  *See id.* at ¶¶ 70-71.  IBM would not, or could not, resolve the E1 problems.  *Id.* at ¶ 72.  During this period alone, IBM billed Connection approximately $3 million in additional fees, but still did not correct the defects or complete the project.  *Id.* at ¶ 71.

## ARGUMENT

## I.    LEGAL STANDARD

To overcome IBM's motion to dismiss, Connection's Complaint must contain sufficient factual material, accepted as true, to "state a claim to relief that is plausible on its face." *Balsamo v. University Sys. of N.H.*, 2011 WL 4566111, at *1 (D.N.H. Sept. 30, 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is "facially plausible" when "it pleads 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "'Plausibility does not demand a showing that a claim is likely to succeed,' but does require 'a showing of more than a sheer possibility of success.'"  *Dickert v. North Coast Family Health, Inc.*, 2015 WL 3988676, at *1 (D.N.H. June 10, 2015) (quoting *Butler v. Balolia*, 736 F.3d 609, 616 (1st Cir. 2013)).  The defendant "bears the burden of demonstrating that the complaint fails to state a claim for which relief can be granted." *Id.*

Rule 9(b) requires a party alleging fraud to state with particularity the circumstances of the fraud.  Fed. R. Civ. P. 9(b).  The "federal pleading rules require the Court to read complaints

broadly" and Rule 9(b) "must be construed in conjunction with Rule 8(a)(2)."  *Save on Surplus Pension Plan v. United Saver's Bancorp, Inc.*, 1990 WL 264538, at *1 (D.N.H. Nov. 28, 1990).

## II.      **CONNECTION HAS SUFFICIENTLY PLED A BREACH OF CONTRACT**

### A.      **The Complaint Meets the Federal Standard For Pleading Breach of Contract**

IBM first argues Connection has not met the standard under New York law for pleading breach of contract.  *See* IBM Memorandum of Law In Support of Motion to Dismiss (Dkt. No.12-1) ("Memo.") at 6 n.2.  However, this case is governed by the liberal pleading standard under Rule 8(a) of the Federal Rules of Civil Procedure.

It is well established that "[i]f there is a Federal Rule of Civil Procedure that addresses the same issue as a state rule, a federal court must apply the federal rule as long as it is authorized by the Rules Enabling Act and otherwise valid."  *In re New England Compounding Pharmacy, Inc. Products Liability Litig.*, 2015 WL 13715288, at *4 (D. Mass. July 28, 2015). Here, Rule 8(a) establishes the pleading standard in federal courts and requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  With respect to pleading breach of contract, Rule 8(a) does not require a plaintiff to identify specific provisions of a contract to survive a motion to dismiss.  *See Balsamo*, 2011 WL 4566111, at *3 ("the fact that [plaintiff] has not identified these policies by name does not, standing alone, require dismissal of his breach of contract claim"); *Roman v. Spirit Airlines, Inc.*, 2019 WL 9093467, at *3 (S.D. Fla. Oct. 20, 2019) (Rule 8(a) does not require a plaintiff to cite to "a specific contractual provision that was breached"); *Goodman Mfg. Co. L.P. v. Raytheon Co.*, 1999 WL 681382, at *13 (S.D.N.Y. Aug. 31, 1999) (same).[2]

---

[2] Although there are cases in which federal courts in diversity have applied state pleading standards, these decisions appear to have done so without engaging in a choice of law analysis. *See, e.g., Yanes v. Ocwen Loan Servicing, LLC,* 2015 WL 631962, 2 (N.D.N.Y. July 8, 2016).

As both Rule 8(a) and the New York pleading standard go directly to the sufficiency of the complaint, they address the same issue and the federal rule governs.  *See, e.g., LaRue v. Mortgage Electronic Registration Sys., Inc.*, 2012 WL 3886876, at *4 (W.D. Mich. Sept. 6, 2012) (refusing to apply a Michigan pleading rule because "the Federal Rules of Civil Procedure set out the pleading standards applicable to federal cases"); *McKinley v. United States*, 2015 WL 5842626, at *9 (M.D. Ga. Oct. 6, 2015) (rejecting Tennessee rule that had the "practical effect" of increasing the pleading burden beyond F.R.C.P. 8).[3]

Here Connection's detailed, 34-page Complaint alleges that Connection and IBM entered into the 2017 SOW, Connection fulfilled its obligations under the contract, IBM breached the contract by failing to deliver on specific obligations undertaken by IBM, and Connection has been damaged by IBM's breach.  Compl. ¶¶ 92-101. These allegations satisfy Rule 8(a).  *See Goodman,* 1999 WL 681382, at *13 ("to state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.")

### B.    The Complaint Also Meets the Standard Under New York Law

Even under New York law, Connection has sufficiently pled its breach of contract claim. In addition to identifying the express contractual warranties and covenants in the 2017 SOW, the Complaint enumerates IBM's obligations under the contract, and identifies multiple ways in

---

[3] The existence of a contractual choice of law provision does not alter this result.  *See Bessemer System Federal Credit Union v. Fiserv Solutions, LLC*, 472 F. Supp. 3d 142, 155-56 (W.D. Penn. 2020) (while master agreement called for application of New York law, the pleading standard under the Federal Rules of Civil Procedure applied, and did not require plaintiff "to set forth the specific provisions of the Master Agreement it allege[d] [defendant] breached to state a claim for breach of contract …").

which IBM breached those obligations.  *See, e.g.,* Compl. ¶ 13 (IBM breached duty to design, develop, and test implementation of E1); *id.* at ¶ 14 (IBM breached duty to assign competent consultants to project); *id.* at ¶¶ 48-49 (enumerating work within IBM's scope); *id.* at ¶¶ 50-51 (identifying IBM's failure to provide critical deliverables under the contract); *id.* at ¶¶ 69, 75-91 (identifying multiple system defects, failures, and configuration problems attributable to matters within IBM's scope of work); *id.* at ¶¶ 95-96 (citing IBM's breach of enumerated contractual obligations). These allegations are sufficient to provide notice to both the Court and IBM as to the terms of the contract and IBM's breaches.  *See, e.g., State of New York, Workers' Comp. Bd. V. Cody Mgmt, Inc.*, 2015 WL 2383325, at *8 (N.Y. Sup. Ct. Mar. 6, 2015) (unreported) (complaint pled "the existence of an enforceable contract  … breaches of the [agreement] … performance of its contractual obligations and resulting damages" and "[n]o more is required").[4]

C.   <u>The Complaint Properly Alleges Breach of the 2017 SOW's Express Warranties</u>

Connection's breach of contract claim also alleges that IBM breached the express warranties and covenants in the 2017 SOW.  Compl. ¶¶ 97-98.  IBM argues these express contractual warranties cannot be enforced because, it alleges, New York law does not permit a plaintiff to "base a breach of contract claim on warranty provisions in a contract for services." Memo. at 6.  New York law is otherwise.

At the outset, IBM's argument relies entirely on the proposition that this is a contract for the provision of services.  *Id.* at 7.  However, it is well established that a "hybrid service-sale

---

[4] The cases relied on by IBM (Memo. at 6 n.2) are inapposite.  In two of them, the plaintiff did not even identify the contract that was the subject of the action or provide any information regarding the contract's terms.  *See Yanes*, 2015 WL 631962, at *2 (complaint failed to specify even what contract was breached); *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996) ("[t]here [was] no presentation of the terms of a contract, its duration, or even when it was formed" nor did the complaint "explain what obligations were imposed on each of the parties by the alleged contract").

transaction" can "give rise to a cause of action for breach of warranty … if the sales aspect of the transaction predominates and the services aspect is merely incidental." *OneBeacon America Ins. Co. v. Comsec Ventures Int'l, Inc.*, 2010 WL 114819, at *5 (N.D.N.Y. Jan. 7, 2010) (internal citation omitted).  Here, the thrust of the parties' agreement was for IBM to provide a functioning ERP system – a good – to Connection.  Courts have found that contracts for the provision of computer software are predominantly for the sale of goods *even where* the contract includes long periods of software development or servicing.  *See Colonial Life Ins. Co. of Am. v. Electronic Data Sys. Corp.*, 817 F. Supp. 235, 239 (D.N.H. 1993) (applying UCC to software contract which included "four years" of development and customization because "[t]he essence of the contract was to license" the use of the software); *Nielsen Media Research, Inc. v. Microsystems Software, Inc.*, 2002 WL 31175223, at *9 (S.D.N.Y. Sept. 30, 2002) (denying summary judgment because contract involving the provision of software and services "may actually be for goods").

Even were the 2017 SOW construed as predominantly a services agreement, IBM's argument that Connection cannot maintain a contract claim based on the breach of express warranties in the 2017 SOW lacks merit.  An express contractual warranty "is as much a part of the contract as any other term."  *CBS Inc. v. Ziff-Davis Pub. Co.*, 75 N.Y.2d 496, 503 (App. Ct. 1990) (reversing dismissal of claim alleging breach of express warranty in purchasing agreement regarding accuracy of financial information provided by seller prior to sale).[5]  Under New York

_____

[5] Under IBM's position, any express warranty provisions in a contract for services would be incapable of enforcement and would therefore be rendered meaningless.  IBM has not cited any authority to justify this result, which in contrary to basic rules of contract interpretation.  *See Walker v. Thompson*, 404 F. Supp. 3d 819, 825 (S.D.N.Y. 2019) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless … is not preferred and will be avoided if possible") (internal citation omitted).  Moreover, IBM's position would interfere with parties' freedom of contract.

law, where a contract – including a contract for services – contains an express warranty, that warranty "is part and parcel of the contract containing it and <u>an action for its breach is grounded in contract</u>." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184-85 (2d Cir. 2007) (emphasis added); *Milau Associates v. North Ave. Dev. Corp.,* 42 N.Y.2d 482, 487 (1977) ("where the party rendering services can be shown to have expressly bound itself to the accomplishment of a particular result, the courts will enforce that promise.").[6]  For example, courts have recognized claims for breach of contract based upon express warranties in a medical services contract. *Robins v. Finestone*, 308 N.Y. 543, 545-46 (N.Y. App. 1955) (finding that it is "inescapable that a cause of action for breach of contract is stated" where contract included an express promise that plaintiff would be cured); *see also Owen v. Appelbaum*, 613 N.Y.S. 2d 504, 504 (N.Y. App. Div. 1994) ("a breach of contract claim in relation to the rendition of medical services by a physician is sufficient only when based upon an express promise to effect a cure or to accomplish some definite result").

The seminal case of *Milau,* is illustrative.  There, the sprinkler system in a commercial building failed, and the plaintiffs filed suit against the fire protection specialist that subcontracted to design and install the system. *Milau*, 42 N.Y.2d at 484.  The specialist's subcontract contained an express warranty that "all *Work* under this Subcontract shall be of good quality, free from defaults and defects and in conformance with the Contract Documents."  *Id.* (emphasis in original).  However, the plaintiffs did not seek recovery under this express contractual warranty, and instead brought claims for negligence and breach of implied warranty. *Id.* at 484.  In affirming the trial court's refusal to submit the implied warranty claim to the jury, the *Milau*

---

[6] *See also Torok v. Moore's Flatwork & Foundations, LLC*, 966 N.Y.S.2d 572, 575 (N.Y. App. Div. 2013) ("No warranty attaches to the performance of a service" but "if it constitutes a breach of contract, the action is for that breach") (internal citation omitted); *Mallards Dairy, LLC v. E&M Engrs. & Surveyors, P.C.*, 897 N.Y.S.2d 552, 552 (N.Y. App. Div. 2010) (same).

Court held that the "exacting warranty standards from imposing liability without proof of fault will not be imported from the law of sales" – i.e., the UCC – and applied to contracts for services. *Id.* at 486. However, the Court emphasized that "where the party rendering services can be shown to have expressly bound itself to the accomplishment of a particular result, the courts will enforce that promise." *Id.* at 487. The Court observed that the plaintiffs could have brought a claim under "the written warranty provided in the work subcontract," but they "opted instead" to pursue claims for negligence and breach of implied warranty under the UCC. *Id.*; *see also Roizen v. Marder's Nurseries, Inc.*, 615 N.Y.S.2d 235, 236 (1994) (denying motion to dismiss contract claim for breach of express warranty).

None of the cases cited by IBM support the proposition that a claim for breach of contract cannot be based on breach of an express warranty in a services contract. *See, e.g.*, *Glover v. Bob's Discount Furniture, LLC*, 2022 WL 3353454, at *6 (S.D.N.Y. Aug. 12, 2022) (dismissing breach of warranty claim, not breach of contract); *Blackhawk Dev., LLC v. Krusinski Constr. Co.*, 2021 WL 1225917, at *5 (S.D.N.Y. Mar. 31, 2021) (same). Indeed, one of IBM's cases, *Orlander v. Staples, Inc.*, 2014 WL 2933152, at *8 (S.D.N.Y. June 30, 2014), was vacated by the Second Circuit to *reinstate* a breach of contract claim brought by the plaintiff based upon the breach of an express contractual warranty. 802 F.3d 289, 302 (2d Cir. 2015).[7]

---

[7] Despite IBM's assertion (Memo. at 8) that courts "routinely" reject attempts to plead a breach of contract based on express contractual warranties, none of the cited cases actually supports this proposition. *See Landtek Grp., Inc. v. N. Am. Specialty Flooring, Inc.*, 2017 WL 11264722, at *16 (E.D.N.Y. Aug. 12, 2016) (dismissing claim not based on warranty, but lack of apparent authority); *Cutrone v. Mortgage Electronic Registration Sys., Inc.*, 2015 WL 13931932 (E.D.N.Y. June 26, 2015) (not addressing the possibility of a breach of contract claim); *Renaissance Hous. Dev. Fund Corp. v. Phoenix Constr., Inc.*, 25 N.Y.S.3d 866, 866 (N.Y. App. Div. 2016) (finding that "untimely warranty claims" could not be changed to "timely breach of contract claims" without ruling on the merits); *Gallup v. Sommerset Homes, LLC*, 920 N.Y.S.2d 504, 507 (N.Y. App. Div. 2011) (finding that "the existence of a *statutory limited warranty*

**D.**   **Connection's Contract Claim Is Not Time Barred**

IBM argues Connection's contract claim is time barred because "Connection does not allege any contract breaches within the statute of limitations period." Memo. at 9. This argument is premature. The "determination of when a statute of limitations began to run is generally a factual one," and a "motion to dismiss is often not the appropriate stage to raise affirmative defenses like the statute of limitations." *Bild v. Konig*, 2011 WL 666259, at \*3 (E.D.N.Y. Feb. 14, 2011), *on reconsideration in part* 2011 WL 1563576 (E.D.N.Y. Apr. 25, 2011) (internal citations omitted). Since a court "must accept all of the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor on a motion to dismiss … dismissal on statute of limitations grounds at the motion to dismiss stage is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Bizelia v. Clinton Towers Housing Co., Inc.*, 2022 WL 1747763, at \*4 (S.D.N.Y. May 31, 2022) (internal citation omitted).

IBM argues Connection has not alleged a breach after April 30, 2020. This is inaccurate. The Complaint alleges IBM breached the 2017 SOW on May 15, 2020 (well within the two year statutory period), when IBM directed Connection to proceed with the implementation of a defective E1 system that did not meet the standards specified in the 2017 SOW. Compl. ¶¶ 63-67, 96-98. The May 15, 2020 go-live marked the delivery of the E1 system, the design and implementation of which was the entire point of the 2017 SOW. The Complaint also alleges that IBM continued to breach the 2017 SOW after May 15, 2020, when IBM failed to repair defects in the system and complete its work. *Id.* at ¶¶ 68-91. Connection's cause of action therefore accrued, at the earliest, on May 15, 2020 upon IBM's tender of the deficient system. *See*

---

precludes common-law causes of action") (emphasis added); *Goodman*, 1999 WL 681382, at \*13 (contract that specifically disclaimed the existence of warranties beyond the contract).

*Richard A. Rosenblatt & Co., Inc. v. Davidge Data Sys., Corp.*, 743 N.Y.S. 2d 471, 472 (N.Y. App. Div. 2002) (contract for purchase of hardware and software accrued upon delivery); *Liecar Liqs. V. CRS Bus. Computers*, 613 N.Y.S. 2d 298, 299 (N.Y. App. Div. 1994) (contract for system accrued upon tender).

This case is closely analogous to a construction contract, wherein a party provides services over a lengthy period of time resulting in the delivery of a final product.  New York courts have routinely held that a cause of action for breach of such a contract accrues upon the completion of performance.  *See Starakis v. Baker*, 993 N.Y.S. 2d 177, 179 (N.Y. App. Div. 2014) ("A claim against a contractor for damages arising from defective construction accrues, for limitations purposes, upon completion of performance under the contract"); *Calamel v. Ridge View Realty Corp.*, 496 N.Y.S. 2d 154, 155 (N.Y. App. Div. 1985) (similar).

IBM argues that Connection "cannot save its claim by alleging that it did not discover system defects and deficiencies" until the go-live date.  Memo. at 9.  Again, Connection has adequately alleged that IBM breached the contract upon the delivery of the defective system on May 15, 2020, and thereafter when IBM failed to repair the system and complete its work.  Moreover, as a result of IBM's continued false assurances and misrepresentations concerning the E1 platform, IBM's ability to successfully complete the implementation, the system's preparedness to go-live, and IBM's willingness and ability to address any system problems post go-live, IBM is equitably estopped from pleading the statute of limitations.  Under New York law, a "defendant may be estopped from pleading the Statute of Limitations where a plaintiff was induced by fraud, misrepresentation, or deception to refrain from timely commencing an action." *Burlington Packaging, Inc. v. Extra Packaging, Inc.*, 2020 WL 5043817, at *2 (E.D.N.Y. Aug. 25, 2020) (denying motion to dismiss where complaint alleged affirmative misrepresentations);

*Waldman v. Escobar*, 2009 WL 861068, at *3 (S.D.N.Y. Mar. 27, 2009) (denying motion to

dismiss where defendant concealed the breach of contract).  Here, Connection alleges that IBM

continually misrepresented the status of the project as well as the extent of the problems

following go-live.  Compl. ¶¶ 61, 68.

## III.   CONNECTION STATES A VALID CLAIM FOR CONTRACTUAL INDEMNIFICATION

In response to Connection's claim for contractual indemnification (Count II), IBM argues

that a claim for indemnification is "nonactionable" "absent a payment to a third party."  Memo.

at 10.  To the contrary, New York courts have repeatedly held that a contractual indemnification

provision may apply to claims between parties to the contract where, as here, the intent to cover

inter-party claims is "unmistakably clear from the language of the promise" or "manifest from

the surrounding facts and circumstances or purpose of the agreement."  *Promuto v. Waste*

*Management, Inc.*, 44 F. Supp. 2d 628, 650 (S.D.N.Y. 1999) (quoting *Hooper Assoc., Ltd. v.*

*AGS Computers, Inc.*, 74 N.Y.S. 2d 487, 492 (1989)).  "Unmistakable clarity" does not require

certain express language, but rather can be determined "from the language and purpose of the

entire agreement and the surrounding facts and circumstances."  *In re Refco Sec. Litig.*, 890 F.

Supp. 2d 332, 341 (S.D.N.Y. 2012).

Here, such an unmistakable intent is clear from the indemnification provision in the 2017

SOW.  This provision provides as follows:

> IBM shall indemnify, defend, and hold harmless Connection, its Affiliates, and their
> representative officers, directors, employees and agents, from and against any and all
> actual or threatened losses, liabilities, damages , and claims, and all related costs and
> expenses (including reasonable attorney's fees) arising from: **(a) any claim by a third**
> **party** alleging bodily injury, death, or property damage, to the extent IBM (or any
> personnel or representatives of IBM) is legally liable; **(b) any breach by IBM of this**
> **Agreement** or any [sic]; **or** (c) any breach by IBM of any confidentiality, privacy, or
> security obligations under this Agreement.

Def's Ex. 2 (2017 SOW) at 36 (emphasis added).

This indemnification provision specifically provides for indemnification for *third-party claims* relating to "bodily injury, death, or property damage," while simultaneously allowing for broader claims relating to IBM breaches, which do not include a third party qualification.  New York courts have held that clauses like this provide sufficient clarity to support inter-party indemnification claims.[8]  *See Sagittarius Broadcasting Corp. v. Evergreen Media Corp.*, 243 A.D.2d 325, 326 (N.Y. App. Div. 1997) ("the first sentence of the subject clause cannot reasonably be interpreted as limited to third-party claims, particularly in view of the second portion of that clause, which clearly pertains to third-party actions, thereby rendering the first part mere surplusage …"); *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 178-79 (2d Cir. 2005) (similar).[9]

## IV.   THE COMPLAINT STATES A CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT

IBM argues that Connection's claim for breach of the implied covenant of good faith and fair dealing (Count III) should be dismissed as duplicative of its breach of contract claim. Memo. at 10-11.  This argument both misapplies New York law and overlooks that these claims may be pled in the alternative.

---

[8] The 2017 SOW's indemnification clause further makes clear that it applies to inter-party claims because it is unclear how subsection c – which applies to IBM's breach of confidentiality, privacy or security obligations in the contract – could expose Connection to liability from third-party suit.  *See Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 146 (S.D.N.Y. 2004) (finding that the indemnification provision applied to inter-party claims where "[i]t is difficult to imagine a third-party action as a result of" the covered claim).

[9] IBM cites *Sussman Sales Co., Inc. v. VWR Int'l, LLC*, 2021 WL 1165077, at *19 (S.D.N.Y. Mar. 26, 2021), which found that an indemnification provision "must refer 'exclusively or unequivocally' to claims between Plaintiff and Defendant to cover first-party claims."  No courts have followed *Sussman* in this context.  *Sussman* is against the weight of authority in New York courts, which, as shown, have held that unmistakable clarity does not require certain express language, but can be inferred from the surrounding circumstances.

The "touchstone" for whether these claims are duplicative "is whether they rely on the same factual allegations." *Sobel v. Major Energy Servs, LLC*, 2020 WL 5362357, at *8 (S.D.N.Y. Sept. 8, 2020). The case *Freepoint Commodities LLC v. Ridgebury Kilo LLC* is instructive. There, the court was presented with a contract to maintain a maritime vessel. The court held that breach of contract and implied covenant claims were sufficiently distinct where the contract claim involved the failure to "maintain a vessel … according to the terms of the" agreement, while the implied covenant claim alleged the failure "to disclose the true nature of their breach." 2022 WL 461991, at *7-8 (S.D.N.Y. Sept. 30, 2022). Moreover, in *Freepoint*, the claims also involved different damages as the defendant's actions leading to the implied covenant claim "made it impossible for Plaintiffs … to mitigate the cost" arising from the breach which "imposed further losses." *Id.* So too here. Connection's breach of contract claim centers on IBM's failure to produce a functioning ERP system, Compl. ¶¶ 96-98, while the implied covenant claim concerns conduct such as IBM's bad faith insistence that Connection proceed to go-live, despite its knowledge that the system was not ready, *id.* at ¶ 109. These claims rely on different factual allegations as one involves the defective delivery of a product and the other misrepresentations regarding the status of the product.

Furthermore, as this Court sits in diversity, Connection is permitted to plead its breach of contract and implied covenant claims in the alternative. *See, e.g., Ortiz v. Sig Sauer, Inc.*, 448 F. Supp. 3d 89, 106 (D.N.H. 2020) (noting that the federal rules allow alternative pleading); *Wabash Castings, Inc. v. Fuji Machine Am. Corp.*, 2016 WL 4765717, at *2 (N.D. Ill. Sept. 13, 2016) (finding that Federal Rule 8(d)(3) applied in a diversity action which permitted plaintiff to allege claims in the alternative although it could only recover under one); *Ruberti v. Ethicon,*

18

*Inc.*, 2021 WL 5570109, at *3 (M.D. Ala. Nov. 29, 2021) ("The issue of alternative pleading is procedural" and the federal rule "does not violate the Rules Enabling Act or the Constitution").[10]

## V.   THE COMPLAINT ALLEGES A CLAIM FOR BREACH OF PROFESSIONAL NEGLIGENCE

IBM argues Connection's professional negligence claim fails because Connection does not allege a duty independent of the 2017 SOW.  Memo. at 11-13.  Not so.  It is well established that "[a]n action for professional [negligence] may lie in the context of a contractual relationship if the professional negligently discharged the duties arising from that relationship."  *17 Vista Fee Associates v. Teachers Ins. & Annuity Ass'n of Am.*, 693 N.Y.S. 2d 554, 559 (N.Y. App. Div. 1999).  A professional may be subject to tort liability based upon the relationship of the parties, the type of activity at issue, and the resulting injury.  *See Anunziatta v. Orkin Exterminating Co., Inc.*, 180 F. Supp. 2d 353, 358-59 (N.D.N.Y. 2001).

Here, Connection alleged that IBM had a duty to "adhere[] to the professional obligations, practices, rules, and standards that apply to software implementation professionals."  Compl. ¶ 113.  IBM was subject to this duty because: (1) Connection and IBM had a long-term relationship; (2) IBM represented itself as having special expertise in the area; (3) IBM conducted a thorough Discovery Assessment (for which it charged Connection $600,000) to determine Connection's business needs; and (4) IBM's conduct resulted in catastrophic damages for Connection.  *See* Compl. ¶¶ 3, 6-10, 34-42, 68-91; *see also Anunziatta*, 180 F. Supp. 2d at 358-59 (an independent relationship existed where defendant held itself out as a reliable professional, the task required reasonable care and the conduct could result in extensive property

---

[10] This claim is timely as it arose at the earliest in May 2020, and in any case, IBM should be equitably estopped from raising the statute of limitations.  *See supra* at Section II.D.

damages).[11]  Nor is this claim duplicative of Connection's breach of contract claim; when an independent legal duty exists, "the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself."  *Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 470 (S.D.N.Y. 2007).

## VI.   <u>CONNECTION HAS SUFFICIENTLY PLED ITS FRAUD CLAIMS</u>

### A.   <u>Connection's Fraud Claims Are Distinguishable From Its Contract Claims</u>

IBM argues Connection's claims for fraudulent inducement (Count V), fraudulent misrepresentation (Count VI), and negligent misrepresentation (Count VII) cannot be maintained alongside a breach of contract claim.  This issue is governed by the test set forth in *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). Connection "must either: (i) demonstrate a legal duty separate from the duty to perform under the contract, or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."  *Id.* (internal citation omitted).  While Connection need only satisfy one of the three *Bridgestone* factors, *Wild Bunch, SA v. Vendian Entertainment, LLC*, 256 F. Supp. 3d 497, 507 n.5 (S.D.N.Y. 2017), it meets all three.

As to the first *Bridgestone* factor, an independent duty may arise between parties to a contract where there is a "special relationship" between the entities.  *See Apple Records, Inc. v. Capitol Records, Inc.*, 529 N.Y.S. 2d 279, 282 (N.Y. App. Div. 1988).  Such a special

---

[11] Although some New York courts have declined to uphold claims for professional malpractice for computer consultants, these cases do not involve the type of relationship and reliance as existed between IBM and Connection.  *See, e.g.*, *Richard A. Rosenblatt & Co.*, 743 N.Y.S. 2d at 473; *Donald Dean & Sons, Inc. v. Xonitek Sys. Corp.*, 656 F. Supp. 2d 314, 324 n.21 (N.D.N.Y. 2009).

relationship has been found between a party designing and implementing an ERP system and its customer, where the customer "did not have the necessary expertise" to design the system and the designer "assessed [the customer's] software needs for nine months before signing" the agreement and had "specialized expertise" regarding the system. *J & R Electronics Inc. v. Business & Decision N.A.*, 2013 WL 5203134, at *7 (S.D.N.Y. Sept. 16, 2013). So too here. Connection and IBM had a long-term relationship, with IBM having served as an expert consultant to Connection as early as 2011. Starting at least in 2013, IBM served as Connection's expert consultant in determining what ERP platform Connection should select to replace the older, JDE World platform. Relying on IBM's representations concerning its skill and experience with ERP upgrades, Connection engaged IBM in 2016 to conduct the year-long Discovery Assessment, during which IBM charged Connection more than $600,000 to identify Connection's business needs as they related to the ERP system, and determine the scope and cost of designing and implementing E1. Compl. ¶¶ 3, 6-10, 34-42.

Moreover, the first *Bridgestone* prong also is met where, as here, a party had a duty to disclose material information. Such a duty arises when the information was "'peculiarly within the knowledge'" of that party and could not have been discovered "through the 'exercise of ordinary intelligence.'" *Wild Bunch*, 256 F. Supp. 3d at 503 (internal citation omitted). Here, information such as IBM's experience and technical expertise in executing ERP implementations, the results of IBM's Discovery Assessment, IBM's determination of the suitability of E1, the time and cost required to complete the Project, and IBM's determination as to whether the E1 system was ready to go-live, were particularly within IBM's own knowledge. IBM made these representations with the intent that Connection would believe in and rely on them, for example by entering into the 2017 SOW and engaging IBM to design, develop, and

implement the new ERP system, by continuing to pay IBM's fees, and by proceeding to go-live. *See id.* at 504 (finding a duty where defendant "deliberately cultivated just such a reliance").

Connection has also met the second *Bridgestone* factor, as its fraud and misrepresentation claims are collateral to and separate from its contract claims. At the outset, as a matter of law, the fraudulent inducement claim is not duplicative as this claim "involves a separate breach of duty from the obligations imposed under the contract" and is "therefore, collateral to the contract." *Saul v. Cahan*, 2014 WL 5801839, at *7 (N.Y. Sup. Ct. 2014) (unreported). In addition, the Second Circuit has made clear that a "misrepresentation of present fact is collateral to the contract (though it may have induced the plaintiff to sign the contract)." *Merrill Lynch & Co. Inc.*, 500 F.3d at 184. This is true *even if* "the alleged misrepresentation would represent, if proven, a breach of the contractual warranties." *Id.; see also Subramanian v. Lupin Inc.*, 2020 WL 7029273, at *12 (S.D.N.Y. Aug. 21, 2020), *R&R adopted by* 2020 WL 6075523 (S.D.N.Y. Oct. 15, 2020). This rule prevents a party from insulating its prior false statements by including them in a contract. As the District Court observed in *Taylor Precision Prods., Inc. v. Larimer Grp., Inc.*: "[o]nce you have told someone that you hold title to the Brooklyn Bridge to entice that person to buy it, executing a contract to sell it that states that you hold title to the Brooklyn Bridge does not make your prior statement any less fraudulent, nor does it convert the fraud into a breach of contract." 2018 WL 4278286, at *19 (S.D.N.Y. Mar. 26, 2018) (quoting *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 303 (E.D.N.Y. 2002)).

Here, Connection's fraud and misrepresentation claims are based on IBM's statements of present facts. IBM's representations concerning its experience and expertise, the results of its assessment at to the suitability of E1, the time and cost required to complete the implementation, and the readiness of the E1 system to go-live, were all statements of present fact. *See, e.g.,*

*Airport Mart Inc. v. Dunkin' Donuts Franchising LLC*, 2019 WL 4413052, at *10 (S.D.N.Y. Sept. 16, 2019) (statements regarding the suitability of a location for a project were collateral); *Beyond Bespoke Tailors, Inc. v. Barchiesi*, 2022 WL 428193, at *10 (S.D.N.Y. Feb. 11, 2022) (statements regarding defendant's "skills and qualifications" were collateral).

Moreover, statements of present fact made to induce a party to continue performance under a contract, or to hide deficient performance, are not duplicative of a breach of contract claim even if they are made post-contract formation.  *See BJB Ltd. v. iStar Jewelry LLC*, 533 F. Supp. 3d 83, 103 (E.D.N.Y. 2021) (misrepresentations made after contract formation were collateral "as they are alleged to have had the effect of inducing BJB to remain in the agreement"); *IS Chrystie Mgt. LLC v. ADP, LLC*, 168 N.Y.S.3d 449, 450 (N.Y. App. Div. 2022) (misrepresentation that a problem had been fixed was collateral); *VTech Holdings Ltd. v. Lucent Tech., Inc.*, 172 F. Supp. 2d 435, 440 (S.D.N.Y. 2001) (similar).  Here, as the project extended far past IBM's initial project completion deadlines, and IBM's fees vastly exceeded IBM's prior representations as the E1 platform required extensive customizations to provide the base functionality required for Connection to operate, IBM concealed its prior misrepresentations and deficient performance by making misstatements of present fact concerning the project's continued viability, IBM's ability to successfully complete the implementation, and the readiness of the E1 system to go-live.  These misstatements were collateral to the 2017 SOW.  *See BJB Ltd.*, 533 F. Supp. 3d at 83; *IS Chrystie Mgt. LLC*, 168 N.Y.S.3d at 450

Finally, Connection has met the final *Bridgestone* factor as the damages it seeks for its fraud-based claims are distinct from its contractual damages.  As set forth above, IBM made repeated misrepresentations to induce Connection to enter into 2017 SOW, as well as to continue performance.  Absent these representations, Connection would not have entered into the

agreement and would not have agreed to continue paying Connection beyond its original price estimation.  These damages are entirely distinct from its breach of contract claims.  *IS Chrystie*, 168 N.Y.S.3d at 450-51 (damages did not overlap with breach of contract where fraud resulted in "plaintiff's overpaying its employees" and failing to terminate the contract); *EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 279 (S.D.N.Y. 2004) (damages were "distinct from the 'benefit of the bargain' damages sought in the contract claim" even if they were not specified in the complaint).

### B.    The Complaint Alleges Fraud With Sufficient Particularity

As a threshold matter, while IBM argues Rule 9(b) applies to Connection's negligent misrepresentation claim, courts in this district have held that "a claim for <u>negligent</u> misrepresentation must meet only the pleading standards of Federal Rule of Civil Procedure 8(a)(2)."  *See Roberts v. Johnson & Johnson and Ethicon, Inc.*, 2021 WL 395575, at *2 (D.N.H. Feb. 4, 2021) (emphasis in original); *L'Esperance v. Manhattan Mortg. Corp.*, 2012 WL 3839376, at *3 (D.N.H. Sept. 5, 2012).  Although a negligent misrepresentation claim may be subject to Rule 9(b) "where the core allegations effectively charge fraud," the *Roberts* court found that the defendants had not shown that the allegations "allege fraud rather than negligence" where defendants faulted plaintiffs "for failing to allege facts to show that they knew their representations were false, which is an element of fraud." *Roberts*, 2021 WL 395575, at *2. So too here.  Connection's negligent misrepresentation claim alleges that IBM failed to exercise "reasonable care of competence."  Compl. ¶ 137.

IBM's arguments regarding failure to plead fraud with sufficient particularity lack merit. At the outset, IBM's argument that "[n]one of the alleged misrepresentations identify the

speaker, the context … or the date or general timeframe" is inaccurate.  Memo. at 17.  The Complaint is replete allegations specifying the details of IBM's misrepresentations.

The Complaint identifies specific representations made by IBM to induce Connection to engage IBM and enter into the 2017 SOW.  These included:

- IBM's <u>written</u> misrepresentations in a July 2013 PowerPoint presentation to Connection regarding its experience and qualifications, and the suitability of E1, Compl. ¶¶ 33-34;

- IBM's false representations following the Discovery Assessment that standard, "vanilla," "out of the box" E1 software, with only 15 customiations, would be suitable for Connection, *id*. at ¶ 39;

- IBM's false representations that it could complete the Project in 17 months at a cost of $9.2 million, *id.* ¶¶ 39-40, which IBM later repeated, in writing, in the 2017 SOW, *id.* at ¶¶ 45-46;

- IBM's false representations by named IBM representatives, including William Cahill, Marc Bjarnson, and Sandeep Singh, to conceal IBM's deficient performance and induce Connection to proceed to go-live, *id.* at ¶¶ 15, 64;

- IBM's false representations in its "Go-Live Readiness Assessment," which alleged the E1 system was "97% prepared" and the risk proceeding was "minimal" and which served to induce Connection to "go-live" on May 15, 2020, *id.* at ¶ 65, and <u>Exhibit A</u>;

- Cahill and Bjarnson's misrepresentation that a "roll-back plan" was in place, Compl. ¶ 67;

- IBM's false post go-live representations that Connection was experiencing only typical "glitches" – i.e., normal interruptions that would quickly be resolved, *id.* at ¶ 68;

- In the year after go-live, IBM knowingly misrepresented, and knowingly withheld material information concerning, the extent of the defects and deficiencies with the E1 system, and IBM's ability to correct the same, while at the same time billing Connection approximately $3 million in additional fees, *id.* at ¶¶ 68, 71.

These allegations satisfy Rule 9(b).  In addition to identifying the speaker, content, and manner of the misrepresentations, Connection has sufficiently identified the date or time period during which the misrepresentations were made.  *See N.H. Elec. Coop., Inc. v. Elster Sols., LLC*, 2017 WL 2861667, at *3 (D.N.H. Jul. 5, 2017) (complaint sufficiently identified timeframe as "during the 'request for proposal' process"); *Homes Dev. Corp. v. Edmund & Wheeler, Inc.*, 2022 WL 4586480, at *8 (D.N.H. Sept. 29, 2022) (complaint sufficient where it alleged general timeframe of 180 days); *Howard v. Cycare Sys., Inc.*, 128 F.R.D. 159, 164 (D. Mass. 1989) (complaint identifying a three month period provided sufficient particularity); *see also* 5A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1298 (4th ed. 2022) (less particularity may be required where "the issues are complicated or the transactions cover a long period of time").  Moreover, as to IBM's misrepresentations contained in the Go-Live Readiness Assessment, attached hereto, the Court may consider the contents of the document in deciding particularity.  *Langlais v. Brenner-Currier*, 561 F. Supp. 3d 103, 114 (D.N.H. Oct. 2, 2020).

Furthermore, as for statements attributable to IBM, Rule 9(b) does not require Connection to identify a specific IBM employee associated with the statements.  *See Surge Res., Inc. v. The Barrow Grp.*, 2003 WL 1193012, at *2 (D.N.H. Mar. 12, 2003) (upholding complaint where misrepresentations were attributed to the defendant corporation); *Moore v. Mortgage Elec. Registration Sys., Inc.*, 848 F. Supp. 2d 107, 131 (D.N.H. Jan. 27, 2012) (finding that allegation that the defendant sent a misleading letter was sufficient and it was not necessary "to identify the particular employee").

Finally, a significant amount of IBM's fraudulent conduct involves not only actual misrepresentations, but the failure to provide necessary information, such as information concerning the limitations of E1, the actual cost and time required for the Project, the system's

readiness to go live, and the risks of proceeding with go-live in May 2020. Compl. ¶¶ 118(a),

(d)-(f), 126(a)-(h), 136(a)-(h). "[I]t is unclear how [Connection] could be more specific" since

"there is no practical way … to detail the date or place of conversations that never occurred."

*Homes Dev. Corp.*, 2022 WL 4586480, at *9 (internal citation omitted).

### C.    The Complaint Sufficiently Alleges Scienter

Connection sufficiently alleges scienter.  A "plaintiff may allege knowledge or scienter

'generally,'" and only needs to "meet the plausibility standard of Rule 8(a)." *N.H. Elec. Coop.,*

2017 WL 2861667, at *3.  For fraud, the plaintiff must allege facts to provide a reasonable basis

to infer that a defendant made a representation "with knowledge of its falsity or with conscious

indifference to its truth." *Id.* at *4 (internal citation omitted).  For negligent misrepresentation,

the plaintiff must allege facts to plausibly infer that the defendant failed to "exercise reasonable

care to verify the truth of a misrepresentation." *Id.* (internal citation omitted).  In evaluating if a

complaint sufficiently alleges scienter, "the court's job is not to scrutinize each allegation in

isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights,*

*Ltd.*, 551 U.S. 308, 326 (2007).

Courts can infer a defendant "made a promise without the intention to perform based on

the surrounding circumstances." *Langlais v. Brenner-Currier*, 561 F. Supp. 3d at 113 (internal

citation omitted).  For example, the "unreasonableness of a promisor's belief forms an

evidentiary basis for a finding of intent to defraud." *Id.* (quotations omitted).  In addition,

"[u]nder certain circumstances, courts are permitted to infer fraudulent intent based, in part, on a

promise and subsequent failure to perform." *Avalanche IP, LLC v. FAM, LLC*, 2021 WL

149258, at *8 (D. Mass. Jan. 15, 2021) (citing *Hoffman v. Optima Sys., Inc.*, 683 F. Supp. 865,

868 (D. Mass. 1988) (factfinder "would surely be permitted to such an inference of scienter from

the abject failure of performance").  Furthermore, where a defendant makes false statements about an entity with which the defendant has a "long-standing, close relationship," that relationship can support a plausible inference that the defendant knew the statements were false. *Homes Dev. Corp.*, 2022 WL 4586480, at *9.

Moreover, scienter can be pled through factual allegations that the plaintiff "continuously warned and expressed grave concerns to the defendants" about the misrepresentations which "defendants ignored."  *Davis v. Gutierrez*, 2018 WL 1514869, at *10 n.48 (D.N.H. Mar. 27, 2018); *Avalanche*, 2021 WL 149258, at *8 (fact that CEO made false statements about defendant's ongoing commitment to partnership with plaintiff after plaintiff "expressed reservations" about that issue, supported inference that CEO knew statements were false and made them to induce plaintiff to extend contract with defendant).  Further, factual allegations that the defendant stood to realize a financial gain from the misstatements also support a finding of scienter.  *Homes Dev. Corp.*, 2022 WL 4586480, at *9 (quoting *Tellabs*, 551 U.S. at 325).

Connection has met this standard.  Regarding IBM's misrepresentations to induce Connection to enter into the 2017 SOW, the allegations in the Complaint – including allegations concerning IBM's long-standing relationship as Connection's technical consultant,  Compl. ¶ 30, IBM's intimate knowledge (gained through the year-long Discovery Assessment) of both Connection's use of JDE World and the system functionality required to operate its business, *id.* at ¶¶ 35-42, and IBM's professed expertise in successfully leading JDE implementations, *id.* at ¶¶33-34 – support a reasonable inference that IBM knew its misrepresentations concerning the suitability of "vanilla" E1, the lack of customization that would be required, and the cost and time to complete the implementation, were false.  *See Homes Dev. Corp.,* 2022 WL 4586480, at *9.  The fact that this was the same playbook IBM used previously to induce other clients to

engage IBM to undertake ERP implementations that failed under circumstances which mirror those presented here, also supports a finding of scienter.  Likewise, factual allegations that IBM, in response to Connection's stated concerns, assured Connection that IBM understood the Company's non-negotiable requirements for the Project, *id.* ¶¶ 38, 45-47, and that IBM had a strong financial motive to make these misrepresentations (as it stood to earn millions of dollars in fees from the Project), *id.* at ¶¶ 11, 18, provide grounds for inferring scienter.  *See Davis,* 2018 WL 1514869, at *10 & n.48*; Homes Dev. Corp.,* 2022 WL 4586480, at *8-9  Finally, the vast disparity between IBM's pre-contract representations and how the Project ultimately unfolded – including the fact that over 90 customizations to E1 were required, not 15, and that the Project cost over twice as much, and took over twice as long as IBM had claimed, Compl.  ¶¶ 57-61 – points to the unreasonableness of IBM's representations and supports a finding of scienter.  *See Avalanche,* 2021 WL 149258, at *7-8.

Regarding IBM's misrepresentations made to induce Connection to proceed to go-live – including misrepresentations regarding the testing of the E1 system, the readiness to go-live, the existence of a roll-back plan, and the lack of risk to Connection – Connection has alleged ample facts to support an inference that IBM's knew these misrepresentations were false, or at a minimum failed to exercise reasonable care to ascertain the truth of the representations.  Here again, factual allegations concerning IBM's intimate knowledge of the E1 system and Connection's business needs support a finding of scienter.  So too do allegations that IBM made the misrepresentations after Connection executives directly questioned IBM about the preparedness of the E1 system to go-live.  Compl. ¶ 63-65.  IBM actually doubled down on its falsehoods and chided Connection for being too conservative.  *Id.* at ¶¶ 63-64, 67.  The catastrophic impact of the go-live, and the wide-scale system failures that occurred, demonstrate

the unreasonableness of IBM's representations that the E1 platform had been appropriately tested and was ready to go-live, and provide an evidentiary basis for inferring an intent to defraud. *See Langlais,* 561 F. Supp. 3d at 112-14 . Taken together, these allegations support a reasonable inference that IBM knew its misrepresentations were false.

Finally, to the extent IBM argues that not all of the misrepresentations cited in the Complaint are pled with the requisite specificity, this is still not enough to succeed on a motion to dismiss. *Rodi v. S. New England Sch. of L.*, 389 F.3d 5, 15-16 (1st Cir. 2004) ("When a claim sounding in fraud contains a hybrid of allegations, some of which satisfy the strictures of Rule 9(b) and some of which do not, an inquiring court may sustain the claim on the basis of those specific allegations that are properly pleaded"); *Adhesive Tech., Inc. v. Isaberg Rapid AB*, 2011 WL 2134381, at *19 (D.N.H. May 26, 2011) (finding that the claim met Rule 9(b) after "*[t]aking the complaint as a whole*") (emphasis added). Connection's fraud-based claims should therefore be upheld as sufficiently particular to survive a motion to dismiss.

### D.   Connection Has Alleged Actionable Misrepresentations

IBM's argument that the alleged misrepresentations are nonactionable "opinions, estimates, predictions or puffery" is similarly unavailing. Memo. at 19-20.

First, IBM argues that misrepresentations regarding the suitability of the out-of-the box "vanilla" software and the readiness of the system for go-live are nonactionable statements of opinion. *Id.* at 19. However, "even statements of opinion are actionable if they are made in bad faith or are not reasonably supported by the available evidence." *ADL, LLC v. Tirakian*, 2010 WL 3925131, at *12 (E.D.N.Y. Aug. 26, 2010), *R&R adopted by* 2010 WL 3926135 (E.D.N.Y Sept. 29, 2010); *see also Mann v. Levy*, 776 F. Supp. 808, 813 (S.D.N.Y. 1991) ("expression of opinion may constitute actionable fraud where it is shown that the opinion or prediction is not

honestly held at the time when made").  Connection has sufficiently alleged that, based on IBM's extensive knowledge of Connection's business and existing software, IBM *knew* that "vanilla," "out of the box" E1 with minor modifications would not sufficiently meet Connection's needs, and that IBM knew the system was not ready for go-live when it directed Connection to proceed with the implementation.  *See* Compl. ¶¶ 8-9, 15-16, 39-40, 64-66; *see also ADL, LLC*, 2010 WL 3925131, at *12 (looking to the surrounding circumstances to "infer that [defendant] intended … representations as expressions of fact" and not opinion).  Moreover, Connection alleges that IBM did not believe its own misrepresentations, and made them to induce Connection to continue with the project.  *See Rodi*, 389 F.3d at 14 ("[I]t is an actionable misrepresentation for a corporation falsely to tell investors that a specific project is 'a great success' that is 'proceeding smoothly … and better than expected' in order to keep them from pulling the plug") (internal citation omitted).

IBM's misrepresentations regarding the system's readiness for go-live are particularly egregious.  There, after Connection "requested confirmation" regarding the system readiness, IBM stated that "Connection was '97% prepared,' and that there was 'minimal' risk in proceeding."  Compl. ¶ 65.  These direct representations of concrete facts, in response to Connection's direct questions, do not constitute expressions of opinion.  *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 123 (E.D.N.Y. Aug. 31, 2011) (representation that was "a positive assertion of fact made in response to a direct question" was not mere opinion or puffery).

Second, IBM argues its misrepresentations regarding the expected cost and timeframe for the Project, as well as the harm to Connection from a premature conversion, are nonactionable predictions.  Memo. at 19-20.  However, "a relatively concrete representation as to a defendant's future performance, if made at a time when the speaker knows that the represented performance

cannot be achieved, may ground a claim of fraud." *N.Y. Islanders Hockey Club, LLP v. Comerica Bank—Texas*, 71 F. Supp. 2d 108, 118 (E.D.N.Y. Oct. 9, 1999) (citing *Cohen v. Koenig*, 25 F.3d 1168 (2d Cir. 1994)); *White v. Davidson*, 55 N.Y.S.3d 223, 224 (N.Y. App. Div. 2017) (statements of future actions are actionable "if a promise was actually made with a preconceived and undisclosed intention of not performing it") (internal citation omitted).  This is exactly the case here – at the time it made the representations, IBM knew, given its knowledge of Connection's business, that it would be impossible to meet its promises as to timeline and cost. Compl. ¶ 40; *see also N.Y. Islanders Hockey Club*, 71 F. Supp. 2d at 118 (statement that loan would be completed was actionable when defendant knew there was not "sufficient personal resources to make good on the check").

Nor is IBM's misrepresentation regarding the harm which would result from a premature go-live a statement of future intent.  The Complaint alleges IBM represented, falsely, that a "roll-back plan" was in place if problems arose after the implementation began.  Compl. ¶ 67.  In fact, no roll-back plan could be used.  *Id.*  The Complaint further alleges that IBM represented that any remaining issues existing at the time of go-live could be resolved after go-live "through 'simple workarounds.'"  Compl. ¶¶ 64-67.  These representations were false as well.  *Id.*  These were not statements of the future or predictions, but were rather actionable statements of "a past or existing fact."  *Hempchain Farms, LLC v. Sack*, 516 F. Supp. 3d 197, 208 (N.D.N.Y. 2021) (statements of then-existing facts "were not expressions of future expectations").

Finally, IBM argues that its statements as to its depth of experience, skill, and ability to complete the project were mere puffery.  Memo. at 20.  These statements are not mere "puffery" as they include concrete and specific representations about IBM's prior experience and ability to complete its contractual obligations.  For example, IBM stated that it had "extensive experience"

32

in "successfully implementing JDE upgrades."  Compl. ¶ 6.  Where a defendant's statements

about its prior experience are "concrete and measurable," this does not constitute puffery.

*Solomon Cap., LLC v. Lion Biotechnologies, Inc.*, 98 N.Y.S.3d 26, 28 (N.Y. App. Div. 2019);

*White,* 55 N.Y.S.3d at 224 (defendants' statements that "their record label was highly successful

and that they had previously successfully represented famous recording artists" were "not mere

opinion or puffery, but included specific representations concerning the Think Say defendants'

experience in promoting performing artists").  Nor are IBM's misrepresentations about its

present ability to fulfill its contractual obligations simply puffery.  *See Dynamic-Hakim, LLC v.*

*Maloney*, 93 N.Y.S. 3d 289, 291 (N.Y. App. Div. 2019) (statement that "experience gave

[defendants] the wherewithal to complete the project" was an actionable "misrepresentation of

material present fact"); *Hamilton Exhibition, LLC v. Imagine Exhibitions, Inc.*, 2019 WL

2590639, at *3 (S.D.N.Y. June 11, 2019) (statement about defendant's "experience and

capabilities" were not mere puffery).

### E.   Connection's Fraudulent Inducement Claim Is Timely

IBM's argument that Connection's fraudulent inducement claim is time barred lacks

merit, as it neglects to account for New York's discovery rule.  Pursuant to New York tort law,

"[t]he discovery rule 'postpones the accrual of a cause of action from the time when the tort is

complete to the time when the plaintiff has discovered sufficient facts to make him aware that he

has a cause of action." *Panos v. Universal Forest Prods., Inc.*, 2020 WL 416445, at *4

(S.D.N.Y. Jan. 27, 2020).  Here, IBM repeatedly took measures to hide its misrepresentations

from Connection, thereby concealing the fraud until it was revealed upon go-live.  *See* Compl. ¶¶

61-67.  Connection therefore did not become aware of its cause of action until the system go-live

on May 15, 2020.  IBM identified no authority to suggest that application of the statutory

discovery rule is precluded by the contractual limitations period.  *See Weatherly v. Universal Music Pub. Grp.*, 125 Cal. App. 4th 913, 919 (Cal. App. Ct. 2004) (finding there is no authority under California law which sanctions a contractual provision permitting parties to opt out of the benefits of the discovery rule in situations where the discovery rule would otherwise apply); *Minn. Laborers Health & Welfare Fund v. Granite Re, Inc.*, 844 N.W.2d 509, 518-19 (Minn. 2014) (contractual limitations period may be tolled by fraudulent concealment).

### F.    The Fraudulent Inducement Claim Is Not Barred By the Merger Clause

It is well established under New York law that "merger clauses generally do not bar claims for fraudulent inducement unless the clause specifically addresses the very conduct complained of in the fraud allegation." *Icebox-Scoops v. Finanz St. Honore, B.V.*, 676 F. Supp. 2d 100, 111-12 (E.D.N.Y. 2009).  Here, IBM does not even attempt to argue that the merger clause in the 2017 SOW is sufficiently specific to bar the claim.  Nor could it, as courts have found similar clauses to be insufficiently specific.  *Id.* at 112 (clause was not sufficiently specific where it stated that there were no representations or agreements beyond the agreement); *see also CooperVision, Inc. v. Intek Integration Tech., Inc.*, 7 Misc.3d 592, 604 (N.Y. Sup. Ct. 2005) ("[I]n order to be considered sufficiently specific … a guarantee must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim") (internal citation omitted).

IBM argues courts "routinely" dismiss claims based on merger clauses "negotiated by sophisticated parties."  Memo. at 21.  However, to meet this standard IBM must show that the fraud claim is "inconsistent with the language, such as the other specific recitals, in the contract." 28 N.Y. Prac., Contract Law § 5:11.  IBM has not demonstrated that the misrepresentations at issue were inconsistent with other recitals in the 2017 SOW.  *See In re CINAR Corp. Sec. Litig.*,

186 F. Supp. 2d at 314 (refusing to dismiss fraud claim even where sophisticated parties negotiated merger clause where "no amount of sophistication or due diligence could have helped" to discover the fraud).

**VII.   CONNECTION HAS SUFFICIENTLY ALLEGED AN NHCPA VIOLATION**

IBM argues that Connection's NHCPA claim (Count VIII) does not satisfy Rule 9(b). Memo. at 22-23.   As shown, Connection has met this standard.  *See supra* at Section V.B.

**VIII.   ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE**

For all of the reasons stated herein, Connection has adequately alleged each of the counts in its Complaint.  However, to the extent that the Court dismisses any count, such dismissal should be without prejudice to Connection's ability to replead the count.  *See Costa Precision Mfg. Corp. v. Farris*, 2007 WL 1558577, at *5 (D.N.H. May 29, 2007) (allowing amendment after motion to dismiss "[g]iven the early stage of this litigation, and the absence of prejudice"); *Amyndas Pharm., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 37 (1st Cir. 2022) (finding that "a motion to dismiss or a ruling from the court pointing out flaws in the original pleading" are valid reasons to amend); *Christian v. Anderson*, 2006 WL 3698907, at *1 (D.N.H. Dec. 13, 2006) ("Consent to file amended pleadings shall be freely given when justice so requires unless the amendment would be futile or reward undue delay") (quoting *Adorno v. Crowley Towing & Transp. Co.*, 443 F.3d 122, 126 (1st Cir. 2006)).

Respectfully submitted,

PC CONNECTION, INC. d/b/a CONNECTION

By its attorneys,

Dated:  January 18, 2023

*/s/ Christopher H.M. Carter*
Christopher H.M. Carter (#12452)
Daniel M. Deschenes (#14889)
Cassandra T. Desjourdy (*pro hac vice* pending)
Hinckley, Allen & Snyder LLP
650 Elm Street, Suite 500
Manchester, NH 03101
Telephone: (603) 225-4334
ccarter@hinckleyallen.com
ddeschenes@hinckleyallen.com
cdesjourdy@hinckleyallen.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed through the CM/ECF system on

January 18th, 2023, and will be sent electronically to the registered participants identified on the

Notice of Electronic Filing.

*/s/ Christopher H.M. Carter*
Christopher H.M. Carter (#12452)