UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

PC Connection, Inc.

     v.                            Civil No. 1:22-cv-397-JL
                                        Opinion No. 2023 DNH 103P

International Business Machines Corporation

## **MEMORANDUM ORDER**

In this action, the plaintiff asserts contract, negligence, fraud, and New Hampshire Consumer Protection Act claims all stemming from the defendant's allegedly poor performance under a contract governing a software implementation project. The plaintiff, PC Connection, Inc., is a Maryland corporation with a principal place of business in New Hampshire. It provides technology solutions, including over 425,000 products. The defendant, International Business Machines Corporation, is a New York corporation that provides software consulting and implementation services.

Around 2013, IBM began advising PC Connection on options for upgrading its Enterprise Resource Planning ("ERP") software, which PC Connection used for a variety of business functions, including processing orders, shipments, payments, and invoices; tracking inventory; managing compensation; and more. After assessing PC Connection's business needs for several months, IBM selected an ERP software system that it considered the right fit for the business and developed a Statement of Work for IBM to implement the new software. The parties executed the SOW in 2017.

The SOW detailed the scope, activities, and timeline for the software's implementation.  In the SOW, IBM estimated that the project would take 17 months and cost about $9.2 million to complete.  IBM began working on the implementation project in October 2017, and it deployed the new ERP system in May 2020.  IBM ultimately exceeded the estimated budget and timeline, and the project proved more complex than IBM had projected and set forth in the SOW.  Moreover, once deployed, the software exhibited defects that disrupted PC Connection's business processes and ability to serve its customers.

PC Connection contends, among other things, that IBM misrepresented and/or omitted material facts going to its ability to perform under the contract, the nature and scope of the project, and issues that arose during its performance.  PC Connection further avers that IBM failed to satisfy its obligations under the SOW either before or after the deployment of the new software.  Specifically, PC Connection asserts eight claims against IBM: breach of contract (Count 1), contractual indemnification (Count 2), breach of the duty of good faith and fair dealing (Count 3), negligence or professional negligence (Count 4), fraudulent inducement (Count 5), fraudulent misrepresentation (Count 6), negligent misrepresentation (Count 7), and breach of the New Hampshire Consumer Protection Act (Count 8).  IBM moves to dismiss each of these claims.

The court has subject-matter jurisdiction under 28 U.S.C. § 1332 (diversity).  After reviewing the parties' submissions and holding oral argument, the court grants the motion to dismiss in part and denies it in part.  The court denies the motion as to the breach of contract claim because the claim is not barred under New York law or the statute of

limitations.  The court dismisses the contractual indemnification claim, given that the SOW's indemnification provision applies to third-party claims, and not claims between IBM and PC Connection.  Next, the court denies the motion as to the breach of the duty of good faith claim, after concluding that it is not duplicative of the breach of contract claim.  On the other hand, the court dismisses the negligence claim because PC Connection fails to allege facts supporting an independent tort duty that can give rise to a claim for negligent performance of a contract.  Further, the fraud-based claims—for fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation (which sounds in fraud)— survive dismissal in part, to the extent that PC Connection has plead facts supporting each claim with the requisite particularity, they are based on actionable statements, and they are not duplicative of the breach of contract claim. Finally, the court denies the motion to dismiss the New Hampshire Consumer Protection Act claim, concluding that PC Connection also sufficiently pleads facts supporting that claim.

## I.  <u>Applicable legal standard</u>

"A pleading that states a claim for relief must contain," among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To satisfy this requirement, a plaintiff must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Martinez v. Petrenko, 792 F.3d 173, 179 (1st Cir. 2015).

3

In applying this standard, the court must "take the complaint's well-pleaded facts as true," and "draw all reasonable inferences in the plaintiffs' favor." Barchock v. CVS Health Corp., 886 F.3d 43, 48 (1st Cir. 2018). "Well-pleaded facts must be 'non-conclusory' and 'nonspeculative.'" Id. (quoting Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012)). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Id. (internal quotation omitted).

**_Fraud or mistake._** This pleading standard, however, "is not universally applicable." Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 15 (1st Cir. 2004). Claims sounding in fraud or mistake are subject to a heightened pleading standard. See N. Am. Catholic Educ. Prog. Found, Inc. v. Cardinale, 567 F.3d 8, 15 (1st Cir. 2009). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Specifically, the complaint must specify the "who, what, where, and when of the allegedly false or fraudulent representations." Rodi, 389 F.3d at 15. The heightened pleading standard "extends only to the particulars of the allegedly misleading statement [and] . . . [t]he other elements of fraud, such as intent and knowledge, may be averred in general terms." Rodi, 389 F.3d at 15; see also Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

II.     **Background**

The court gathers the following facts from the complaint and from information contained in the documents on which the complaint relies and which are central to the plaintiff's claims.  See Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (in determining the sufficiency of the complaint under Rule 12(b)(6), the court may consider "documents central to plaintiffs' claim [and] . . . documents sufficiently referred to in the complaint" (internal quotation omitted)).

PC Connection is a provider of information technology products and services.  It works with over 1,600 suppliers to offer more than 425,000 products, and it provides same-day shipping to its customers.  According to PC Connection, its "success is built on a 40-year history of providing exceptional customer service."[1]  It has three primary subsidiaries, which serve distinct customer bases: small and medium enterprises; large enterprises; and government and educational institutions.  IBM provides computer hardware and software consulting and implementation services.

IBM began serving as a consultant and hardware and software vendor to PC Connection in 2011.[2]  In or around 2013, IBM began advising PC Connection regarding its options for upgrading its ERP system.  The ERP system is PC Connection's "nerve center," which coordinates and integrates PC Connection's business functions both

---

[1] Compl. (doc. no. 1) at ¶ 4.

[2] See IBM-PC Connection Customer Agreement (doc. no. 12-2) at 1 (signed on February 7, 2011).

internally and with third parties.[3]  For example, PC Connection uses the ERP system for "Electronic Data Interchange."  In this process, PC Connection serves as the conduit between distributors and customers, sending distributors' electronic catalogs to customers, and managing the subsequent transfer of purchase orders and invoices between the customers and distributors.  PC Connection also uses the ERP System for other "critical business processes" including "customer purchasing, billing, order fulfillment, financial accounting, inventory tracking, warehouse management, compensation, and payment/credit card processing."[4]

When IBM began advising PC Connection on upgrade options, PC Connection was using a customized ERP system that was installed in 1998.  The system was created by J.D. Edwards and called JDE World.  PC Connection told IBM that the JDE World system had been heavily customized to meet PC Connection's business needs, and that it wanted IBM to find the "best fit" that would provide flexibility and retain the "mission-critical functionality" of JDE World.[5]

In July 2013, IBM delivered a presentation to PC Connection in which it advised that PC Connection upgrade to a newer Oracle/JDE platform known as EnterpriseOne ("E1").  IBM counseled that the E1 software met PC Connection's "core functional and technical requirements"; shared similar traits as the JDE World, including its look and

---

[3] Compl. (doc. no. 1) at ¶ 1.

[4] Id. at ¶ 28.

[5] Id. at ¶ 4.

feel; and would be "faster and less costly to implement" than other systems.[6]  IBM also represented that it was qualified to implement the software upgrade, as it had a "World Class JDE Practice," was a "Tier 1 provider with demonstrated results in transformation programs," provided "strong Project Management and Governance," and had other accolades.[7]

A few years later, in August 2016, the parties entered into a contract for IBM to conduct a "discovery assessment" of PC Connection's business in order to understand how it used JDE World, what functionality PC Connection would need in an upgraded system, and whether the E1 software was a suitable solution.  According to the contract, IBM would use the information gathered during the discovery assessment to determine the scope of the implementation project, including the project cost and timeline.  To facilitate the assessment, PC Connection granted IBM access to all of its business units, as well as JDE World, and permitted IBM to spend hundreds of hours meeting with PC Connection's employees to discuss the business.  IBM charged PC Connection over $600,000 for the assessment, which it completed at some point in 2017.

Following that, IBM "represented to [PC] Connection that it had thoroughly analyzed, and understood, the [c]ompany's requirement for its ERP system."[8]  IBM "determined that a 'vanilla' upgrade that leveraged 'out of the box' E1 software was

---

[6] Id. at ¶ 33.

[7] Id. at ¶ 34.

[8] Id. at ¶ 8.

suitable" for PC Connection's needs and "would not require extensive customizations," resulting in a 17-month implementation period at a cost of $9.2 million.[9]  PC Connection claims that IBM knew or should have known, based on the complexity of PC Connection's business, that the E1 software would require extensive customizations in order to perform as needed, and IBM could not complete the project within the estimated timeline and budget.

On August 7, 2017, IBM provided the SOW to PC Connection, outlining the E1 software implementation project's scope and each party's responsibilities.  The SOW identified the project objectives as, in part, "minimizing potential disruptions to the operating companies[] and their ability to manage the impact to customers" from the conversion to the new ERP system.[10]

The SOW set forth a multi-phased project, including the "design phase," which was focused on "gain[ing] alignment" on the project scope and schedule and determining the "high-level requirements" for the ERP system; the "build phase," in which the "JDE solution" was "construct[ed] and validate[d]" according to the requirements previously identified; and multiple "deploy" and "hypercare" phases, in which the conversion to the E1 system occurred (deploy) and IBM subsequently offered "post go-live support" to bring the software to "steady state" and hand it off to PC Connection (hypercare).[11]  In

---

[9] Id.

[10] See 2017 Statement of Work (doc. no. 15) at 5.

[11] See id. at 23-30.

describing each phase, the SOW listed associated activities and IBM's deliverable materials, which were subject to PC Connection's review and approval.  The SOW also allocated the tasks between the parties.  For many activities, both PC Connection and IBM were expected to participate, with one party designated as "primarily responsible" and the other "actively engaged in [] assisting and advising on the preparation and delivery of the activity."[12]

In the SOW, IBM repeated its prior representations that the project was estimated to be completed in 17 months at a cost of $9.2 million, and that IBM would "leverage the standard," or "vanilla," "functionality that the base . . . software offer[ed], . . . [and] work to reduce the number of customizations" applied to the software. [13]  The SOW also provided for a Project Change Control Procedure, through which either party could propose project alterations that could "result in modifications to the [e]stimated [s]chedule, [c]harges, and other terms of the SOW."[14]  As part of the procedure, the requesting party was required to submit a Project Change Request which "describe[d] the change, the rationale for the change, and the effect the change [would] have on the project."[15]  The request had to be "signed by authorized representatives from both

---

[12] Id. at 20.

[13] Id. at 5.

[14] Id. at 7.

[15] Id. at 48.

parties" before the change could be implemented.[16]  Finally, the SOW included covenants and warranties in which IBM promised, for example, to provide software implementation services and deliverables in a "professional, workperson-like manner, . . . by competent and skilled personnel, . . . and in accordance with the professional practices and standard adhered to by large internationally recognized providers of IT consulting services."[17]

IBM began the implementation project in October 2017.  The SOW provided that the implementation project would be performed in PC Connection's Merrimack, New Hampshire facility.  PC Connection alleges several shortcomings in IBM's work. These purported issues fall into a few different categories.

*Personnel.*  In early 2018, less than a year into the implementation project, IBM removed Senior Project Manager Doug Willis as the project lead and did not replace him with someone of comparable experience.  PC Connection claims that the individuals that IBM placed on the project team "over the next three years had little to no experience with [the] E1" software.[18]

*Required customizations to the E1 software.*  The SOW identified 15 "technical enhancements," or customizations, "to the core applicable software package," with the possibility that more enhancements could be identified during the design phase and added

---

[16] Id.

[17] Id. at 38-39.

[18] Compl. (doc. no. 1) at ¶ 57.

on through the Project Change Control Procedure.[19]  Over 90 customizations were ultimately applied to the E1 software, and PC Connection claims that the software "still did not provide the functionality that IBM knew [PC] Connection required."[20]

   ***Premature go-live.***  About a year before the conversion to the E1 system (also referred to as the E1 system's "go-live"), IBM project members, including one of the lead consultants, Bill Cahill, informed PC Connection, including its CEO Tim McGrath, that the E1 system was "fundamentally ready," and PC Connection should proceed to go-live.[21]  Cahill also expressed that PC Connection was "'too conservative' in its approach to the conversion," and that any remaining issues in the system could be resolved after the go-live "through simple 'workarounds.'"[22]  PC Connection requested testing data confirming readiness, and IBM "assembled a 'Business Excellence Team' to confirm."[23] The complaint does not detail what work or results the Business Excellence Team produced.

   After that, Cahill and another lead consultant, Marc Bjarnson, continued to urge PC Connection to deploy the E1 system.  PC Connection again "requested confirmation that all critical company processes were ready for the upgrade," and IBM directed PC

---

[19] See Statement of Work (doc. no. 15) at 13.

[20] Compl. (doc. no. 1) at ¶ 59.

[21] Id. at ¶ 62.

[22] Id. at ¶ 64.

[23] Id. at ¶ 63.

Connection to its Go-Live Readiness Assessment Document, which analyzed and calculated the E1 system's preparedness for the go-live.[24]  In the document, IBM represented that the E1 system was 97% ready, and the risk of proceeding was minimal. PC Connection claims that it relied on IBM's representations regarding system readiness in agreeing to proceed to go-live, and IBM knew, or should have known, that the system was not actually prepared.

The go-live began on May 15, 2020, and defects in the system became apparent "within hours."[25]  The following day, PC Connection told IBM to revert to the JDE World system.  IBM could not fulfill this request, though Cahill, Bjarnson, and other IBM team members had previously told PC Connection that "a roll back plan was in place."[26]

More problems with the E1 system arose after the go-live.  The system's flaws disrupted PC Connection's operations by impeding its ability to accept Electronic Data Interchange orders from customers, accurately invoice customers, order products from distribution partners, update pricing and availability information in catalogs, process credit card transactions, track physical inventory, calculate freight costs, halt shipments when credit card transactions were declined, and more.  As a result, for example, customer orders were erroneously accepted or rejected based on inaccurate information

---

[24] Id. at ¶ 65; see also 2017 Statement of Work (doc. no. 15) at 46.

[25] Compl. (doc. no. 1) at ¶ 67.

[26] Id.

on product availability, incorrect bills were issued to customers, PC Connection's shipments were delayed, products were sent to customers without the requested configurations, and all Electronic Data Interchange functions were interrupted.  PC Connection lost customers, orders, and revenue due to the system's deficiencies.

PC Connection conducted an investigation after the go-live, which uncovered "deficiencies in much of IBM's work."[27]  PC Connection found that, in calculating preparedness in the Go-Live Readiness Assessment Document, IBM weighed all tasks equally, instead of weighing them based on their importance to the system's functionality.  As a result, the 97% readiness determination did not accurately account for the underdevelopment of system-critical tasks.  Also, under the SOW, IBM was responsible for developing a plan for conversion to the E1 system (a "cut-over plan") and conducting two cut-over trial runs.  PC Connection claims that IBM either did not perform the cut-over trial runs correctly prior to the go-live, or did not inform PC Connection that the trial-runs indicated that the system was unprepared.  According to PC Connection, IBM knew or should have known of "critical risks" that "threatened to . . . undermine the project" at various points, but it did not disclose these risks to PC Connection.[28]

---

[27] Id. at ¶ 73.

[28] Id. at ¶ 89.

***Post go-live support.***  In the aftermath of the go-live, it became "obvious" that the system's problems were not small issues with simple workarounds.[29]  IBM told PC Connection that it was committed to fixing the errors by, in part, dispatching a "Red Team" comprised of its most skilled technicians.  IBM instead proceeded to engage "the same individuals who had worked on the project, ineffectively, before go-live."[30]  In the year following the go-live, IBM charged PC Connection about $3 million in fees, but IBM "did not correct the system defects," including defects affecting "features identified in the [] SOW as within IBM's scope of work."[31]  PC Connection personnel spent 80,758 hours to correct the errors in the E1 system, and PC Connection hired outside professionals for assistance.

***Timeline and cost estimates.***  The projected completion date for the project, based on the 17-month timeline, was January 2019.  The project was not complete by that time, as the go-live did not begin until May 2020.  IBM also added millions of dollars to the estimated project cost.  Meanwhile, "IBM did not disclose that it was unable or unwilling to complete the [p]roject as represented," and instead "continued to represent to PC Connection that the [p]roject was on course and would be successful."[32]

---

[29] Id. at ¶ 70

[30] Id.

[31] Id. at ¶¶ 71, 90.

[32] Id. at ¶¶ 60-61.

PC Connection asserts contract, negligence, fraud, and New Hampshire Consumer Protection Act claims premised on IBM's purported flawed and incomplete work on the E1 implementation project.  IBM moves to dismiss each of the claims.

## III.   <u>Analysis</u>[33]

### A.   Breach of contract claim (Count 1)

In its breach of contract claim, PC Connection asserts, in large part, that IBM violated express representations and warranties in the SOW, which are replicated below.

> IBM warrants and covenants that the Services shall be performed and completed, and the Deliverables and Work Product prepared and provided: (a) in a timely, professional, workperson-like manner; (b) by competent and skilled personnel who, when first assigned by IBM to perform Services hereunder, shall be appropriately qualified and experienced for the performance of Services to which assigned; and (c) in accordance with this SOW . . . and in accordance with the professional practices and standards adhered to by large internationally recognized providers of IT consulting services.
>
> . . .
>
> IBM warrants and covenants that the Deliverables and Work Product . . . and the results of Services performed by IBM hereunder, shall: (a) be free of material or frequent errors or defects; (b) conform to the applicable specifications and other requirements of this SOW; (c) perform in accordance with the applicable documentation.[34]

IBM first argues that the claim must be dismissed because, under New York law, "warranty provisions . . . cannot form the basis of a breach of contract claim" where, as

---

[33] The parties refer to New York state substantive law when developing their arguments for Counts 1-7.  Since the parties agree that New York law governs, the court follows suit.

[34] 2017 Statement of Work (doc. no. 15) at 38-39.

here, the contract concerns the performance of services.[35]  This argument misstates applicable law.

Some general background on warranties is useful for grounding IBM's argument. A warranty is "an assurance by one party to a contract of the existence of a fact upon which the other party may rely[,] . . . [and] it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue . . . .'" Metro. Coal Co. v. Howard, 155 F.2d 780, 784 (2d Cir. 1946) (internal citations omitted).  The Uniform Commercial Code as adopted in New York provides for "exacting warranty standards" in the context of the sale of goods, which can give rise to a cause of action "without proof of fault." Milau Assocs. v. N. Ave. Dev. Corp., 42 N.Y.2d 482, 486 (1977).  Under the U.C.C., "any affirmation of fact or promise made by the seller to the buyer which relates to the goods [being sold] and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." N.Y.U.C.C. § 2-313(1)(a).  The U.C.C. also provides for "implied warrant[ies], . . . [which] arise[] in the absence of an express representation, and [are] imposed by operation of law." Marcus v. AT & T Corp., 938 F. Supp. 1158, 1172 (S.D.N.Y. 1996), aff'd sub nom., 138 F.3d 46 (2d Cir. 1998).  An implied warranty is "an unspoken and unwritten promise made by a seller to a buyer that the goods being sold are fit for the ordinary purposes for which they are to be used." Orlander v. Staples, Inc., No. 13 CIV. 703 NRB, 2014 WL 2933152, at

---

[35] Def.'s Mot. to Dismiss (doc. no. 12-1) at 5-6.

*7 (S.D.N.Y. June 30, 2014) (citing N.Y.U.C.C. § 2-314), vacated and remanded on other grounds, 802 F.3d 289 (2d Cir. 2015).

Relevant here, "[t]he courts have been reluctant to apply U.C.C. concepts of warranty to . . . service contracts."  1 Corbin on Contracts § 1.22 (2023).  New York courts have held that a "predominantly service-oriented[]" transaction "falls outside the provisions of U.C.C. [A]rticle 2 . . . and plaintiffs have no cause of action for breach of express or implied warranty" as defined therein.  Chenango Cnty. Indus. Dev. Agency v. Lockwood Greene Engineers, Inc., 114 A.D.2d 728, 729 (1985) (citing Schenectady Steel Co. v. Trimpoli Gen. Constr. Co., 43 A.D.2d 234, 236-237 (1974), aff'd 34 N.Y.2d 939 (1974)); see also Milau Assocs., 42 N.Y.2d at 487 ("The express warranty section [of the U.C.C.] would . . . be no more applicable to a service contract than the code's implied warranty provisions.").

This rule has no bearing on, and does not bar the enforcement of, express warranties that appear in service contracts.  To the contrary, under New York law, if "the party rendering services can be shown to have expressly bound itself to the accomplishment of a particular result, the courts will enforce that promise."  Milau Assocs., 42 N.Y.2d at 487 (emphasis added) (citing cases); see also Aegis Prods., Inc. v. Arriflex Corp. of Am., 25 A.D.2d 639, 639 (1966) ("if [a] service is performed negligently, the cause of action accruing is for that negligence.  Likewise, if it constitutes a breach of contract, the action is for that breach.").  Consistent with this, courts applying New York law have recognized a cause of action for breach of warranty and/or breach of contract predicated on an express warranty within a contract for services.  See Cutrone v.

Mortg. Elec. Registration Sys., Inc., No. 13-CV-3075 ENV VMS, 2015 WL 13931932, at *6 (E.D.N.Y. June 26, 2015) (finding "no cause of action for breach of warranty (express or implied)" where the subject service contract was not for the sale of goods and did not "involve . . . express warranties"); Trump Int'l Hotel & Tower v. Carrier Corp., 524 F. Supp. 2d 302, 313 (S.D.N.Y. 2007) (denying defendant's motion for summary judgment on a breach of warranty claim premised on an express warranty in a service contract, and rejecting the plaintiff's "weak[] . . . argument" that "there is no cause of action available for breach of warranty when the transaction which is the basis for the complaint . . . is predominantly service-oriented"); Barnett v. City of Yonkers, 731 F. Supp. 594, 601 (S.D.N.Y. 1990) (noting that "New York law is crystal clear that in service-oriented contracts, such as agreements to render architectural services, no action in breach of implied warranty . . . will lie for the negligent performance of professional services[,]" adding that "[a]bsent an express warranty of specific results, an architect may only be held liable in malpractice for the negligent performance of [his] professional services" (emphasis added)).

In sum, IBM accurately characterizes PC Connection's contract claim as one premised on express warranty provisions in the SOW.  Contrary to IBM's contention, such claims are not barred under New York law merely because the contract is one for

services.[36]  Accordingly, the court denies the motion to dismiss the contract claim on this

ground.[37]

IBM also argues that PC Connection's contract claim is barred by the statute of

limitations.  The parties agree that a two-year statute of limitations applies for contract

causes of action arising under the SOW.  See Ajdler v. Province of Mendoza, 890 F.3d

95, 99 (2d Cir. 2018) (under New York law, the statute of limitations generally applicable

to contract claims is six years, but "where . . . a shorter time is prescribed by written

agreement, . . . the shorter period controls as long as it is reasonable." (internal quotations

omitted)).  The parties further agree that, since PC Connection filed its complaint on

September 30, 2022, and the parties tolled the statute of limitations period for a few

months in 2022, any contract breaches that accrued before April 30, 2020 are time-

barred.  The parties' dispute centers on when the contract claim accrued.

Under New York law, a contract claim typically accrues, and the statute of

limitations begins to run, when the breach occurs.  T & N PLC v. Fred S. James & Co. of

New York, 29 F.3d 57, 59 (2d Cir. 1994).  "[N]either knowledge of the breach nor

---

[36] In defending against IBM's erroneous argument that New York law does not recognize breach of contract claims based on express warranty provisions in service contracts, PC Connection contends, in part, that the SOW is a contract for goods, and not services.  The court need not reach the merits of this contention, as IBM's argument misstates New York law and does not warrant dismissal, as discussed above.

[37] IBM also argues that, if the court discards PC Connection's warranty-based allegations as nonactionable, PC Connection's remaining allegations are vague and conclusory, and fail to state a claim for breach of contract under New York or federal pleading standards.  Because PC Connection's warranty-based allegations are actionable and remain part of the complaint, the court need not address this argument.

cognizable damages are required to start the statute of limitations running at breach." Id. at 60. When, however, "the defendant's obligation" under a contract "is a continuing one . . . , the claims for breach of that obligation are not referable exclusively to the day the original wrong was committed." Stalis v. Sugar Creek Stores, Inc., 295 A.D.2d 939, 941 (2002) (internal quotations omitted). Instead, "each successive breach" of the continuing obligation "may begin the statute of limitations running anew." Guilbert v. Gardner, 480 F.3d 140, 150 (2d Cir. 2007) (citing cases). The continuing breach doctrine applies "only where there is a series of independent, distinct breaches, not one breach that continues to cause harm or increases the damages by the passage of time without performance." Nuance Commc'ns, Inc. v. Int'l Bus. Machines Corp., 544 F. Supp. 3d 353, 382 (S.D.N.Y. 2021) (internal quotation omitted), aff'd, No. 21-1758-CV, 2022 WL 17747782 (2d Cir. Dec. 19, 2022)); see also Selkirk v. State, 249 A.D.2d 818, 819 (1998) ("the continuing violation doctrine . . . is usually employed where there is a series of continuing wrongs and serves to toll the running of a period of limitations to the date of the commission of the last wrongful act").

IBM contends that the claim accrued about a year before the May 15, 2020 go-live date, when, according to PC Connection's allegations, the IBM project team told PC Connection that the E1 system was prepared for go-live. PC Connection asserts that the claim accrued, at the earliest, when IBM tendered the E1 system to PC Connection, on the go-live date. PC Connection further avers that the SOW created continuing obligations for IBM, and IBM committed a series of breaches within the limitations period, both during and after go-live.

In order to dismiss a claim based on a statute of limitations defense, the court must find that "the facts establishing the defense are clear 'on the face of the plaintiff's pleadings.'" Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008) (quoting Blackstone Realty LLC v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001)). Here, the complaint does not establish that the contract claim is time-barred.  Rather, PC Connection alleges facts from which the court can reasonably infer that the SOW required continuing performance, and that multiple, distinct breaches occurred after April 30, 2020, with which the contract "cause of action accru[ed] anew." Stalis, 295 A.D.2d at 941.

Indeed, the complaint alleges, and the SOW reflects, that the implementation project was a months-long endeavor involving multiple phases, each consisting of a set of tasks and deliverables.  IBM expressly warranted that it would, for example, perform the services and complete the deliverables in a timely, professional manner with skilled personnel, and that the work product would be free from material or frequent errors. These warranties represented ongoing obligations lasting as long as the implementation project continued, applicable to each task and phase, and susceptible to several breaches. See Kwan v. Schlein, 441 F. Supp. 2d 491, 501 (S.D.N.Y. 2006) (denying a motion to dismiss on statute of limitations grounds based on the plaintiff's argument "that the contract at issue called for continuous performance by [defendants] in that they were to provide her with co-author credit and compensation not just at the moment of contracting but, essentially, for as long as the book continued to be sold").

PC Connection alleges successive, independent breaches that took place during the limitations period, and particularly during and after the flawed go-live. For example, PC Connection claims that IBM deployed a defective and unprepared system on May 15, 2020; it failed to revert to the JDE World system thereafter, once defects in the E1 system became apparent; and it did not dispatch its Red Team to remedy the system deficiencies, relying instead on the existing project team, which lacked the requisite skills. These allegations are sufficient at this stage to overcome the statute of limitations defense under the continuing performance doctrine. The court accordingly denies the motion to dismiss as to the contract claim.

### B.      Contractual indemnification claim (Count 2)

IBM next seeks to dismiss PC Connection's contractual indemnification claim, under which PC Connection seeks indemnification for "damages caused by IBM in the course of its [alleged] failure to fulfill its obligations under the 2017 SOW."[38] IBM argues that the SOW's indemnification provision contemplated reimbursement for payments related to third-party claims (which PC Connection does not allege), and not for claims between IBM and PC Connection. The court agrees and thus dismisses Count 2.

"[T]he default presumption in New York courts is that indemnification involves liabilities, losses, or claims associated with third-party suits, rather than contractual damages or losses between the contracting parties."  BNP Paribas Mortg. Corp. v. Bank

---

[38] Compl. (doc. no 1) at ¶ 106.

of Am., N.A., 778 F. Supp. 2d 375, 416 (S.D.N.Y. 2011); see also Peoples' Democratic

Republic of Yemen v. Goodpasture, Inc., 782 F.2d 346, 350 (2d Cir. 1986) ("[a]n

indemnity claim seeks reimbursement for payment made to a third party").  Thus, an

agreement for contracting parties to indemnify one another for inter-party claims must be

"unmistakably clear from the language of the promise, . . . or else it must be manifest

from the surrounding facts and circumstances or purpose of the agreement."  Promuto v.

Waste Mgmt., Inc., 44 F. Supp. 2d 628, 650 (S.D.N.Y. 1999) (citing Hooper Assoc., Ltd.

v. AGS Computers, Inc., 74 N.Y.2d 487, 492 (1989) and Breed, Abbott & Morgan v.

Hulko, 139 A.D.2d 71 (1988), aff'd, 74 N.Y.2d 686 (1989)); see also Lehman XS Tr.,

Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc., 916 F.3d

116, 125 (2d Cir. 2019) ("absent unmistakably clear language in an indemnification

provision that demonstrates that the parties intended the clause to cover first-party claims,

an agreement between two parties to indemnify each other does not mean that one party's

failure to perform gives rise to a claim for indemnification." (internal quotation omitted)).

        More specifically, "[u]nless the indemnification clause refers 'exclusively or

unequivocally' to claims between the indemnitor and indemnitee, the court 'must find the

agreement to be lacking evidence of the required intent' to cover such claims."  BNP

Paribas Mortg. Corp., 778 F. Supp. 2d at 415 (quoting Sequa Corp. v. Gelmin, 851 F.

Supp. 106, 110-11 (S.D.N.Y. 1994)).  On the other hand, "[i]f it is apparent that no third-

party claims were contemplated by the parties, then the agreement should be construed to

provide indemnity for claims between the parties—otherwise the agreement would be

superfluous."  In re Refco Sec. Litig., 890 F. Supp. 2d 332, 344 (S.D.N.Y. 2012) (internal

citation omitted).

Neither the text of the indemnification provision, nor the surrounding facts and

circumstances of the SOW, indicate an unmistakably clear intent to cover first-party

claims.  The purpose of the SOW is to manage the implementation of an ERP system—a

system that, according to PC Connection's allegations, facilitates the processing of

orders, payments, and shipments among PC Connection, customers, and distributors.

Thus, it is reasonable to infer that, in developing the SOW, the parties were

contemplating the rights, interests, and potential claims arising from third-party

customers and distributors.

The language of the indemnification provision confirms this notion.  The provision

states:

> IBM shall indemnify, defend, and hold harmless PC Connection, its Affiliates, and
> their representative officers, directors, employees and agents, from and against any
> and all actual or threatened losses, liabilities, damages, and claims, and all related
> costs and expenses (including reasonable attorney's fees) arising from: (a) any
> claim by a third party alleging bodily injury, death, or property damage, to the
> extent IBM (or any personnel or representatives of IBM) is legally liable; (b) any
> breach by IBM of this Agreement [SOW] or any [sic]; or (c) any breach by IBM
> of any confidentiality, privacy, or security obligations under this Agreement.[39]

None of the subclauses listed in the provision "exclusively or unequivocally"

refers to first-party claims; instead, each can readily be linked to potential third-party

claims.  BNP Paribas Mortg. Corp., 778 F. Supp. 2d at 415 (quoting Sequa Corp., 851 F.

Supp. at 110-11); see also In re Refco, 890 F. Supp. 2d at 344 ("[T]he potential for third-

---

[39] 2017 Statement of Work (doc. no. 15) at 39.

party claims means that the contractual indemnification provisions cannot definitively be read to refer to non-third-party claims, and thus the parties' intent to indemnify such claims is not unmistakably clear." (quoting Goshawk Dedicated Ltd. v. Bank of New York, No. 06 CIV. 13758 (MHD), 2010 WL 1029547, at *9 (S.D.N.Y. March 15, 2010))).  First, subclause (a) explicitly references third-party claims.  Next, subclause (b) is triggered by any breach of the SOW, including (as described in the complaint) a flawed rollout of the ERP system.  As PC Connection alleges, defects in the ERP system can, for example, cause errors in the fulfillment and shipment of customers' orders for goods from third-party distributors, as well as inaccuracies in customers' invoices.  These types of issues can disrupt revenue streams for distributors and increase costs and cause inconveniences for customers, potentially giving rise to claims from third parties.

Finally (and contrary to PC Connection's contention), IBM's breach of the confidentiality, privacy, and security obligations under the SOW, as described in clause (c), can also implicate third-party rights and create third-party claims.  IBM's responsibilities with respect to information security are detailed, in part, in Appendix C of the SOW, which provided that IBM will "handle information identified by [PC Connection as confidential, business sensitive, personal[,] and sensitive personal in accordance with" the information security "controls" described in the SOW.[40]

Elsewhere, the SOW defined "sensitive personal information" as "an individual's name in conjunction with that individual's social security number, driver license number,

---

[40] See id. at 50, 51.

state identification number, medical information, date of birth, signature[,] or mother's maiden name."[41]  The SOW describes "business sensitive information" as "information the parties agree is due special handling . . . and which is marked as 'sensitive' by the owning Party."[42]  The court can reasonably infer that both categories of information belong not just to PC Connection and its employees, but also to third parties—customers and distributors—since the ERP system is used to update distributors' catalogs, complete customer credit card transactions, and manage customers' orders.  Of course, if IBM were to mishandle the sensitive business or personal information belonging to third parties, those parties could be harmed and could lodge claims.

PC Connection presents two arguments in favor of a different interpretation of the language of the indemnification provision.  Neither prevails.  First, PC Connection contends that, since category (a) refers to a narrower set of claims than categories (b) and (c), it would be rendered mere surplusage if categories (b) and (c) were also only applicable to third-party claims.  The court disagrees with PC Connection's initial premise.  Category (a) pertains to claims that can arise from any of IBM's actions, while categories (b) and (c) cover claims that result only from IBM's breach of the SOW.  Thus, category (a) is, in fact, broader than the other two categories, and is not rendered superfluous if all three categories are read to only apply to third-party claims.  See In re Refco, 890 F. Supp. 2d at 347 (an indemnity clause that is "triggered by any performance

---

[41] Id. at 37.

[42] Id.

[by the party] under the [contract]" is broader than an indemnity clause that "is triggered only by [the party's] breach of contract.").

More generally, PC Connection also seems to argue that, because category (a) specifically references third-party claims, and categories (b) and (c) omit any such qualification, the latter two categories must extend to first-party claims. This argument, though not illogical, does not effectively counter the court's analysis of the provision. The court cannot conclude that categories (b) or (c) exclusively or unequivocally refer to first-party claims merely because they do not explicitly state that they are limited to third-party claims. See India Globalization Cap., Inc. v. Apogee Fin. Invs., Inc., No. 21-CV-1131 (VEC), 2022 WL 671172, at *8 (S.D.N.Y. Mar. 4, 2022) (dismissing a claim for attorney's fees from first-party litigation, reasoning, in part, that "[t]he fact that third parties are referenced in some clauses but not others does not constitute an unmistakably clear indication that the parties intended for those clauses to cover first parties"); Sussman Sales Co., Inc. v. VWR Int'l, LLC, No. 20 CIV. 2869 (KPF), 2021 WL 1165077, at *19 (S.D.N.Y. Mar. 26, 2021) (finding, in interpreting an indemnification provision at the motion to dismiss stage, that "[t]he fact that [two sub-clauses in the indemnification provision] lack language referencing third-party claims," while other "sub-clauses in the provision expressly reference third-party claims[,] . . . does not lead to the inference that [the former provisions] support a right to a first-party action.").

In sum, the language of the indemnification provision and surrounding context of the SOW do not indicate an unmistakably clear intent to cover first-party claims. Thus, the court reads the indemnification provision to apply only to third-party claims,

consistent with the default presumption under New York law.  Since PC Connection does not allege any third-party claims, its indemnification claim is dismissed.

### C.    Breach of the duty of good faith and fair dealing (Count 3)

In Count 3, PC Connection asserts that IBM breached the SOW's implied covenant of good faith and fair dealing.  IBM moves to dismiss the claim, arguing that it is duplicative of PC Connection's breach of contract claim.

Under New York law, claims for breach of contract and breach of the implied covenant of good faith and fair dealing "are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'"  Deutsche Bank Nat. Trust Co. v. Quicken Loans Inc., 810 F.3d 861, 869 (2d Cir. 2015) (quoting Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce, 70 A.D.3d 423, 426 (1st Dep't 2010)); see also Commerzbank AG v. U.S. Bank Nat'l Ass'n, 277 F. Supp. 3d 483, 498 (S.D.N.Y. 2017) ("a claim for breach of the covenant of good faith and fair dealing . . . may be maintained along with a breach of contract claim only if the damages sought by the plaintiff for breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from breach of contract." (internal quotations omitted)); Kalter v. Hartford Ins. Co. of the Midwest, 24 F. Supp. 3d 230, 234 (E.D.N.Y. 2014) ("New York law does not [ ] recognize a separate cause of action for breach of the implied covenant of good faith and a breach of contract on the same facts." (citing New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308 (1995))).

PC Connection insists that its breach of contract and implied covenant of good faith claims are distinct because the former rests on PC Connection's failure to deliver a functional ERP system, and the latter is predicated on IBM's "bad faith insistence that PC Connection proceed to go-live, despite its knowledge that the system was not ready."[43] To support its argument, PC Connection draws an analogy to Freepoint Commodities LLC v. Ridgebury Kilo LLC, which the court finds persuasive.  632 F.Supp.3d 549 (S.D.N.Y. 2022).  In Freepoint, the plaintiffs chartered a cargo vessel to ship fuel internationally and suffered losses because the vessel was in "poor condition" and required repairs and equipment replacements during the trip, leading to stops, delays, and deviations in the shipment route.  Id. at 553.  The plaintiffs asserted breach of contract and implied covenant of good faith claims against the party responsible for maintaining the vessel.  Id. at 554.

In arguing that the claims were based on distinct factual allegations, the plaintiffs asserted that "the breach of contract claim involve[d] [the defendant's] failure to maintain a vessel capable of conveying the Cargo" as warranted in the Voyage Charter, whereas the "implied covenant of good faith claim . . . allege[d] that [the defendant] acted in bad faith during the performance of the Voyage by failing to disclose the true nature of their breach, . . . [thereby] ma[king] it impossible for [the] [p]laintiffs to take measures to mitigate the cost of [the] alleged breach of contract."  Id. at 560.  The plaintiffs further asserted that "disclosure of the true state of the Vessel could (and likely would)" have

_____

[43] Compl. (doc. no. 1) at ¶ 109.

enabled them to reduce their losses by "removing the cargo either at a discharge port or in a ship-to-ship transfer." Id.

The Freepoint Court, applying New York law, credited these arguments and denied the motion to dismiss the implied covenant of good faith claim. The court reasoned that, "[a]lthough underlying both claims is the contention that [the defendant] delivered the Vessel in poor condition, the breach of contract claim depends on whether [the defendant] breached the guarantees in the Voyage Charter, . . . while the breach of the implied covenant of good faith claim flows from whether [the defendant] failed to inform Plaintiffs about the state of the Vessel," and it was possible that the covenant could be breached without a corresponding breach of contract. Id. at 561. The court found the plaintiffs' allegations to be sufficient, even though they were "vague as to precisely how [the plaintiffs] would have mitigated their damages if [the defendant] had informed them of the cause and nature of the Vessel's delays," and the plaintiffs "only identifie[d] two short delays in the early part of the voyage about which [the defendant] failed to inform Plaintiffs." Id. at 560.

As in Freepoint, the breach of contract claim in this case alleges a failure to adhere to warranty provisions regarding the standard of IBM's performance, while the implied covenant of good faith claim alleges a failure to disclose the true occurrence and severity of the breach. Though it seems unlikely, the court cannot decidedly foreclose the possibility, at this early stage of the litigation, that IBM's conduct could violate the covenant without technically violating the contract—particularly since the full scope of the potentially relevant contract provisions, which (for example) require IBM to perform

in a "professional, workman-like manner" and "in accordance with the SOW," are not yet

clear.  Also, it is reasonable to infer that if IBM had disclosed its purported performance

deficiencies and the E1 system's unpreparedness instead of recommending a premature

go-live, PC Connection could have converted to the new system once it was more fully

developed, thereby mitigating damages.[44]

In sum, though it is a close call, the implied covenant of good faith claim is based

on sufficiently distinct facts, and seeks potentially different damages, from the breach of

contract claim.  The claims are thus not clearly duplicative, and the motion to dismiss the

implied covenant of good faith claim is denied.[45]

### D.     Negligence claim (Count 4)

In Count 4, PC Connection alleges that IBM breached its duty "to perform its

professional services with the appropriate level of care[,] . . . [which] includes adherence

to the professional obligations, practices, rules, and standards that apply to software

implementation professionals such as IBM."[46]  According to PC Connection, IBM

breached its duty in some of the same ways that it breached the SOW—by, for example,

---

[44] Though PC Connection does not explicitly set forth this mitigation argument in its briefs or allege it in its complaint, PC Connection did assert during oral argument that the damages it seeks under the implied covenant of good faith claim are distinct in that they are focused on the mitigation of losses.  See Apr. 25, 2023 Hearing Transcript (doc. no. 27) at 57:13-58:12.

[45] IBM sets forth the same statute of limitations argument with respect to the breach of implied covenant of good faith claim as it does with respect to the breach of contract claim.  See Def.'s Mot. to Dismiss (doc. no. 12-1) at 18 n.4.  This argument fails for the same reasons explained supra Section III.A.

[46] Compl. (doc. no. 1) at ¶ 113.

failing to assign appropriately skilled people to the project team, identify and communicate that the E1 system was not suitable in its "vanilla" form, select the proper go-live date, and "apply professional standards in design, development, testing, and project management."[47]  PC Connection does not explicitly limit the claim to a theory of ordinary negligence or professional malpractice, so the court considers the claim in both lights.

First, to the extent that PC Connection is asserting a professional malpractice claim, it is readily disposed of under New York law.  New York does not recognize a cause of action for malpractice with respect to professionals who provide computer-related services, including, as relevant here, software system selection and implementation services.  See Avazpour Networking Servs., Inc. v. Falconstor Software, Inc., 937 F. Supp. 2d 355, 364 (E.D.N.Y. 2013) ("New York State law does not recognize a cause of action for professional malpractice by computer consultants." (citing cases)); Donald Dean & Sons, Inc. v. Xonitek Sys. Corp., 656 F. Supp. 2d 314, 324 n.21 (N.D.N.Y. 2009) (dismissing a negligence claim against a business that implemented an IT system for the plaintiff, noting that the claim "is one alleging the tort of professional computer consultant malpractice," and "the courts of New York do not recognize a cause of action for professional malpractice by computer consultants" (internal quotations and alterations omitted)); Atkins Nutritionals, Inc. v. Ernst & Young, LLP, 301 A.D.2d 547, 548 (2003) (approving the dismissal of a "claim to recover damages for malpractice in

---

[47] Id. at ¶ 114.

the selection and implementation of a computer system" because "the courts of [New York] do not recognize a cause of action to recover damages for professional malpractice by computer consultants" (internal citation omitted)).

The court next turns to PC Connection's ordinary negligence claim, which raises thornier issues.  The Court of Appeals of New York has noted that where, as here, "the parties' relationship initially is formed by contract, but there is a claim that the contract was performed negligently," the claim "falls in the borderland between tort and contract, an area which has long perplexed courts."  Sommer v. Federal Signal Corp., 79 N.Y. 2d 540, 550-51 (1992).  The disposition of this claim depends on whether it is independent from PC Connection's breach of contract claim.  The Second Circuit Court of Appeals summarized the relevant inquiry as follows.

> Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated.  Such a legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract.  Where an independent tort duty is present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct.  If, however, the basis of a party's claim is a breach of solely contractual obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual bargain through an action in tort, the claim is precluded as duplicative.

Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC, 692 F.3d 42, 58 (2d Cir. 2012) (internal citations and quotations omitted).

In determining whether an independent tort duty applies and gives rise to a cause of action for negligent performance of a contract, courts tend to look for facts supporting the existence of "a duty imposed on individuals as a matter of social policy, as opposed to those imposed consensually as a matter of contractual agreement."  Apple Recs., Inc. v.

Capitol Recs., Inc., 137 A.D.2d 50, 55 (1988); see also Hartford Fire Ins. Co. v. Atl. Handling Sys., LLC, No. 09-CV-4127 RRM ALC, 2011 WL 4463338, at *5 (E.D.N.Y. Sept. 26, 2011) (noting that there are a "limited class of cases in which a strong public interest in the careful performance of particular contractual obligations may give rise to a[n] [independent] tort duty of due care.").  As part of this analysis, courts "consider the relationship of the parties, 'the nature of the injury, the manner in which the injury occurred and the resulting harm.'" Anunziatta v. Orkin Exterminating Co., 180 F. Supp. 2d 353, 358 (N.D.N.Y. 2001) (quoting Sommer v. Federal Signal Corp., 79 N.Y. 2d 540, 551 (1992)).

For example, New York "[c]ourts typically uphold claims for negligent performance of a contract when the parties stand in a professional or fiduciary relationship, and the plaintiff relied on the defendant to supply a specialized service." Hartford Fire Ins. Co., 2011 WL 4463338, at *6; see also Avazpour, 937 F. Supp. 2d at 362 ("A duty sufficient to support a claim in tort has been allowed, for example, in a case where parties are in a contractual relationship, and plaintiff can also make a claim for the violation of a 'professional duty.'" (quoting Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 18 (2d Cir. 2000))).  This professional service-related duty is more likely to be found when "the service is provided primarily for the safety of the contracting party, or contemplates an ongoing relationship to address a recurring problem," or where "negligent performance would foreseeably lead to substantial damages." Hartford Fire Ins. Co., 2011 WL 4463338, at *6; see also Green Hills (USA), L.L.C. v. Aaron Streit, Inc., 361 F. Supp. 2d 81, 90 (E.D.N.Y. 2005) (finding that an

environmental consultant owed an independent tort duty where the plaintiff purchased property after the consultant inspected it and failed to identify existing hazardous waste that later contaminated the groundwater and led to investigation and cleaning expenses, largely because the "nature of the work performed by [the consultant] has a significant public interest, and the breach of those duties could have dramatic consequences.").

For example, in Anunziatta v. Orkin Exterminating Co., Inc., plaintiff homeowners brought breach of contract and negligence claims against Orkin Exterminating, a company that they contracted with to treat a termite infestation in their home. 180 F. Supp. 2d at 356. Orkin conducted at least twenty treatments on the plaintiffs' home over the course of ten years, but the termite problem continued. Id. at 357. The Annunziatta Court concluded that a tort duty existed independent of the contract because of the professional and specialized nature of Orkin's services and the disastrous effects of negligent performance. Specifically, the court found that the plaintiffs lacked expertise regarding termites, and they "relied on Orkin's advice and treatment of their home"; "Orkin held itself out to be a reliable professional"; "the type of activity involved required the use of reasonable care to be effective"; and "the injury resulting if due care was not used was potentially disastrous, as the termites were capable of destroying the Plaintiffs' home." Id. at 358-59.

Additionally, New York courts have found a duty "actionable in tort" where "a special relationship of 'trust and confidence' exists between the contracting parties." Apple Recs., 137 A.D.2d at 55 (citing Rich v. New York Cent. & Hudson Riv. R.R., 87 N.Y. 382, 394 (1882)). In Apple Records, Inc. v. Capitol Records, Inc., the plaintiffs,

musicians, brought breach of contract, fraud, and breach of fiduciary duty claims (among others) against their record label, which secretly sold millions of the plaintiffs' records "and pocketed the proceeds." Id. at 56. A New York state court noted that the parties engaged in ongoing business dealings and the plaintiff relied on the defendants' services for 26 years, "[e]ven after [the plaintiffs] attained their remarkable degree of popularity." Id. at 57. The court concluded that "from such a long enduring relation was born a special relationship of trust and confidence, one which existed independent of the [record label's] contractual duties." Id.

In Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., the owners of a nuclear power plant brought negligence and breach of contract claims against a defendant for completing faulty piping work in the facility that led to costly investigation and remediation. See 725 F. Supp. 656, 657-59 (N.D.N.Y. 1989). The court permitted the negligence claim to proceed past the motion to dismiss stage, finding that the plaintiff adequately alleged a "relationship of trust and confidence" by claiming that it shared a five-year long contractual relationship with the defendant that "involved a price tag of approximately $300 million"; the defendant "was entrusted with [Quality Assurance and Quality Control] programs which were vital to the success and safety of the" facility; the defendant "served as plaintiffs' delegate with respect to reporting and disclosure responsibilities to the Nuclear Regulatory Commission"; and the defendant's "failure to perform this [reporting] job resulted in the issuance of a costly 'stop-work' order" issued by the Nuclear Regulatory Commission. Id. at 668.

On the other hand, in Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., the Second Circuit Court of Appeals found no special relationship between the plaintiff, which administered private label credit card programs, and the defendant, the principal of agencies that collected delinquencies on the plaintiff's accounts.  See 98 F.3d 13, 15 (2d Cir. 1996).  The court reasoned that the defendant, who underpaid the plaintiff and destroyed records to hide the fraud, was not "relied upon for advice or the exercise of judgment based on superior information or professional expertise" and "had little discretion to exercise, his obligations under the contract being straightforward and fixed." Id. at 20.  The court added that "[w]hatever trust and confidence was placed in [the defendant] had solely to do with his carrying out his obligations under the contract."  Id.

Finally, "[i]n seeking to disentangl[e] tort and contract claims," the Court of Appeals of New York has drawn a distinction "between the situation where the harm was an abrupt, cataclysmic occurrence not contemplated by the contracting parties"—in which case a tort duty may be recognized—"and one where the plaintiff was essentially seeking enforcement of contract rights."  Dormitory Auth. v. Samson Constr. Co., 30 N.Y.3d 704, 713 (2018).  For example, in Sommer v. Fed. Signal Corp., the Court of Appeals found that a fire alarm company breached an independent tort duty going to its client, the owner of a 42-story skyscraper, when it deactivated the skyscraper's alarm system based on a miscommunication, and minutes later, a four-alarm fire ensued without timely response, causing $7 million in damage.  79 N.Y.2d at 548-49.  The court permitted the plaintiff to pursue a tort claim because the defendant's services were a matter of "public interest," the failure of the company to act with due care "can have

catastrophic consequences," and the "manner in which the injury arose . . . and the resulting harm" were "typical of tort claims," in that the plaintiff suffered property damage from an "abrupt, cataclysmic occurrence." Id. at 553.

The court concludes that, on balance, the facts of this case do not give rise to an independent tort duty.[48] IBM provided professional services that PC Connection could not perform on its own, but the services did not "address a recurring problem," nor did they implicate a public interest or PC Connection's safety, as in Green Hills, Niagara, or Sommer, such that they would be likely to give rise to a professional service-related duty. Hartford Fire Ins. Co., 2011 WL 4463338, at *6. Also, negligent performance on IBM's part could be expected to cause economic losses, but not disastrous damage such as the complete destruction of PC Connection's business or property, as in Orkin. Further, the parties' ongoing business dealings, which began in 2011, were not as enduring as the 26-

---

[48] In arguing that an independent tort duty exists, PC Connection directs the court's attention to J & R Elecs. Inc. v. Bus. & Decision N. Am., Inc., in which the district court found that the plaintiff "plausibly allege[d] a special relationship" with a "consulting systems and integration company" that the plaintiff hired to implement ERP software. No. 12 CIV. 7497 PKC, 2013 WL 5203134, at *1, *7 (S.D.N.Y. Sept. 16, 2013). The J & R Court considered this "a close question," and it based its finding on the following allegations: the plaintiff "engaged in extensive due diligence, assessing numerous ERP software packages and consultants, before ultimately deciding" on the software it felt "best fit its needs"; the plaintiff "ha[d] an in-house team of programmers, but . . . did not have the necessary expertise to design or implement an ERP solution[;] . . . [the defendant] assessed [the plaintiff's] software needs for nine months before signing the Software Agreement[;] . . . [and] [the defendant] possessed specialized expertise concerning ERP solutions." Id. This court weighs additional factors that are raised in the case law before coming to its conclusion in this case—including whether the services that IBM provided concerned PC Connection's safety or matters of public interest, the extent of trust and confidence placed in IBM, and the nature and type of harm that resulted from IBM's negligence. In short, while J & R undoubtedly bears some factual resemblance to this case, the cases are not identical, and this court respectfully rests on its own, differing analysis to draw a different conclusion than the J & R Court.

year long relationship described in Apple Records, nor did they have a price tag

comparable to that described in Niagara.  The relationship between the parties involved

some trust and confidence, since IBM seemingly exercised judgment in order to

configure a complex software system, and the ERP system played a critical role in PC

Connection's business functions.  Indeed, some of the affected business functions

involved customer interactions, and PC Connection alleges that excellent customer

service is one of the foundations for its success.  But the extent of trust and confidence

placed in IBM was limited by the SOW's built-in points of review, oversight, and

approval by PC Connection.  Also, as in Bridgestone/Firestone, "the trust and confidence

. . . placed in [IBM] had solely to do with . . . carrying out [its] obligations under the

[SOW]," as opposed to duties sourced from outside of the contract, including from social

policy.  Bridgestone/Firestone, 98 F. 3d at 20.

Finally, PC Connection does not seek different damages under its breach of

contract and negligence claims, and IBM's actions did not result in tort-style damages.

PC Connection suffered seemingly significant economic losses, but it did not sustain

personal injuries or abrupt and/or cataclysmic damage to property, as in Sommer and

Orkin.  Finding no viable malpractice claim and no independent tort duty, the court grants

the motion to dismiss Count 4.

### E.    Fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation claims (Counts 5-7)

In Count 5, PC Connection asserts a fraudulent inducement claim, arguing that PC

Connection misrepresented or failed to disclose material facts "when it had a duty to do

so," in order to induce PC Connection to enter into the SOW.[49]  Then, in Count 6, PC

Connection raises a fraudulent misrepresentation claim premised on IBM's

misrepresentations and failure to disclose material facts while executing the

implementation project.  Finally, in Count 7, PC Connection sets forth a negligent

misrepresentation claim that rests on a combination of the misrepresentations and

omissions listed in the previous two Counts and asserts that "IBM failed to exercise

reasonable care or competence in communicating this information to PC Connection, and

in failing to disclose material information to PC Connection."[50]

IBM argues that all three claims should be dismissed because PC Connection fails

to satisfy the heightened pleading standard applicable to fraud claims under Rule 9(b).

IBM further avers that the purported misrepresentations underlying each claim are not

actionable statements of fact.  Finally, IBM contends that the claims are duplicative of PC

Connection's breach of contract claim.  The court considers each argument in turn.

### i.      The Rule 9(b) pleading standard is satisfied as to some allegations of fraud

As previously noted, to state a claim sounding in fraud, PC Connection must

satisfy the heightened pleading standard of Rule 9(b), which requires the plaintiff to

allege "the who, what, where, and when" of the purportedly false statements or

omissions, as well as a reasonable basis for inferring scienter.  Rodi, 389 F.3d at 15; see

also Davis v. Gutierrez, No. 17-CV-147-JL, 2018 WL 1514869, at *9 (D.N.H. Mar. 27,

---

[49] Id. at ¶ 118.

2018) ("The heightened standard imposed by Rule 9(b) . . . means that a complaint rooted

in fraud must specify the who, what, where, and when of the allegedly false or fraudulent

representations or omissions." (internal quotation omitted)).  IBM contends that PC

Connection's fraud and negligent misrepresentation claims fail under this standard on

both fronts.  The court finds otherwise, in part, after viewing the allegations as a whole.

As an initial matter, contrary to PC Connection's contention, Rule 9(b)'s

heightened pleading standard does apply to the negligent misrepresentation claim.  In

stating the claim, PC Connection alleges elements of fraud.  It asserts, for example, that

IBM made false representations about its experience and expertise "to convince [PC

Connection] to enter into the 2017 SOW," and IBM "knowingly misrepresented, and

knowingly withheld material information concerning, the extent of the deficiencies with

the E1 system" after the go-live.[51]  Where, as here, "fraud 'lies at the core' of a common

law negligence claim, both that claim and any associated fraud claims must satisfy Rule

9(b)'s heightened pleading requirements."  In re Tyco Int'l, Ltd., No. 04-CV-1336-PB,

2007 WL 1687775, at *8 (D.N.H. June 11, 2007) (Barbadoro, J.) (citing Hayduk v.

Lanna, 775 F.2d 441, 443 (1st Cir. 1985)).

***Pleading with particularity.***  The court begins by assessing whether PC

Connection alleges the circumstances surrounding the fraud with the required

particularity.  The court first analyzes the fraudulent inducement and the fraudulent

misrepresentation claims (separately).  The court then applies its findings to the negligent

---

[51] Id. at ¶¶ 135, 136(h).

misrepresentation claim, since it is premised on a subset of the very same misrepresentations and omissions that underlie the two fraud claims.

In considering the sufficiency of PC Connection's factual allegations, the court bears in mind that the First Circuit Court of Appeals prescribes a holistic approach when assessing whether the Rule 9(b) standard is satisfied. Specifically, "[w]hen a claim sounding in fraud contains a hybrid of allegations, some of which satisfy the strictures of Rule 9(b) and some of which do not, an inquiring court may sustain the claim on the basis of those specific allegations that are properly pleaded." Rodi, 389 F.3d at 15-16 (citing Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003)).

PC Connection predicates its fraudulent inducement claim on seven categories of misrepresentations and/or omissions, which the court refers to using the letters assigned to them in the complaint. PC Connection alleges that IBM misrepresented (a) IBM's "assessment of [PC] Connection's business and requirements regarding the functionality of the ERP system"; (b) the results of the discovery assessment; (c) "that it had the knowledge, skill, experience, capabilities and personnel to successfully undertake the upgrade"; (d) "the suitability of 'vanilla' E1 to meet [PC] Connection's identified needs"; (e) "the extent to which the E1 system would require extensive custom configurations that would increase the [p]roject cost and duration"; (f) the "time and cost required to implement the upgrade"; and (g) IBM's "ability and willingness to complete the implementation."[52] PC Connection also asserts that IBM withheld material information

---

[52] See id. at ¶ 118.

concerning categories (a), (d), (e), and (f).  In support of this claim, PC Connection

alleges the following facts, in relevant part:

1. IBM delivered a PowerPoint presentation to PC Connection "in or about July 2013," advising that PC Connection adopt the E1 system, as it "met all of PC Connection's 'core functional and technical requirements' . . . and would be 'faster and less costly to implement' than other systems."[53]

2. In the July 2013 PowerPoint presentation, "IBM also promoted itself as 'the right partner' to lead the implementation, alleging it had a 'World Class JDE Practice'; was 'a Tier 1 provide[r] with demonstrated results in transformation programs'; . . . . [and] provided 'Strong Project Management and Governance.'"[54]

3. After completing the discovery assessment in 2017, IBM "represented to PC Connection that[] IBM had thoroughly assessed [PC] Connection's business model and needs."[55]

4. After completing the discovery assessment, IBM also represented to PC Connection that it "had determined that standard, 'out of the box' E1 software, with only minimal modifications, would be suitable for [PC] Connection; IBM was committed to, and was fully qualified to perform, the

---

[53] Id. at ¶ 33.

[54] Id. at ¶ 34.

[55] Id. at ¶ 39.

implementation; and IBM had determined it could complete the Project in 17 months at a cost of $9.2 million."[56]

5. IBM presented the SOW to PC Connection on August 7, 2017, and in the SOW, IBM "reiterated many of the representations that it made to induce [PC] Connection to engage IBM."[57]

The first two statements set forth misrepresentations concerning categories (c), (d), and (g)—IBM's capabilities, the suitability of the E1 system in its "vanilla" form, and IBM's ability and willingness to complete the project. The statements identify the content of the misrepresentations, as well as the mechanism of delivery (a PowerPoint presentation). Further, the timing of the misrepresentation is limited to the month of July 2013, which is adequate to satisfy Rule 9(b). See Homes Dev. Corp. v. Edmund & Wheeler, Inc., No. 21-CV-0633-SM, 2022 WL 4586480, at *8 (D.N.H. Sept. 29, 2022) (McAuliffe, J.) (finding that a 180-day period was sufficient to satisfy the timing component of the Rule 9(b) pleading standard). Finally, since these misrepresentations appeared in a single, specific presentation attributable to IBM, PC Connection does not need to identify the employee(s) who delivered or formulated the presentation in order to put IBM on notice and satisfy Rule 9(b). See Moore v. Mortg. Elec. Registration Sys., Inc., 848 F. Supp. 2d 107, 131 (D.N.H. 2012) (where misrepresentations were written in letters from the defendant companies, "it [was] not necessary for the [plaintiffs] to

---

[56] Id.

[57] Id. at ¶ 45.

identify the particular employee of each defendant who allegedly signed or authorized the letters" to satisfy Rule 9(b) (citing Gilmore v. Sw. Bell Mobile Sys., L.L.C., 210 F.R.D. 212, 224 (N.D. Ill. 2001) and Vista Co. v. Columbia Pictures Indus., Inc., 725 F. Supp. 1286, 1302 (S.D.N.Y. 1989))).

The fifth statement directs the court to the SOW. The SOW identified a total of 15 "enhancement (or extensions) to the core application software packages,"[58] a total project cost of $9.29 million,[59] and a 17-month implementation period.[60] It further states that "IBM['s] standard approach is to design the solution to follow the 'vanilla' processes of the [E1] application."[61] These misrepresentations go to categories (d), (e), and (f). Elsewhere in the SOW, IBM warrants that it "had sufficient opportunity to analyze Connection's needs and requirements with respect to the" implementation,[62] and that it "will leverage the knowledge gained from the Discovery [Assessment] with the [PC] Connection team."[63] This language constitutes a characterization of the depth and value of IBM's assessment of PC Connection's business and ERP-related needs, and thus falls under category (a). The complaint also makes clear that the misrepresentations contained

---

[58] State of Work (doc. no. 15) at 13.

[59] See id. at 33-34.

[60] Id. at 32.

[61] Id. at 13.

[62] Id. at 38.

[63] Id. at 6.

in the SOW were presented to PC Connection on August 7, 2017.  Again, as with the

2013 PowerPoint presentation, PC Connection need not specify the employee(s) who

developed the SOW in order to satisfy Rule 9(b).

The third and fourth statements identify misrepresentations that fall under

categories (a), (c), (d), (e), (f), and (g), as well.  These statements fail to satisfy Rule

9(b)'s pleading standard since they do not specify the timings, speakers, or locations of

the assertions.  But this does not affect the court's final analysis, as each of these

categories of the fraudulent inducement claim is "sustain[ed] on the basis of those

specific allegations," discussed above, "that are properly pleaded."  Rodi, 389 F.3d at 15-

16 (citing Vess, 317 F.3d at 1105).

Category (b), the final remaining category of the fraudulent inducement claim,

concerns misrepresentations of the <u>results</u> of the discovery assessment.  According to the

complaint, the purpose of the discovery assessment was for IBM to "meet with [PC]

Connection employees . . . in order to assess their use of JDE World, to determine

whether [the] E1 would be a suitable platform for Connection, and to determine the

projected time and cost to implement [the] E1."[64]  The results of the discovery

assessment, then, would be the completion of these tasks and IBM's determinations as to

the suitability of the E1 software and the timeline and cost of the project.  PC Connection

has not stated any misrepresentations concerning IBM's completion of the discovery

assessment tasks.  The other results of the discovery assessment form separate categories

---

[64] Compl. (doc. no. 1) at ¶ 35.

under the fraudulent inducement claim—categories (a), (d), (e), and (f).  Thus, the court dismisses category (b) of the fraudulent inducement claim, as inadequately plead and/or duplicative of the other elements of the claim.

In sum, PC Connection states, with the requisite particularity, misrepresentations going only to categories (a), (c), (d), (e), (f), and (g) of the fraudulent inducement claim.[65] The corresponding elements of the negligent misrepresentation claim are also plead with the requisite particularity.[66]

The court turns next to the fraudulent misrepresentation claim.  PC Connection claims that, after the SOW was executed, IBM misrepresented and withheld material facts concerning eight categories of information: (a) "the time and cost required to complete the implementation"; (b) "IBM's ability to complete the implementation as represented to [PC] Connection and warranted in the 2017 SOW"; (c) IBM's "mismanagement of the project"; (d) "IBM's failure to properly plan, design, and test the implementation"; (e) "customizations that would be required to the E1 system"; (f) "the

---

[65] As previously noted, PC Connection claims that IBM both misrepresented <u>and</u> withheld material information going to categories (a), (d), (e), and (f).  The alleged misrepresentations concerning these categories of information also constitute omissions of material fact.  In other words, by affirmatively misrepresenting its assessment of PC Connection's business and ERP needs, the suitability of the E1 system in its "vanilla" form, the customizations that the E1 system would require, and the timeline and cost of the project, IBM also omitted material, accurate information on each issue.

[66] Categories (a), (c), and (d) of the fraudulent inducement claim form part of the negligent misrepresentation claim.  <u>See</u> Compl. (doc. no. 1) at ¶ 135 (repeating categories (a), (c), and (d) of the fraudulent inducement claim when stating the negligent misrepresentation claim).  The remainder of the negligent misrepresentation claim replicates the fraudulent misrepresentation claim, Count 6, in full.

E1 system's preparedness to go-live"; (g) "the harm and disruption to [PC] Connection's operations that would occur if the conversion was implemented before the system was ready"; and (h) following the go-live, "the extent of defects and deficiencies with the E1 system, and IBM's ability to correct the same."[67]

First, PC Connection alleges the specifics of misrepresentations that fall under categories (f) and (g), pertaining to the E1 system's readiness for the go-live and the business disruptions that were expected to occur after a premature go-live. These same facts support the omissions alleged under these categories. PC Connection claims that, roughly one year prior to May 2020, Cahill told PC Connection's CEO that the system was prepared for deployment. PC Connection also attaches the Go-Live Readiness Assessment Document to its objection, which is referenced in the complaint and dated May 12, 2020. This document—which the SOW identified as a deliverable that IBM was required to develop and submit to PC Connection for review and approval[68]—contains a

---

[67] See id. at ¶ 126.

[68] In its Reply brief, IBM attempts to disclaim ownership of the Go-Live Readiness Assessment Document, stating instead that "nearly all the persons responsible for reviewing and evaluating system readiness [for the Go-Live Readiness Assessment Document] were [PC] Connection employees. Indeed, as shown on the document, the final 97% readiness score resulted from [PC] Connection's readiness evaluations." Def.'s Reply (doc. no. 25) at 24. The court does not find facts in the complaint or in "the documents on which the complaint relies," including the Go-Live Readiness Assessment Document, which confirm the accuracy of these assertions. Curran, 509 F.3d at 44. At the motion to dismiss stage, the court cannot simply assume that these statements from the Reply brief are accurate. In reviewing the record before it, the court finds the SOW instructive on this matter. The SOW indicated that the Go-Live Readiness Assessment Document was prepared by IBM for PC Connection's review and approval. See 2017 Statement of Work (doc. no. 22) at 28 (identifying the Go-Live Readiness Assessment Document as one of the "Deliverable Materials" associated with Deploy Phase I); id. at 31 ("IBM will deliver one copy of each of the Deliverable Materials"); id. at 48 (describing the process through which IBM

chart that lists over 500 different system tasks or functions, assigns each a numerical score reflecting its completion status, and (for some, but not all, line items) identifies a "responsible person."  The document concludes that the system was 97% ready for go-live and the risk of proceeding was "minimal."[69]  Further, two signature blocks appear at the end of the document, designating locations for Bjarnson and Singh to sign.  Thus, though it is not necessary under Rule 9(b) to identify a particular IBM employee who is responsible for the document, it is reasonable to infer that the document can be attributed to Bjarnson and Singh, or the "responsible person[s]" identified in the chart, to the extent that they are IBM personnel.

The allegations that fall under category (h), regarding the deficiencies in the E1 system following the go-live and IBM's ability to remedy them, do not pass muster under Rule 9(b).  PC Connection claims that, after the go-live date, "IBM initially" stated that the problems with the system were "typical 'glitches.'"[70]  Later, "[w]hen it was obvious that [the] E1 problems could not be dismissed as 'mere glitches,' . . . IBM said it would dispatch a so-called 'Red Team' comprised of IBM's most skilled technicians" to fix the E1 system, but those individuals "never appeared."[71]  While the timing of the first

---

submits "Deliverable Materials" to PC Connection and obtains edits and approval from PC Connection).  The court views the Go-Live Readiness Assessment Document in this light throughout the opinion, as it is unable to determine the extent to which PC Connection contributed to the analysis or results of the document based on the record before it at this time.

[69] See Go-Live Readiness Assessment Document (doc. no. 22) at 29.

[70] Compl. (doc. no. 1) at ¶ 68.

[71] Id. at ¶ 70.

statement can be narrowed down to a date that shortly followed the May 2020 go-live date, the timing of the second statement is not sufficiently specified. Further, PC Connection does not identify the speaker or location of the statements.[72]

Next, in its objection, PC Connection identifies one allegation in the complaint that supports categories (b), (c), and (d), which pertain to IBM's ability to complete the project as represented and warranted in the SOW; IBM's mismanagement of the project; and IBM's failure to properly plan, design, and test the implementation. PC Connection claims that, at an undisclosed time, "IBM's leadership team, specifically Sandeep Singh and William Cahill, insisted that the [p]roject was on track, and they gave Connection no reason to believe that the Project would not be completed successfully."[73] This allegation does not satisfy the Rule 9(b) standard. It does not specify or narrow down when or

---

[72] It bears noting that even if the court were willing to infer that the statements were made in PC Connection's Merrimack, New Hampshire facility, where the project work took place (an argument that PC Connection does not advance), the court's conclusion would not change because the statements' speaker(s) are unknown. While PC Connection argues that it satisfies Rule 9(b)'s strictures by attributing these statements to IBM, that is incorrect, and the cases that PC Connection cites for this proposition do not support its argument. See Pl.'s Objection (doc. no. 20 at 36). PC Connection cites Surge Res., Inc. v. The Barrow Grp., in which the court concluded that the defendant alleged fraud with particularity "in regard to [two] alleged misrepresentations," both of which were attributed to a specific individual who was named in the complaint. No. CIV. 02-145-B, 2003 WL 1193012, at *1, 3 (D.N.H. Mar. 12, 2003) (Barbadoro, J.). PC Connection also cites Moore v. Mortg. Elec. Registration Sys., Inc., in which the court found it unnecessary for the plaintiff to "identify the particular employee of each defendant [corporation] who allegedly signed or authorized the letters" which contained the subject misrepresentations. 848 F. Supp. 2d at 130. While the finding in Moore is relevant to IBM's PowerPoint presentation, the SOW, and the Go-Live Readiness Assessment Document, as previously discussed, it is not applicable to the oral misrepresentations at issue here. See Rodi, 389 F.3d at 15 (finding that statements "made by an unidentified person at an unnamed place and at an unspecified time," including statements attributed to the defendant institution generally, "are patently inadequate under Rule 9(b).").

[73] Compl. (doc. no 1) at ¶ 15.

where the statements were delivered.  It also sets forth the content of the

misrepresentations in relatively general terms.

Finally, PC Connection does not allege any specific misrepresentations or

omissions that occurred after the execution of the SOW and support categories (a) and

(e), which concern the timeline and cost of the project, as well as the customizations that

the E1 system would require.  The court accordingly dismisses categories (a), (b), (c), (d),

(e) and (h) of the fraudulent misrepresentation claim as inadequately plead.[74]  The

---

[74] As previously noted, PC Connection alleges that IBM both misrepresented <u>and</u> withheld
material facts as to each of these categories of information.  The bulk of the court's discussion
has focused on the alleged misrepresentations, but PC Connection also fails to sufficiently allege
relevant omissions.  PC Connection states, with little elaboration, that any deficiency in its
allegations regarding the omissions can be written off because PC Connection cannot "detail the
date or place of conversation that never occurred."  Pl.'s Objection (doc. no. 20) at 20 (quoting
Homes Dev. Corp., 2022 WL 4586480, at *8).  While this argument has been properly credited
in some cases, it is not compelling under the facts of this specific case.  The SOW provided for
cooperation between PC Connection and IBM on various tasks, as well as PC Connection's
review and approval of IBM's deliverables, work product, and Project Change Requests.  In this
way, IBM periodically transferred information and documents about the project to PC
Connection.  Nevertheless, PC Connection does not specify interactions with particular IBM
project team members, or IBM deliverables, in which IBM withheld material facts going to the
subject categories of information.  As an example, with respect to IBM's omissions regarding the
timeline of the project, PC Connection alleges that "IBM extended the completion date through
project change requests," but does not provide the dates of requests that ostensibly omitted
material facts on this issue.  Compl. (doc. no. 1) at ¶ 60.  The court cannot reasonably infer,
under these circumstances, that PC Connection is simply unable to identify "the who, what,
where, and when of the alleged[] omissions."  Davis, 2018 WL 1514869, at *9.

corresponding elements of the negligent misrepresentation claim are also dismissed.[75]

Still, all three claims survive, in part.[76]

*Scienter.*   IBM contends that PC Connection fails to sufficiently allege scienter.

In order to satisfy Rule 9(b), PC Connection must "set[] forth specific facts that make it

reasonable to believe that defendant knew that a statement was materially false or

misleading." Cardinale, 567 F.3d at 13.  In New Hampshire, "fraud requires a

representation . . . made with knowledge of its falsity or with conscious indifference to its

truth," while "[n]egligent misrepresentation" sets forth a lower bar, "requir[ing] a failure

to exercise reasonable care to verify the truth of [a misrepresentation]." New Hampshire

Elec. Coop., Inc. v. Elster Sols., LLC, No. 16-CV-440-PB, 2017 WL 2861667, at *4

(D.N.H. July 5, 2017) (Barbadoro, J.) (internal quotations omitted).  As explained below,

PC Connection alleges facts supporting a reasonable inference of scienter with respect to

its fraud claims.  Thus, these allegations also suffice with respect to the negligent

misrepresentation claim.

PC Connection claims that the defects in the E1 system became apparent within

hours of the go-live; these defects appeared in "features specifically identified in the []

SOW as within IBM's scope of work"; and they led to multiple disruptions to critical

---

[75] See Compl. (doc. no. 1) at ¶ 136 (a), (b), (c), (d), (e). (h) (repeating categories (a), (b), (c), (d), (e). and (h) of the fraudulent misrepresentation claim when stating the negligent misrepresentation claim).

[76] At this time, the court does not grant PC Connection leave to amend its complaint to attempt to provide more specifics on the categories of Counts 5, 6, and 7 that are dismissed for failure to satisfy Rule 9(b), since the claims all survive in part.

business functions.[77]  PC Connection further alleges that IBM charged millions of dollars

beyond the estimated $9.2 million project cost; installed over 90 customizations to the E1

system; and failed to correct the system errors after the go-live, leaving PC Connection's

employees to devote over 80,000 hours to responding to and remedying the defects.  The

rapidity with which the system failures or flaws arose, as well as their severity, support a

reasonable inference of scienter as to each of the categories of misrepresentations that are

adequately plead.  Similarly, the considerable inaccuracy of IBM's representations

regarding the expected length and cost of the project, as well as the customizations that

the E1 system would require, also supports an inference of scienter.  See Avalanche IP,

LLC v. FAM, LLC, No. 20-CV-10102-ADB, 2021 WL 149258, at *8 (D. Mass. Jan. 15,

2021) ("Under certain circumstances, courts are permitted to infer fraudulent intent

based, in part, on a promise and subsequent failure to perform" (internal citation

omitted)); Hoffman v. Optima Sys., Inc., 683 F. Supp. 865, 868 (D. Mass. 1988) ("While

a mere failure of promised performance normally does not permit a factual finding that

the defendant never intended to perform the promised act, the trier of fact would surely

be permitted to draw such an inference of scienter from the abject failure of performance"

(quoting Gibbons v. Udaras na Gaeltachta, 549 F. Supp. 1094, 1124 (S.D.N.Y. 1982))).

   PC Connection also alleges facts indicating that IBM stood to gain financially by

initially misrepresenting the cost, length, and complexity of the project in order to obtain

the work, and then using the Project Change Control Procedure to increase these

---

[77] Compl. (doc. no. 1) at ¶ 90.

estimates over time, resulting in additional revenue.  Indeed, PC Connection alleges that

IBM charged it millions of dollars beyond the estimated $9.2 million project cost.

Though these allegations of financial motive and opportunity do not necessarily support

an inference of scienter on their own, they can serve to strengthen the inference, when

viewed in the light most favorable to PC Connection and alongside the facts discussed

above.  See Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 325 (2007) ("motive

can be a relevant consideration, and personal financial gain may weigh heavily in favor

of a scienter inference"); Brennan v. Zafgen, Inc., 853 F.3d 606, 614 (1st Cir. 2017) ("a

plaintiff may combine various facts and circumstances indicating fraudulent intent,

including those demonstrating motive and opportunity, to satisfy the scienter

requirement" (internal quotation and alterations omitted)); Avalanche IP, 2021 WL

149258, at *8 (considering the defendant's "pecuniary motive" and opportunity to extend

a contract through false representations as relevant factors in finding that the plaintiff

adequately plead fraudulent intent); In re Vertex Pharms. Inc., Sec. Litig., 357 F. Supp.

2d 343, 352-53 (D. Mass. 2005) (noting, in the context of a securities fraud claim,

"[w]hile motive evidence alone is insufficient to satisfy the scienter requirement,

unusually strong financial incentives may be relevant when considered in combination

with other factors.").

　　　　PC Connection has sufficiently alleged scienter.  IBM's motion to dismiss Counts

5-7 on this ground is denied.

### ii.     The alleged misrepresentations are actionable

IBM also argues that many of the alleged misrepresentations underlying Counts 5, 6, and 7 are nonactionable opinions, estimates, or mere puffery, as opposed to assertions of fact.  In making this argument, IBM points to three groups of misrepresentations, which the court considers individually below.

***The E1 system's suitability and preparedness for go-live.***  IBM points to the purported misrepresentations concerning the E1 system's suitability in its "vanilla" form and the E1 system's readiness for go-live as nonactionable expressions of opinion.  As a general matter, "[t]o constitute actionable fraud, the false representation relied upon must relate to a past or existing fact, or something equivalent thereto, as distinguished from a mere estimate or expression of opinion."  ILKB, LLC v. Singh, No. 20-CV-4201 ARR SJB, 2021 WL 3565719, at *6 (E.D.N.Y. Aug. 12, 2021) (internal quotation omitted).  Consistent with this, New York courts have treated "indefinite[] . . . figures" or "expressions of expectations" about outcomes that "both parties kn[o]w could not be foretold" as nonactionable opinions.  George Backer Mgmt. Corp. v. Acme Quilting Co., 46 N.Y.2d 211, 220 (1978).

Under New York law, however, "[d]eclarations of opinion as to future events which the declarant does not in fact hold may be found by a jury to be fraudulent." United States v. Amrep Corp., 560 F.2d 539, 543 (2d Cir. 1977) (internal citation omitted).  "As such, for [an opinion] to be actionable, a plaintiff must allege that the holder of the opinion . . . did not believe the opinion at the time that it was made."  Tolin v. Standard & Poor's Fin. Servs., LLC, 950 F. Supp. 2d 714, 722 (S.D.N.Y. 2013).  As

previously noted, "[m]alice, intent, knowledge, and other conditions of mind of a person may be alleged generally" in pleading a claim for fraud.  Fed. R. Civ. P. 9(b).

IBM's pre-contractual representations regarding the E1's suitability in its "vanilla" form are expressions of opinion and future promises that are indefinite and subject to change based on information gathered during the project, as opposed to assertions grounded in "concrete fact or a past or existing event."  George Backer, 46 N.Y.2d at 220.  Indeed, the SOW provided that IBM's "standard approach is to design the solution to follow the 'vanilla' processes of the application," but "enhancements and extensions to the software are sometimes necessary to meet business requirements."[78]  The SOW then stated that 15 software enhancement would be required over the course of the project, but the project team "may identify additional" enhancements during the design phase and add them on using the Project Change Control Procedure.[79]

The suitability statements are, however, still actionable as opinions that IBM did not honestly hold at the time, for the reasons discussed in the court's analysis of the scienter requirement.  See supra Section III.E.i.  Also, PC Connection claims that, during the discovery assessment, IBM learned that the JDE World system had been extensively customized in order to meet PC Connection's business needs.  PC Connection also alleges several facts indicating that its business and the demands on its ERP system are complex.  For example, PC Connection claims that it offers 425,000 products, works with

---

[78] 2017 Statement of Work (doc. no. 15) at 13.

[79] Id.

over 1,600 suppliers, engages with customers in the private and public sector, and offers same-day shipping.  Drawing all reasonable inferences in PC Connection's favor, and taking into consideration that the basis and accuracy of IBM's suitability assessment is peculiarly within IBM's knowledge and difficult to discern without discovery, the court finds these allegations sufficient to support the inference that IBM did not honestly believe that the E1 system would be suitable in its "vanilla" form.

IBM's assertions regarding the E1 system's readiness for go-live, on the other hand, lack some of the characteristics of an opinion—they are not indefinite or pertaining to an issue that cannot be known.  Further, IBM told PC Connection that the E1 system was ready for go-live after IBM spent months designing, developing, and testing the system for the very purpose of preparing it for deployment.  And when PC Connection sought reassurance regarding the system's preparedness, IBM directed PC Connection to the Go-Live Readiness Assessment Document, which relied on then-present facts regarding the completion status of over 500 system functions and tasks to determine that the system was 97% prepared.

It follows that IBM's statements regarding readiness can be understood as concrete assertions of fact, borne from PC Connection's requests for information and IBM's analysis of a system that was "in existence at the time," as opposed to one that "had not actually been assembled and set up, . . . [or] which was to be constructed in the future, the characteristics of which were largely conjectural."  Bareham & McFarland v. Kane, 228 A.D. 396, 397-98 (1930) (a seller's assertions that a heater, once installed, would "give much better heat than coal[,] [and] that the electricity would not run over $5

to $6 a month" constituted "positive statements of existing fact," as they pertained to a

system that was in existence or had previously been manufactured, and they "could easily

be understood to relate to the inherent capacity, character, and quality of the heater, and

what it was actually capable of doing"); see also Woods v. Maytag Co., 807 F. Supp. 2d

112, 123 (E.D.N.Y. 2011) (concluding that a sales representative's statement that an oven

was not "prone to hazardous flare-ups and explosions," was "not mere opinion, 'puffery,'

or a casual statement, but rather a positive assertion of fact made in response to a direct

question," and reasoning that "if a defendant's misrepresentation comes in the form of a

positive assertion, then it is likely that defendant will be responsible if it happens to be

false" (internal quotation omitted)).

Even if IBM's statements regarding the E1 system's readiness for go-live are

construed as opinions, they are still actionable because the court can reasonably infer that

they did not reflect PC Connection's actual views at the time.  In addition to the facts

supporting the scienter requirement, see supra Section III.E.i, PC Connection alleges that

IBM was responsible for completing two cut-over trial runs before the go-live, and that

IBM either hid the bad results or did not perform the trial runs correctly.  Further, IBM

began claiming that the E1 system was ready for go-live around May 2019, roughly 18-

19 months after it began the implementation project in October 2017.  It is reasonable to

infer from these facts that IBM knew of the flaws in its cut-over trial runs and that the E1

system was not prepared for deployment, but IBM nevertheless told PC Connection that

the system was ready because it had exceeded the projected 17-month project timeline by

May 2019.

***The disruptive effects of the software deployment and the timeline and cost of***

***the project.***  IBM contends that the misrepresentations regarding the disruption that

would occur after a premature go-live, as well as the timeline and cost of the project, are

nonactionable estimates, predictions, and expectations.  Generally, a cause of action for

fraud "cannot be based upon a statement of future intentions, promises[,] or expectations

which were speculative or an expression of hope at the time when made, rather than an

assumption of fact."  Roney v. Janis, 430 N.Y.S.2d 333, 335 (1980) aff'd, 53 N.Y.2d

1025 (1981).  In other words, to be actionable, "the alleged misrepresentation must be

factual in nature and not promissory or relating to future events that might never come to

fruition."  Hydro Invs., Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20-21 (2d Cir. 2000)

(citing cases).  But, as with opinions, statements of "future intentions" can support a

claim for fraud if the plaintiff "allege[s] facts to show that defendant, at the time the

promissory representation was made, never intended to honor or act on her statement."

Roney, 430 N.Y.S.2d at 335.

To begin, as with IBM's representations regarding the E1 system's readiness for

go-live, the court can reasonably view IBM's statement regarding the disruptive effects

of a premature deployment as an assertion of fact.  In short, IBM's representation that the

go-live posed minimal risks is found in the Go-Live Readiness Assessment Document.

Thus, the statement was based on IBM's tabulation of the contemporaneous status of

various system tasks and functions, which constituted then-present facts.  These

assertions are not converted to predictions merely because they would be acted upon, and

proven true or false, in the (near) future.  Even if they are construed as predictions,

however, they remain actionable for the same reasons that IBM's readiness assertions remain actionable.

IBM's representations regarding the timeline and cost of the project, on the other hand, are expectations and predictions. Indeed, the SOW referred to both as estimates that could be modified using the Project Change Control Procedure, and stated that the timeline was "dependent" on unknowable future events, such as "timely business decisions, and, if applicable, the timely resolution of critical [p]roject issues."[80] The SOW also used forward-looking language when discussing these parameters, stating that the "objective is to complete this project within this estimated timeline and budget" and that the project "should" be completed at the estimated cost "barring any changes or unforeseen issues."[81] See W. Valley KB Venture, LLC v. ILKB LLC, No. 20-CV-3278 JS AYS, 2021 WL 4171918, at *8 (E.D.N.Y. Sept. 13, 2021) (finding that representations using the words "would" and "could" were non-actionable "predictions about future performance" that "use[d] predictive language"); Naturopathic Lab'ys Int'l, Inc. v. SSL Americas, Inc., 18 A.D.3d 404, 404 (2005) (representations using the phrase "would envision" and the word "intend" were nonactionable predictions). These statements of future intention remain actionable, however, because (as discussed with respect to the representations regarding the E1 system's suitability in its "vanilla" form), PC

---

[80] Id. at 19; see also id. at 6 ("barring any changes or unforeseen issues, the project should be completed with the estimated costs set forth in the SOW"); id. at 32 ("The Services in this SOW are estimated to be performed by IBM in a period estimated at 17 months").

[81] Id. at 6.

Connection alleges facts regarding its business and its ERP needs, system failures, and pecuniary motive and opportunity, which support the inference that IBM underrepresented and did not intend to honor its estimates of the project's complexity, timeline, and cost.

> ***IBM's expertise, capabilities, and ability and willingness to complete the project.***
Finally, IBM avers that its statements regarding its expertise, experience, and willingness to complete the project, as well its status as a leading expert, are mere puffery that do not support fraud or negligent misrepresentation claims.

Some of the statements in IBM's July 2013 PowerPoint presentation—that, for example, it provided "strong Project Management and Governance" and was the 'right partner'—are puffery, as they have "no fixed meaning." Solomon Cap., LLC v. Lion Biotechnologies, Inc., 171 A.D.3d 467, 468 (2019); see also Doe v. Uber Techs., Inc., 551 F. Supp. 3d 341, 366 (S.D.N.Y. 2021) ("[s]ubjective claims about products, which cannot be proven either true or false" are puffery (quoting Lipton v. Nature Co., 71 F.3d 464, 474 (2d Cir. 1995))). But IBM also made more "concrete and measurable" representations regarding its experience, capabilities, and willingness to perform, which are actionable. Solomon, 171 A.D.3d at 468. In the 2013 PowerPoint presentation, IBM claimed to have "demonstrated results in transformation programs," and experience with JDE systems, in particular. These assertions are "specific enough to be falsifiable," through anecdotal or numerical evidence of IBM's past involvement in successful JDE system upgrades, and thus are not mere puffery. Uber Techs., 551 F. Supp. 3d at 366 (internal citation omitted).

In short, the false statements that PC Connection alleges under its fraud and negligent misrepresentation claims are actionable, with the exception of some (but not all) of the statements regarding IBM's expertise and capabilities.  The court denies the motion to dismiss Counts 5, 6, and 7 on this ground, as well.

### iii.    The fraud claims are not wholly duplicative of the breach of contract claim

Finally, IBM moves to dismiss Counts 5, 6, and 7 as duplicative of the breach of contract claim.  The court analyzes this argument only with respect to those categories of the fraud-based claims that are plead with the requisite particularity, as determined <u>supra</u>, Section III.E.i.  In other words, the court considers the misrepresentations and omissions going to categories (a), (c), (d), (e), (f), and (g) of the fraudulent inducement claim; categories (f) and (g) of the fraudulent misrepresentation claim; and the corresponding elements of the negligent misrepresentation claim.

"Under New York law . . . a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract."  <u>FPP, LLC v. Xaxis US, LLC</u>, 764 F. App'x 92, 94 (2d Cir. 2019) (internal quotation omitted).  In determining when parallel breach of contract and fraud claims can be sustained, New York courts generally "distinguish[] between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action[,] and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement" or

fraudulent misrepresentation.[82] Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500

F.3d 171, 184 (2d Cir. 2007); see also VTech Holdings Ltd. v. Lucent Techs., Inc., 172 F.

Supp. 2d 435, 439 (S.D.N.Y. 2001) (the "mere allegation" that a party to a contract

"made a contractual promise with no intention of performing it" is generally insufficient

to state a claim for fraud that is non-duplicative of a breach of a contract claim, as parties

are presumed to enter into contracts intending to either perform as promised or "suffer the

ordinary contractual consequences for breach"); Microtel Franchise & Dev. Corp. v.

Country Inn Hotel, 923 F. Supp. 415, 417 (W.D.N.Y. 1996) ("In a case involving a

breach of contract, . . . a fraud claim may exist only where the alleged misrepresentations

concern a 'present' fact (i.e., the financial stability of the company) as opposed to a

statement of future intent (i.e., that something will be provided as part of the proposed

contract)"); KCG Americas LLC v. Brazilmed, LLC, No. 15 CIV. 4600(AT), 2016 WL

900396, at *4 (S.D.N.Y. Feb. 26, 2016) ("If . . . a plaintiff pleads misconduct

independent from the breach of contract, such that it was induced to enter into a

transaction because a defendant misrepresented material facts," then the fraud claim

---

[82] IBM contends that this distinction is only relevant to pre-contractual misrepresentations, and is inapplicable to misrepresentations made after the contract is executed. See Def.'s Reply (doc. no. 25) at 19. IBM's contention is not supported by the law. See, e.g., Minnie Rose LLC v. Yu, 169 F. Supp. 3d 504, 520 (S.D.N.Y. 2016) ("Misrepresentations of present facts made post-contract formation are collateral or extraneous to the contract and are actionable in fraud" (internal citations omitted)); Eagle Comtronics, Inc. v. Pico Products, Inc., 256 A.D.2d 1202, 1203 (1998) ("The complaint states a viable cause of action for fraud. Plaintiff does not allege merely that Defendant entered into the contract while misrepresenting its intent to perform as agreed, but alleges that, after the contract was entered into, defendant repeatedly misrepresented or concealed existing facts." (internal citations omitted)). Thus, the court relies on the present fact/future intent distinction in its analysis of all of the alleged misrepresentations, regardless of when they took place.

survives "even though the same circumstances also give rise to the breach of contract claim." (internal quotation omitted)).

In Bridgestone/Firestone, the Second Circuit Court of Appeals set forth three exceptions to the "dominant trend [] that a fraud claim cannot be based solely on the allegation that a party has made a contractual promise with no intention of performing it." VTech Holdings, 172 F. Supp. 2d at 440. "To maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract, . . . or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, . . . or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Bridgestone/Firestone, 98 F.3d at 20 (internal citation omitted).

***Misrepresentations of present fact.*** The court begins its analysis with the alleged misrepresentations of present fact, which are likely not subject to the Bridgestone/Firestone test. See VTech Holdings, 172 F. Supp. 2d  at 440-41 (finding that "[t]he Bridgestone/Firestone test may not apply" to a fraud claim premised on misrepresentations of "contemporaneous facts," given that the test "was developed in the context of misrepresentations of future intent rather than present fact."). Regardless, the misrepresentations, as discussed below, do satisfy the first Bridgestone/Firestone exception, as the Second Circuit Court of Appeals has held that "[a] misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty." Merrill Lynch, 500 F.3d at 184.

64

First, New York courts have repeatedly held that a party's pre-contractual representations regarding its existing ability and willingness to perform under the contract, or its capabilities or resources, constitute present facts that can support a non-duplicative fraudulent inducement claim.  See, e.g., Wild Bunch, SA v. Vendian Ent., LLC, 256 F. Supp. 3d 497, 506 (S.D.N.Y. 2017) ("New York law is clear that, at a minimum, false statements about a party's present financial condition or current ability to perform, made in order to induce a party to enter into a contract, will support a claim of fraudulent inducement"); KCG Americas, 2016 WL 900396, at *4 ("Representations about an entity's ability to perform under a contract," made in order to induce the plaintiff to enter into the contract, "are distinct from representations that the entity will perform," and support a non-duplicative fraudulent inducement claim).  IBM's pre-contractual statements regarding its skills and capabilities; its completion of a thorough assessment of PC Connection's business and ERP needs in preparation for the implementation project; and its ability and willingness to complete the project all fall within this category.  Further, it is reasonable to infer that these misrepresentations induced or encouraged PC Connection to enter into the SOW, as they each reflect positively on IBM's likelihood of completing the project successfully.  Thus, categories (a), (c), and (g) of the fraudulent inducement claim survive dismissal on duplicativeness grounds.

IBM attempts to avoid this outcome by arguing that these misrepresentations are repeated in the SOW warranty provisions and thus "mirror the parties' contractual

obligations."[83]  IBM's observation is accurate, but this repetition is not fatal to the

fraudulent inducement claim.  Indeed, there is a "longstanding pedigree in New York" of

fraudulent inducement claims based on "misrepresentations that [also] breach express

warranties," in part because "a warranty is not a promise of performance, but a statement

of a present fact."  Merrill Lynch, 500 F.3d at 184 (internal quotation omitted); see also

Wild Bunch, 256 F. Supp. 3d at 505 ("a plaintiff may maintain a fraudulent inducement

claim alongside a breach of warranty claim where proof of the false statement would also

prove that the warranty was false").

　　　　The court turns next to the fraudulent misrepresentation claim.  As discussed supra

Section III.E.ii, IBM's assertions regarding the E1 system's preparedness for go-live, as

well as the disruption to PC Connection's operations that would occur after a premature

go-live, are reasonably viewed as misrepresentations of present fact.  Further, the court

can reasonably infer that these misrepresentations induced or encouraged PC Connection

to proceed to go-live with an underprepared, defective system.  Accordingly, categories

(f) and (g) of the fraudulent misrepresentation claim are not duplicative of the breach of

contract claim, either.  See IS Chrystie Mgmt. LLC v. ADP, LLC, 205 A.D.3d 418, 418-

19 (2022) (finding that a fraud claim was based on present facts, and thus "collateral to

the contract," where the plaintiff alleged that, when the services performed under the

contract "proved to be deficient, [the defendant] would purport to deal with the problem

and then misrepresent to Plaintiff that the problem had been fixed, when it had not"

---

[83] Mot. to Dismiss (doc. no. 12-1) at 21.

(internal citations and alterations omitted)); VTech Holdings, 172 F. Supp. 2d at 440
(sustaining a fraud claim where the plaintiff alleged "that it was induced to enter into a
contract and then complete the closing by a series of misrepresentations of present fact,
rather than a series of false promises"); Minnie Rose, 169 F. Supp. 3d at 521 (concluding
that a fraud claim was not duplicative of a breach of contract claim where the defendant,
who agreed to "select factories for manufacturing, supervise production, and invoice
Plaintiff," misrepresented present facts by "conceal[ing] the actual price of
manufacturing each time they sent Plaintiff invoices").

   ***Misrepresentations of future intent.***  The remaining misrepresentations are IBM's
pre-contractual statements regarding the suitability of the E1 system in its "vanilla" form,
the customizations that the E1 system would require, and the project timeline and cost—
which go to categories (d), (e), and (f) of the fraudulent inducement claim.  As explained
supra Section III.E.i and III.E.ii, these misrepresentations all constitute future promises,
predictions, and/or estimates that were also stated in the SOW and insincere when
expressed.  In other words, they are "contractual promise[s]" made "with no intention of
performing [them]."  VTech Holdings, 172 F. Supp. 2d at 440.  Thus, these
misrepresentations must satisfy at least one of the three Bridgestone/Firestone exceptions
in order to escape dismissal.

   The court begins with the first Bridgestone/Firestone exception, which is triggered
if the misrepresentations violate a legal duty separate from IBM's duty to perform under
the contract.  PC Connection contends that IBM had an independent duty to disclose
material facts.  "A duty to disclose arises in one of three circumstances: where the parties

are in a fiduciary relationship; under the special facts doctrine, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge; or where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 582 (2d Cir. 2005) (internal quotations and alterations omitted). According to PC Connection, the special facts doctrine applies here.[84]

Assuming, for the sake of argument, that PC Connection is correct, and the special facts doctrine creates a duty to disclose in this case, the first Bridgestone/Firestone exception is still not satisfied because that duty would not "exist separately from the duty to perform under the contract." TVT Recs. v. Island Def Jam Music Grp., 412 F.3d 82, 91 (2d Cir. 2005); see also Great Earth, 311 F. Supp. 2d at 426 ("[W]here a party selling pharmaceuticals intentionally includes illegal ingredients in its products and mislabels them to hide its deeds, violation of relevant [Canadian] regulations [concerning public health and safety] constitutes the breach of a legal duty separate from the duty to perform under the contract, even if the obligation is also reflected in a provision of a contract, and accordingly may support a cause of action in tort" (internal quotation omitted)); Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 389 (1987) (an independent legal

---

[84] PC Connection also argues that the first Bridgestone/Firestone exception is satisfied because an independent duty arose from the special relationship between PC Connection and IBM. The court reviewed and rejected this argument when analyzing PC Connection's negligence claim. See supra Section III.D. PC Connection stated during oral argument that the same analysis applies to the special relationship inquiry in both contexts, so the court rejects the argument here, as well. See Apr. 25, 2023 Hearing Transcript (doc. no. 27) at 64:10-14, 72:12-20.

duty supporting a cause of action in tort "must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.")  Indeed, the SOW stated that IBM's "objective" was to "complete th[e] project within th[e] estimated timeline and budget," and that both parties would "use commercially reasonable efforts to" meet this objective.[85]  The SOW further provided that IBM "will work to reduce the number of customizations" required, and to "leverage" the software's "standard (vanilla) capabilities."[86]  IBM's duty to disclose the unattainability or insincerity of these objectives is part and parcel of, not independent from, its duty to perform in accordance with these aspects of the SOW.

Next, the second Bridgestone/Firestone exception permits fraud claims that are premised on misrepresentations that are collateral or extraneous to the contract.  "[A]s a matter of both logic and law, the primary consideration [raised by the second Bridgestone/Firestone exception] is whether the contract itself speaks to the issue."  Great Earth, 311 F. Supp. 2d at 427; see also Astroworks, Inc. v. Astroexhibit, Inc., 257 F. Supp. 2d 609, 616 n.11 (S.D.N.Y. 2003) ("whether a promise is collateral or extraneous to an agreement depends entirely on the contours of the agreement"); Frontier-Kemper Constructors, Inc. v. Am. Rock Salt Co., 224 F. Supp. 2d 520, 532 (W.D.N.Y. 2002). (describing a collateral promise as a "promise[] to do something other than what it was required to do under the contract").  Here, the misrepresentations are not collateral or

---

[85] 2017 Statement of Work (doc. no. 15) at 6.

[86] See id. at 5, 9.

extraneous to the contract because they are each present in the SOW, as discussed in the previous paragraph and more fully supra Section III.E.i.

Finally, the third Bridgestone/Firestone exception does not apply because the only unique damages that PC Connection seeks under its fraudulent inducement claim are punitive damages.[87]  Under New York law punitive damages do not constitute "special damages" as referenced in Bridgestone/Firestone's third exception.  See Cargo Logistics Int'l, LLC v. Overseas Moving Specialists, Inc., 557 F. Supp. 3d 381, 397 (E.D.N.Y. 2021) (noting that the plaintiff "seeks punitive damages for his fraud claim that he does not seek for the breach of contract claim," but "these damages are an insufficient basis to render the fraud claim non-duplicative" (citing cases)); ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd., No. 19-CV-7800, 2021 WL 1177532, at *22 (S.D.N.Y. Mar. 29, 2021) ("[P]unitive damages are, by definition, not 'caused by' fraud and therefore do not count as 'special damages' that would differentiate the fraud claim from the breach of contract claim." (quoting Magnacoustics, Inc. v. Integrated Comput. Sols., Inc., No. 17-CV-4967, 2020 WL 4041310, at *6 (E.D.N.Y. July 17, 2020))).  In its briefs, PC Connection does not attempt to argue that its request for punitive damages prevents dismissal.  Instead, it asserts that "[a]bsent the[] [pre-contractual] misrepresentations,

---

[87] See Compl. (doc. no. 1) at ¶¶ 124, 133 ("[B]ecause IBM's actions were committed knowingly, willfully and in conscious disregard of the rights of [PC] Connection, [PC] Connection is entitled to recover punitive damages in an amount to be determined at trial.").  According to the complaint, PC Connection does not seek punitive damages in relation to its negligent misrepresentation claim.

[PC] Connection would not have entered into the agreement . . . ."[88]  But PC Connection does not explain, nor does it cite authority demonstrating, how the alleged false representations that induced entry into the SOW resulted in damages that are unrecoverable as contract damages.[89]

In sum, categories (a), (c), and (g) of the fraudulent inducement claim and categories (f) and (g) of the fraudulent misrepresentation claim, along with the corresponding portions of the negligent misrepresentation claim, are not duplicative of the breach of contract claim.  Categories (d), (e), and (f) of the fraudulent inducement claim, on the other hand, are dismissed as duplicative of the breach of contract claim, since they are premised on misrepresentations of IBM's future intention to perform, and they do not satisfy any of the three Bridgestone/Firestone exceptions.  The corresponding portions of the negligent misrepresentation claim are dismissed for the same reason.

### F.      The fraudulent inducement claim (Count 5)

IBM raises two more arguments for dismissal that are specific to PC Connection's fraudulent inducement claim.  The court applies these  arguments to those elements of the fraudulent inducement claim that were not dismissed as inadequately plead or duplicative of the breach of contract claim—categories (a), (c), and (g), which concern IBM's

---

[88] Pl.'s Objection (doc. no. 20) at 33-34.

[89] Counsel for PC Connection also stated, for the first time during oral argument, that "it's too soon to tell" whether the damages under the fraud and contract claims are distinct.  Apr. 25, 2023 Hearing Transcript (doc. no. 27) at 75:11-15.  This argument cannot be credited at this stage, as it is wholly underdeveloped, but the court's ruling on the motion to dismiss does not foreclose the possibility of pursuing the argument at a later date, since the fraudulent misrepresentation, fraudulent inducement, and negligent misrepresentation claims all survive dismissal, in part.

"assessment of [PC] Connection's business and requirements regarding the functionality

of the ERP system"; IBM's capabilities; and IBM's "ability and willingness to complete

the implementation."[90]  Both arguments miss the mark.

### i.  Statute of limitations

First, IBM avers that the claim is barred by the two-year statute of limitations set

forth in the SOW because it accrued before April 30, 2020.  IBM points out that a cause

of action for fraudulent inducement "accrues when the document is executed and when

the party alleging fraud has given consideration and thus suffered damage."  Triangle

Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 748 (2d Cir. 1979) (internal

quotation omitted); see also Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC, No. 12

CIV. 7372 (AT), 2020 WL 264146, at *2 (S.D.N.Y. Jan. 17, 2020) ("A fraudulent

inducement claim accrues when the plaintiff enters into the contract or otherwise

completes the act that the fraudulent statements [are] meant to induce.").  Accordingly,

IBM asserts that the fraudulent inducement claim accrued in 2017, when the SOW was

executed.

PC Connection relies on New York's statutory discovery rule to identify a later

point of accrual.  The discovery rule postpones the statute of limitations, making a fraud

claim "timely if brought within two years of when the plaintiff 'discovered the fraud, or

could with reasonable diligence have discovered it.'"  Sejin Precision Indus. Co. v.

Citibank, N.A., 726 F. App'x 27, 30 (2d Cir. 2018) (quoting N.Y. C.P.L.R. § 213(8)).

---

[90] Compl. (doc. no. 1) at ¶ 118 (a), (c), (g).

More specifically, "[t]he two-year period begins to run when the circumstances reasonably would suggest to the plaintiff that he or she may have been defrauded, so as to trigger a duty to inquire on his or her part." Pericon v. Ruck, 56 A.D.3d 635, 636 (2008). "Where the plaintiff has knowledge of his claim or of facts which would have prompted a reasonable person using due diligence to discover the claim, the discovery rule does not extend the time within which the plaintiff must bring his claim." Ruso v. Morrison, 695 F. Supp. 2d 33, 46 (S.D.N.Y. 2010).

PC Connection argues that, under the discovery rule, the statute of limitations began running on the May 15, 2020 go-live date. Taking PC Connection's allegations as true and drawing all reasonable inferences in PC Connection's favor, the court agrees that PC Connection had the requisite knowledge to trigger the discovery rule once the go-live occurred, but not prior to that point.

Indeed, at some point prior to the go-live, PC Connection did become aware that the project was proving more complex, longer, and more expensive than IBM originally projected, as these parameters of the project changed over the course of the implementation period under the Project Change Control Procedure. But even if IBM's projections on these matters were proven incorrect well before the go-live, this is not sufficient to reasonably put PC Connection on notice of IBM's pre-contractual, fraudulent misrepresentations and omissions—in part because the SOW provided for the possibility that each of these estimates were subject to modification. Further, IBM offered PC Connection assurances of the system's readiness prior to the go-live, which would counteract a reasonable person's potential concerns or suspicions of fraud at that

time.  Specifically, as previously discussed, IBM presented a Go-Live Readiness

Assessment Document indicating that the E1 system was 97% prepared for deployment,

and the IBM project leads repeatedly insisted that the system should be deployed.

Further, though the SOW provides for PC Connection involvement in and oversight of

various tasks and deliverables during the project, the court does not find facts in the

complaint (or in documents referenced within the complaint and made available to the

court) from which it can infer that specific work product or interactions should have

reasonably put PC Connection on notice of IBM's pre-contractual misrepresentations and

omissions.

It is clear, however, that once the E1 system went live and the system's defects

manifested within hours, PC Connection had sufficient knowledge that IBM

misrepresented or did not disclose material facts concerning its assessment of IBM's

business and ERP needs, IBM's capabilities and expertise, and IBM's ability and

willingness to carry out the project successfully, and the statute of limitations accordingly

began to run.  Thus, the fraudulent inducement claim is not time-barred, pursuant to the

discovery rule.

### ii.    Merger clause

In order to sustain a claim for fraudulent inducement, a plaintiff must establish

"(1) the defendant made a material false representation, (2) the defendant intended to

defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation,

and (4) the plaintiff suffered damage as a result of such reliance."  Capax Discovery, Inc.

v. AEP RSD Investors, LLC, 285 F.Supp.3d 579, 586 (W.D.N.Y. 2018) (internal

quotation omitted).  In this final argument, IBM contends that the SOW's merger clause

defeats the reasonable reliance element of the fraudulent inducement claim.

As a starting point, "under New York law[,] merger clauses generally do not bar

claims for fraudulent inducement unless the clause specifically addresses the very

conduct complained of in the fraud allegation."  Icebox-Scoops v. Finanz St. Honore,

B.V., 676 F. Supp. 2d 100, 111-12 (E.D.N.Y. 2009); see also In re CINAR Corp. Sec.

Litig., 186 F. Supp. 2d 279, 313 (E.D.N.Y. 2002) ("a plaintiff must specifically disclaim

reliance on a particular oral representation in order to preclude a claim of fraud in the

inducement based on that representation; a general merger clause alone is insufficient.").

> The merger clause in the SOW provides that:
> This SOW, its Appendices and the Agreement (or any equivalent agreement in
> effect between the parties) identified below, are the complete agreement regarding
> Services, and replace any prior oral or written communications, representations,
> undertakings, warranties, promises, covenants, and commitments between [PC]
> Connection and IBM regarding the Services.  In entering into this SOW, neither
> party is relying upon any representation that is not specified in this SOW or the
> Agreement.[91]

This merger clause is general.  It does not disavow the specific representations upon

which PC Connection's fraudulent inducement claim is predicated and, thus, does not bar

the claim.  See Manufacturers Hanover Tr. Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir.

1993) ("[E]ven when the contract contains an omnibus statement that the written

instrument embodies the whole agreement, or that no representations have been made, a

---

[91] 2017 Statement of Work (doc. no. 15) at 40.

party may escape liability under the contract by establishing that he was induced to enter the contract by fraud." (internal quotation omitted)).

The analysis does not end there, IBM argues, as New York courts have held that, "even if an integration clause is general, a fraud claim will not stand where the clause was included in a multimillion-dollar transaction that was executed following negotiations between sophisticated business people and a fraud defense is inconsistent with other specific recitals in the contract." Hindsight Sols., LLC v. Citigroup Inc., 53 F. Supp. 3d 747, 773 (S.D.N.Y. 2014) (internal quotations omitted).  Further, "New York courts are particularly disinclined to entertain claims of justifiable reliance" when "sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access."  Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984).

This argument fails for at least two reasons.  First, IBM does not seriously contend (nor does the court find) that the SOW contains language that is inconsistent with the pre-contractual statements underlying the fraudulent inducement claim.  Second, "whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss."  See Robinson v. Deutsche Bank Tr. Co. Americas, 572 F. Supp. 2d 319, 322 (S.D.N.Y. 2008); see also Schlaifer Nance & Co. v. Est. of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) ("The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive.").

Indeed, when assessing whether to strike fraud claims on reliance grounds due to a party's sophistication, courts have considered, for example, the plaintiff's opportunities and attempts to access relevant information, whether the plaintiff solicited expert opinions prior to the execution of the agreement, and the apparent falsity of the representations.  See, e.g., Consol. Edison, Inc. v. Ne. Utilities, 249 F. Supp. 2d 387, 405 (S.D.N.Y. 2003), rev'd in part on other grounds, 426 F.3d 524 (2d Cir. 2005) (dismissing a fraudulent inducement claim on summary judgment where the plaintiff was "a sophisticated party advised by sophisticated financial and legal advisors, had ample opportunity during due diligence to obtain any necessary information about" the relevant matter, "and has not shown that [the defendant] ever denied access to such information" or that the plaintiff "made sufficient efforts to obtain" the pertinent information); De Sole v. Knoedler Gallery, LLC, 139 F. Supp. 3d 618, 646-47 (S.D.N.Y. 2015) (declining to strike a fraudulent inducement claim on summary judgment because the court could not conclude "as a matter of law[] that the Plaintiffs' alleged sophistication and experience rendered them unreasonable in relying on" the defendants' representations, in part because the plaintiffs "received written confirmation of the truthfulness of the representations at issue"; the representations "contained no hints of falsity"; and evidence in the record suggested that the truth could be discovered "only with extraordinary effort or great difficulty" (internal quotations and alterations omitted)).  Here, the record indicates that PC Connection and IBM engaged in a years-long business relationship, which included a discovery assessment, before executing the SOW.  But the record lacks relevant details and context concerning (for example) PC Connection's access to

information that could confirm the veracity of IBM's pre-contractual assertions; PC Connection's attempts to gather such information; and/or PC Connection's reliance on internal or external expertise to judge and assess these matters prior to the execution of the SOW.

In sum, the merger clause itself does not bar PC Connection's fraudulent inducement claim, and the factual record before the court does not permit the application of a 'sophistication' exception at this stage.  The court denies the motion to dismiss the fraudulent inducement claim on this ground.

### G.      Breach of New Hampshire Consumer Protection Act clam (Count 8)

In Count 8, PC Connection claims that IBM violated the New Hampshire Consumer Protection Act by engaging in unfair and deceptive trade practices when delivering services under the SOW.  This claim is premised on a subset of the same misrepresentations and omissions that support Counts 5-7.

IBM contends that the New Hampshire Consumer Protection Act claim, like Counts 5-7, should be dismissed as insufficiently alleged under Rule 9(b).  As discussed supra Section III.E.i, PC Connection alleges, with sufficient particularity, that prior to the execution of the SOW, IBM misrepresented and/or withheld material facts going to the timeline and cost of the project and the extent of custom configurations that the E1 system would require.  PC Connection also alleges specific misrepresentations and/or omissions regarding "the harm and disruption to [PC] Connection's operations that would occur if the conversion was implemented before the system was ready" and the "E1 system's preparedness for go-live."  Each of these misrepresentations and omissions form

part of the New Hampshire Consumer Protection Act claim.[92]  Count 8 survives "on the

basis of th[e]se specific allegations[,] [which] are properly pleaded."  Rodi, 389 F.3d at

15-16 (citing Vess, 317 F.3d at 1105)).

## IV.   Conclusion

For the reasons stated above, the motion to dismiss[93] is GRANTED in part, with

respect to the contractual indemnification claim (Count 2) and negligence claim (Count

4).  The motion to dismiss is DENIED in part, with respect to the remaining claims, with

the caveat that portions of the fraudulent misrepresentation, fraudulent inducement, and

negligent misrepresentation claims (Counts 5-7) are dismissed, as discussed above, supra

Section III.E.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  August 15, 2023

cc:    Cassandra Desjourdy, Esq.
       Christopher H.M. Carter, Esq.
       Daniel Miville Deschenes, Esq.
       Ann Sidrys, Esq.
       Bryanna Kleber Devonshire, Esq.
       Jonathan R. Voegele, Esq.
       Paul Cozzi, Esq.
       Robert R. Lucic, Esq.

---

[92] Compl. (doc. no. 1) at ¶ 146 (a), (e), (f), (g).

[93] Doc. no. 12.